UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

MOHAMED MUSAID,

                         Petitioner,

          - against -

MICHAEL KIRKPATRICK, *Superintendent of Clinton Correctional Facility*,

                      Respondent.

--------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/20/2021

19-CV-7944 (AT) (RWL)

**REPORT AND RECOMMENDATION
TO HON. ANALISA TORRES**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

**INTRODUCTION** .................................................................................................. **2**

**FACTS AND PROCEDURAL HISTORY** ................................................................. **3**

    **A.**    **The Crime, Investigation, And Indictment** ................................. **3**

    **B.**    **Fitness Evaluations, Hearings, And Determinations** ................ **10**

        **1.**    **First Cycle** ............................................................................ **10**

        **2.**    **Second Cycle** ...................................................................... **21**

        **3.**    **Third Cycle** ......................................................................... **34**

        **4.**    **Fourth And Final Cycle** ...................................................... **40**

    **C.**    **Fitness Decision** ........................................................................ **61**

    **D.**    **DNA Comparison** ........................................................................ **61**

    **E.**    **Psychiatric Defense** .................................................................. **63**

    **F.**    **Trial** ............................................................................................ **70**

        **1.**    **Day One** .............................................................................. **70**

        **2.**    **Day Two** .............................................................................. **76**

        **3.**    **Day Three** ........................................................................... **79**

        **4.**    **Day Four And Verdict** ........................................................ **83**

    **G.**    **Sentencing** ................................................................................. **84**

    **H.**    **Direct Appeal** ............................................................................. **86**

    **I.**    **Habeas Petition** ......................................................................... **88**

**STANDARD OF REVIEW** ..................................................................................... **90**

1

**DISCUSSION** ................................................................................................... **94**

    **A.**    **Exhaustion** ...................................................................................... **94**

    **B.**    **Legal Standards For Competency** ............................................... **97**

    **C.**    **Analysis** ......................................................................................... **100**

        **1.**    **The Trial Court's Initial Fitness Decision Was Not Unreasonable** ...................................................................... **101**

        **2.**    **Proceeding Through Trial Without A Competency Hearing Was Not Unreasonable** ............................................... **108**

    **D.**    **Waiver Of Psychiatric Defense** ................................................... **137**

**CONCLUSION AND OBJECTIONS** ................................................................... **141**

## INTRODUCTION

Mohamed Musaid petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions by a jury of second-degree murder and second-degree criminal possession of a weapon. Musaid argues that his due process rights were violated when the trial court (1) declared him competent to stand trial; (2) failed to hold a hearing on his competency at any point after declaring him competent; and (3) failed to adequately inquire into the waiver of his right to present a psychiatric defense at trial. For the reasons explained below, this Court recommends that Musaid's petition be DENIED.

Competency to stand trial is a fundamental feature of due process. A defendant may not be tried unless they understand the nature of the proceedings against them and can assist in their own defense. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The instant case involves a defendant who went through four cycles of psychological evaluations, hearings, and determinations and was repeatedly assessed as unfit for trial. Although ultimately determined competent to stand trial eight years after his arrest, Musaid exhibited a number of behaviors both before and during trial by which a reasonable

person could conclude that he was incompetent.  Deference imposed by federal statutory law, however, compels denial of Musaid's petition.

Because of the long and winding road leading to Musaid's petition for habeas corpus, and the importance of a defendant's competency to a fair trial, the Court sets forth the factual and procedural history of this case in considerable detail.

## FACTS AND PROCEDURAL HISTORY

**A.      The Crime, Investigation, And Indictment**

**1.      The Crime**

On the morning of November 21, 2007, Juanita Brown sat against a wall on the west side of Lenox Avenue between 132nd and 133rd Streets in Manhattan, waiting for her boss to arrive at work.  (2T 39-43, 52.[1])  At approximately 7:15 a.m., she noticed two men, one walking downtown on her side of Lenox Avenue and another, who was wearing a gray hoodie that covered most of his face, crossing Lenox Avenue in her direction.  (2T 45-48.)  After the man in the hoodie reached the sidewalk, he walked up behind the other man and shot him in the back of head.  (2T 46-47.)  The victim fell face first onto the pavement, and the shooter walked past Brown to 132nd Street.  (2T 49, 53.)  Brown did not see the shooter's face and could not describe his height or weight.  (2T 49, 53.)

At the same time, Detective Efrain Rivera was inside a McDonald's on the northeast corner of Lenox and 132nd, doing surveillance on an unrelated assignment,

---

[1] The record of Musaid's criminal trial consists of two, separately paginated transcripts. "1T" refers to the first transcript, which covers jury selection and opening statements, and can be found at Dkts. 20-3 at 1 through 20-4 at 37.  "2T" refers to the second transcript, which covers the rest of the trial, and can be found at Dkts. 20-4 at 38 through 20-8 at 51. The page numbers cited by the Court refer to the internal pagination of each transcript. Some page numbers repeat.  In those instances, the second page with the same number is followed by an "(a)," e.g., "236" is followed by "236(a)."

when he heard a gunshot.  (2T 143-44.)  He walked outside, looked across the street, and saw a man in a hoodie standing directly over a body lying on the ground.  (2T 144-45, 150-51.)  Detective Rivera got into his unmarked car, made a U-turn on Lenox Avenue, and followed the man as he ran south, but was pulled over by other officers, who had received reports that someone had fled the scene of the shooting in a car, and lost sight of the suspect.  (2T 146-48, 151-52.)

EMS technicians responded to the shooting and declared the victim dead at the scene.  (2T 61, 159-60.)  He had been shot three times, once in the back of the head and twice in the back.  (2T 125, 250.)  Three shell casings were found next to his body, and three bullets were recovered – two lodged in his body and one in his clothing.  (2T 117, 125-26, 250.)

One officer on the scene searched the victim and found a piece of identification bearing the name Rafik Alsamet.  (2T 161.)  Shortly thereafter, Rafik's brother, Noman Alsamet, arrived at the scene.[2]  (2T 9-11.)  Noman was planning to meet Rafik for breakfast.  (2T 9.)  Both Noman and Rafik had immigrated from Yemen, and Rafik co-owned the grocery store on 132nd Street and Lenox in front of which he was killed.  (2T 3-6.)  Noman and Rafik were also related to Musaid – Musaid had married Noman and Rafik's cousin, becoming their cousin-in-law.  (2T 14.)  Musaid had immigrated to the United States, as well, but his wife and their three children remained in Yemen.  (2T 8, 206, 215.)  As Noman later testified, before Rafik was shot, Musaid had repeatedly threatened to kill Rafik, but Noman did not know why and did not think Musaid would actually do it.  (2T 11-12.)

---

[2] For clarity, the Court refers to Rafik and Noman by their first names.

4

Another immigrant from Yemen, Omar Hadwan, was later identified as a witness and placed Musaid at the scene of the crime shortly before the murder.  (2T 21, 23-24.)  Hadwan was fifteen years old at the time.  (*See* 2T 19.)  He had immigrated from Yemen when he was nine years old and had known Musaid since he was a small child back in Yemen.  (2T 19-21.)  Since they had both relocated to New York, Hadwan had seen Musaid regularly.  (2T 22.)  They would see each other, give each other a high five, and chat with one another.  (2T 22.)  Hadwan never had any problems with Musaid.  (2T 22.)

On the morning that Rafik was killed, Hadwan was commuting to school.  (2T 23-24.)  To get there, he crossed town on 132nd Street then walked north on Lenox Avenue to the subway station on 135th Street.  (2T 23-24.)  That morning, when he turned north on Lenox Avenue – sometime between 7:00 and 7:15 a.m. – he saw Musaid standing by the door of a laundromat between 132nd and 133rd Streets.  (2T 23-24.)  Hadwan looked at Musaid, and Musaid looked at him, but then Musaid pulled his hoodie over his head and turned his back to Hadwan to face the wall.  (2T 24-27.)  Hadwan had never seen Musaid do that before, so he got nervous and kept walking, looked over his shoulder, and saw Musaid still standing there.  (2T 28.)  As he approached the subway station at 135th Street, he heard people running, but he had headphones in and was listening to music, so he minded his business, entered the subway, and continued to school.  (2T 29-30.)  Later, he learned that Rafik had been killed.  (2T 30.)

### 2.    Recovery Of The Gun, Ballistics Testing, And DNA Swabs

While officers investigated the crime scene, a switchboard operator noticed that, at 7:27 a.m., a caller had reported that someone had thrown a firearm into a vacant yard next to a church on Lenox Avenue and 131st Street.  (2T 75-76.)  Police responded to the scene and retrieved the gun, which contained one live round.  (2T 85-87, 107.)  The

gun was tested and was fully operable.  (2T 287.)  Based on their tests, the police also believed – and later testified – that the three shell casings found next to Rafik's body and the bullet recovered from his clothing were all fired from that gun.[3]  (2T 256, 354-56.)  The other two bullets were too damaged to be compared.  (2T 354-55.)  The gun was also swabbed for DNA.  (2T 110, 319-20, 335.)

### 3.   Arrest

After their initial investigation, police circulated wanted posters featuring Musaid's name and photograph and a note indicating that he was wanted for questioning with respect to a homicide.  (2T 191-92.)  At approximately 1:45 a.m. on November 24, 2007 – three days after the homicide – a man approached two officers at the intersection of Eighth Avenue and 116th Street and told them that the person from the wanted poster was inside a nearby Kennedy Fried Chicken.  (2T 179-84.)  The officers approached the store and saw Musaid at the counter.  (2T 184.)  After quietly ushering the other patrons out of the restaurant, the officers placed Musaid under arrest and transported him to their precinct.  (2T 185-86.)

### 4.   Confession

After his arrest, Musaid was transported from the nearest precinct to the precinct handling the investigation of Rafik's death and interviewed by Detective Christopher

---

[3] The field of ballistics has been criticized.  *See United States v. White*, No. 17-CR-611, 2018 WL 4565140, at *2 (S.D.N.Y. Sept. 24, 2018) (collecting literature and cases) (due to lack of empirical data on uniqueness of ballistics markings, and subjective nature of comparison, expert could not testify to degree of certainty that there was a "match" between recovered firearm and firearm used in various shootings).  As a result, several federal court judges have concluded that ballistics experts may not testify to high degrees of certainty about ballistics comparisons. *Id.* (collecting cases).  At Musaid's criminal trial, a ballistics expert testified that he had concluded that the shell casings and bullets came from the recovered gun "within a reasonable degree of scientific certainty."  (2T 354, 356.) Musaid did not raise that issue in his direct appeal or habeas petition.

Killen.  (2T 200-04.)  When Detective Killen learned that Musaid was from Yemen, he enlisted the assistance of an Arabic interpreter.  (2T 206-08.)  Once the interpreter arrived, Detective Killen read Musaid his *Miranda* rights and started questioning him about Rafik's murder at approximately 4:30 a.m.  (2T 208-12.)  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  Through a series of questions and answers lasting roughly three and a half hours, Musaid confessed to killing Rafik, explaining his motive, the details of the crime, how he obtained and disposed of the gun, and where he had been the last three days.  (2T 212-26.)  Detective Killen reduced Musaid's answers to a written, narrative confession, which Musaid signed.  (2T 220-26.)  The confession aligned with the existing evidence in several respects.

Musaid stated in his confession that he had known Rafik for fifteen to sixteen years and that they both came from the village of Amiq in Yemen.  (2T 223.)  In about 1999, Musaid married Rafik's cousin, and the two had three sons who were five, six, and seven years old at the time.  (2T 223-24.)  Musaid had not seen his wife or children since 2003, which was the last time he had visited Yemen.  (2T 224.)  According to Musaid, roughly six months before Rafik's death, Musaid's family in Yemen had told him that Rafik was sending money to Musaid's wife so that she would let men have sex with their sons.  (2T 224.)  Musaid confronted Rafik about the allegations and Rafik admitted them.  (2T 224.)  Musaid threatened to kill Rafik if he did not stop, but Rafik told him that there was nothing he could do to make him stop, and the abuse continued despite Musaid's attempts to enlist the help of authorities in both Yemen and the United States.  (2T 215, 224.)  Over the next six months, Musaid continued to hear about the abuse from his family in Yemen and continued to confront Rafik about the allegations.  (2T 216.)

7

Approximately two months prior to Rafik's death, Musaid, by chance, bumped into a man selling a gun, which he purchased for $700.  (2T 224.)  When Musaid bought the gun, it was loaded with four live rounds.  (2T 224.)

The day before Rafik was killed, Musaid confronted him again about sending men to have sex with his children.  (2T 224.)  Rafik told Musaid that he was not going to stop, this time in front of other people, embarrassing Musaid.  (2T 217, 224.)  That night, Musaid called his mother in Yemen and told her that he was going to kill Rafik.  (2T 224.)  His mother told him not to do it because his sons may be killed in retaliation, but Musaid said that he had to do what he had to do.  (2T 217.)

The next morning, Musaid confronted Rafik near Rafik's store and asked him why he was sending men to abuse his children.  (2T 225.)  Rafik told Musaid that his kids stunk.  (2T 225.)  When Rafik turned to walk away, Musaid shot him in the back.  (2T 225.)  After Rafik fell to the ground, Musaid stood over him and shot him again.  (2T 225.)  Musaid then fled down Lenox Avenue, tossed the gun a block or two from the shooting, ran into a building on 130th Street and Lenox Avenue, and hid on the roof for three to four hours, waiting for the police to disperse.  (2T 225.)  After the police left the area, Musaid took a bus to a mosque near 116th Street and Lenox Avenue and remained there until it closed at 7:00 p.m.  (2T 225.)  From there, Musaid walked into a building near 117th Street and Lenox Avenue and spent three or four days on the top floor.  (2T 225.)  Eventually, he got hungry and left to get food, which is when he was apprehended.  (2T 219.)

Several hours after Detective Killen reduced Musaid's confession to writing, an Assistant District Attorney arrived to obtain a videotaped confession and, at roughly 1:00

8

p.m., began questioning him.  (2T 230.)  Approximately seventeen minutes into being recorded, however, Musaid requested an attorney and asked when he was going to be released so that he could go home, and the interview was terminated.[4]  (2T 231-33.)

### 5.    Indictment

On November 30, 2007, four days after his arrest, a grand jury indicted Musaid on three counts: (1) second-degree murder, N.Y. Penal L. § 125.25(1); (2) second-degree criminal possession of a loaded weapon with intent to use unlawfully, N.Y. Penal L. § 265.03(1)(b); and (3) second-degree criminal possession of a loaded weapon, N.Y. Penal L. § 265.03(3).[5]  (1T 7; 2T 378, 454-55, 465-66; Opp. at 3.[6])

### 6.    Summary of Evidence

To summarize, the evidence against Musaid included, at minimum, people who had heard him threaten to kill Rafik; Hadwan seeing him at the scene of the crime moments before Rafik was killed; and his own confession, which included an elaborate motive and details about the crime that were corroborated by other evidence, including

---

[4] Both Detective Killen and the interpreter testified that Musaid never requested a lawyer prior to that point.  (2T 231, 277.)  When confronted with the fact that Musaid allegedly declined a lawyer when Detective Killen read him his *Miranda* rights, but requested one when the ADA read him his *Miranda* rights, the interpreter chalked the different responses up to the fact that the ADA repeated the questions numerous times.  (2T 276.)  The interpreter also explained that Musaid had asked repeatedly during his initial interrogation whether he would be let go afterward.  (2T 276.)  Detective Killen was apparently unaware of that.  He testified that Musaid never once said anything about being released or going home during his questioning.  (2T 233.)  Musaid did not argue in his direct appeal or habeas petition that his *Miranda* rights were violated or that his confession was coerced.

[5] At the charge conference following summations, the prosecution moved to dismiss the second count in order to "streamline the charge[,] leaving one murder charge [and] one gun charge," and stated that the charge "merge[d] for sentencing anyway."  (2T 378-79.)

[6] The State did not submit the indictment itself along with its other exhibits.  "Opp." refers to Respondent's "Memorandum of Law Opposing Petition for a Writ of *Habeas Corpus*" (Dkt. 19).

that a gun recovered nearby had four bullets in it prior to the shooting – matching the three bullets found in the victim and the one remaining in the gun when it was recovered – a detail presumably known only by police and the perpetrator.

The DNA samples taken from the gun that police determined to be the murder weapon were not developed or compared to a DNA sample from Musaid until May 13, 2015, after all of the psychological evaluations discussed below had been conducted and the trial court had issued its final order declaring Musaid fit to stand trial.  (*See* 2T 296-99.)   That fact bears on some of the statements that Musaid made during the psychological evaluations summarized below.[7]

**B.      Fitness Evaluations, Hearings, And Determinations**

Musaid underwent four rounds – or "cycles" – of psychological evaluation to determine his competency to stand trial.

**1.      First Cycle**

**a.      Initial Detainment**

After Musaid was arrested on November 24, 2007, he was initially held at the jail complex on Rikers Island ("Rikers"), which is operated by the New York City Department of Corrections ("DOC").  (*See* Garakani Report, Resp. Ex. I., at 3.[8])  While incarcerated

---

[7] There is no explanation in the record for the lengthy delay in developing a DNA profile from the samples taken from the gun, obtaining a DNA sample from Musaid, or comparing the two.

[8] "Resp. Ex." refers to the exhibits submitted along with the State's opposition to Musaid's habeas petition (Dkts. 18-1 to 18-7).  The exhibits are various source documents related to Musaid's criminal prosecution, including pre- and post-trial briefs, court orders, and the numerous reports of Musaid's psychological examinations.  The Court refers to each psychological report by the last name of the doctor who authored it.  Where the same doctor authored more than one report, the second is labelled "[Doctor's Name] Report II." The page numbers refer to the sequence of the pages within the exhibit rather than to any internal pagination, which is inconsistent across the reports.

at Rikers, Musaid displayed increasingly agitated behavior, paranoid delusions, and somatic preoccupation (false beliefs that his bodily functions were abnormal).  (Shoss Report, Ex. G. at 2.)  Specifically, he complained about pain in his kidneys and accused one of the physicians of poisoning his food.  (Shoss Report at 2.)

On January 16, 2008, after nearly two months in Rikers, he was psychiatrically hospitalized at the Bellevue Hospital Prison Ward in Manhattan ("Bellevue"), which is also operated by the DOC.  (*See* Garakani Report at 3; Kunz Report, Resp. Ex. M, at 2.)  At Bellevue, Musaid refused to take any medication, so, on February 26, 2008, the hospital obtained a court order for treatment over objection and began injecting him with a long-acting form of fluphenazine,[9] an anti-psychotic medication.  (Garakani Report at 3, 5; Kunz Report at 2.)

### b.    First Examination Order

On April 23, 2008 – roughly five months after Musaid's indictment – Justice Gregory Carro, who presided over all of Musaid's pretrial matters, trial, and sentencing, held a hearing at which Musaid was present.  (Dkt. 37 at 2.)  At the hearing, defense counsel stated that he had been in touch with a psychiatrist and a social worker at Bellevue and they had "been unable to stabilize [his] client's condition," so he requested a psychological examination.  (Dkt. 38, Ex. A, at 2.)  After the hearing, Justice Carro issued an order stating that he was "of the opinion that [Musaid] may be an incapacitated person."  (Pet. Ex. at 1.[10])  Justice Carro ordered an examination of Musaid to determine

---

[9] For consistency, the Court refers to all of the medications referenced by their generic names rather than their various brand names, which they are sometimes referred to in the record.

[10] "Pet. Ex." refers to "Petitioner's Exhibit Binder" (Dkt. 28-1).  Petitioner's Exhibit Binder contains several exhibits in a single filing with internal, continuous pagination.  The pages

whether, as a result of mental disease or defect, he "lack[ed] capacity to understand the proceedings against him or to assist in his own defense," pursuant to § 730 of New York's Criminal Procedure Law. (Pet. Ex. at 1.) Many aspects of the procedures outlined in § 730 are relevant to this case, so the Court will summarize the statute here.

### c. Section 730 Hearings And Procedures

Section 730 of New York's Criminal Procedure Law sets forth the procedures that New York courts must follow to prevent prosecuting incapacitated people. *People v. Tortorici*, 92 N.Y.2d 757, 759, 709 N.E.2d 87, 88 (1999); N.Y. Crim. Proc. L. §§ 730.10(1). It defines an "incapacitated person" as "a defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or assist in his own defense." N.Y. Crim. Proc. L. §§ 730.10(1). Such incapacitated persons are not competent to stand trial; prosecuting an incompetent person violates due process and the foundational principles of our criminal legal system; and courts have an ongoing duty to ensure that the state is not prosecuting an incompetent person at every juncture of a criminal proceeding. *Drope*, 420 U.S. at 171-72, 174-75, 181 ("a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial").

Accordingly, pursuant to § 730, whenever a court is of the opinion that a criminal defendant may be an incapacitated person, the court must issue an order of examination. N.Y. Crim. Proc. L. §§ 730.10(1), 730.30(1). When an order of examination is issued, the

---

cited by the court refer to the source documents being discussed (e.g., in this instance, the § 730 order), unless otherwise noted. The page numbers refer to the internal pagination.

defendant must be examined by two qualified psychiatric examiners. *Id.* § 730.20(1). After the examinations are complete, each psychiatric examiner must promptly prepare an examination report, which must be provided to the court that ordered the examinations, and the court must provide a copy to both the prosecution and the defense. *Id.* § 730.20(5).

If the two examination reports agree that the defendant is not an incapacitated person, the court may still, on its own motion, conduct a competency hearing to ensure that the defendant is in fact competent; and, if either party files a motion for such a hearing, the court must conduct one. *Id.* § 730.30(2). But if the reports agree that the defendant is not an incapacitated person and no motion is made, the criminal action must proceed. *Id.*

If the examination reports agree that the defendant is an incapacitated person, the court may still, on its own motion, conduct a competency hearing to ensure that the defendant is in fact incompetent; and, if either party files a motion for such a hearing, the court must conduct one. *Id.* § 730.30(3).

If the reports do not agree about whether the defendant is an incapacitated person, the court must conduct a competency hearing. *Id.* § 730.30(4).

If the court holds a competency hearing and determines that the defendant is not an incapacitated person, the criminal action must proceed. *Id.* § 730.30(2). If the court holds a competency hearing and cannot determine whether the defendant is an incapacitated person, the court must issue another order of examination, starting another round of examinations and reports. *Id.* And if the court holds a competency hearing and determines that the defendant is an incapacitated person, it must issue an order of

13

commitment (or final order of observation), which sends the defendant to a psychiatric institution for treatment for a period of time not to exceed one year in the case of a felony (or ninety days in the case of a misdemeanor). *Id.* § 730.50(1).

If at any time within that one year, the superintendent of the institution determines that the defendant is no longer an incapacitated person, the court and prosecutor must be notified. *Id.* § 720.60(2). If the court disagrees and is satisfied that the defendant remains an incapacitated person, and all parties consent, the court may order the defendant to remain in the institution for the remainder of the year. *Id.* Otherwise, the court must follow the procedures described above for when it receives two reports agreeing that the defendant is not an incapacitated person – that is, it can hold a competency hearing on its own motion; must hold a competency hearing on the motion of either party; must proceed with trial if no motion is made or it deems the defendant competent; must commit the defendant if it deems the defendant unfit; and must issue another examination order if it cannot decide. *Id.*

If, however, a year passes after the original commitment order and the superintendent of the institution in which the defendant is committed still believes that the defendant is an incapacitated person, the superintendent must apply to the court for an order of retention at least sixty days before the commitment order expires. *Id.* § 720.50(2). Upon receiving such an application, the court may hold a competency hearing on its own motion and must hold a competency hearing on the motion of either party. *Id.* If, however, no motion is made, or the court is satisfied that the defendant continues to be an incapacitated person, the court must issue an order of retention which shall authorize continued confinement for another year. *Id.*

14

### d.    First § 730 Examinations and Finding of Incompetency

After Justice Carro issued his first examination order, Drs. Analisa Erba and Amir Garakani examined Musaid with the assistance of an Arabic interpreter on May 12, 2008. (Erba Report, Ex. H, at 1; Garakani Report at 1.)  At that point, Musaid had been in Bellevue for roughly four months and had been receiving antipsychotic medication by injection for a little less than three months.  (*See* Garakani Report at 3, 5.)  Although Dr. Garakani reported that Musaid exhibited some behavioral improvement over that time, both doctors concluded that he was an incapacitated person.  (Erba Report at 1, 5; Garakani Report at 1, 5.)  Each doctor separately diagnosed him with "Psychotic Disorder Not Otherwise Specified" ("Psychotic Disorder NOS") and concluded that his symptoms prevented him from understanding the proceedings against him and assisting in his own defense – thus making him unfit to stand trial.  (Erba Report at 5; Garakani Report at 5.)

Generally, Musaid displayed an accurate understanding of the basic aspects of a criminal prosecution.  He knew that he was charged with murder, he had pled not guilty, his defense attorney's role was to defend him, and the judge's function was to judge. (Erba Report at 2; Garakani Report at 2.)  At first, he displayed some confusion about some other aspects of trial, not understanding the consequence of being found guilty and believing that the District Attorney's role was to help him and the jury's role was to take an oath.  (Erba Report at 2.)  After some discussion, however, he was able to understand that the District Attorney was against him, the jury decided guilt or innocence, and the consequence of being found guilty was prison.  (Erba Report at 2-3.)

In terms of his background, Musaid reported that he had stopped attending school in the seventh grade because he immigrated to the United States.  (Erba Report at 4; Garakani Report at 4.)  However, he also stated that he immigrated when he was twenty

15

years old.  (Garakani Report at 4.)  He could not explain why he was still in the seventh grade at twenty years old other than to say that he had learning problems in school. (Garakani Report at 4.)  Dr. Garakani concluded that Musaid was of "normal" intelligence but noted that he had difficulty with simple tasks like basic calculations and counting backwards, indicating a problem with concentration.  (Garakani Report at 4.)  Dr. Erba felt that Musaid was in the "low average to borderline range of cognitive functioning." (Erba Report at 5.)

Musaid reported that his family had no history of mental illness, and he denied ever taking drugs, drinking alcohol, or receiving any psychiatric treatment or medication until before being admitted to Bellevue.  (Erba Report at 4.)  He did report, however, suffering various head traumas over the years.  To Dr. Erba, he said that he had been hit in the head with a stick two years before moving to the United States and had been hit in the head with a rock two years before the examination.  (Erba Report at 3-4.)  He told Dr. Garakani that he had suffered two prior head traumas within the past two years. (Garakani Report at 4.)  He denied ever having hallucinations or suicidal or homicidal thoughts, but he admitted having panic attacks when he thought about the fact that he was incarcerated.  (Garakani Report at 4.)

Musaid reported two prior arrests, one for jumping a turnstile and one for pulling a knife on a man who hit him in the head with a rock or can of milk, but denied any convictions.  (Erba Report at 4; Garakani Report at 4.)  In addition, Dr. Garakani's report reflected that, since being incarcerated, Musaid had attempted to escape, resisted arrest, committed assault, and engaged in disorderly conduct.  (Garakani Report at 4.)

16

In terms of diagnosis, both doctors highlighted four psychiatric symptoms that prevented Musaid from understanding the proceedings against him and assisting in his own defense, all of which would become hallmarks of his condition: (1) somatic delusions; (2) conspiratorial thinking; (3) denial of his mental illness and refusal to take his medication; and (4) an inability to appreciate the gravity of the evidence against him and potential prison time he faced.

In terms of somatic delusions, Musaid believed that his kidneys were black even though medical tests found no problems with his kidneys. (Garakani Report at 3.) He could not describe the ailment any further but was "very preoccupied with it" during the examinations. (Erba Report at 3.) He believed that the reason he had been admitted to Bellevue in the first place was because of his black kidneys. (Erba Report at 3; Garakani Report at 3.) But he also reported that his black kidneys were a result of the doctors at Bellevue poisoning him, claiming that he was fine before he started receiving the forced injections. (Garakani Report at 3.) He could not reconcile that apparent contradiction. (Garakani Report at 3.)

In addition to believing that the doctors at Bellevue were poisoning him, Musaid was preoccupied with several other conspiratorial beliefs. He thought that the medications were wrecking his brain as well as his kidneys, and that the government and doctors were conspiring to make him sick, both mentally and physically. (Erba Report at 3-4; Garakani Report at 4.) He also thought that his defense attorney was against him, believing that the attorney also worked for the U.S. government; he also was concerned that he could not access $50,000 that he had allegedly stored in a safety deposit box. (Erba Report at 4-5; Garakani Report at 4.) Dr. Erba wrote that Musaid's "thought

17

processes were often vague, illogical, and paranoid," and concluded that Musaid "demonstrated paranoid thinking to the point of delusion." (Erba Report at 4.)

Musaid denied that he suffered from any mental illness and, as noted, refused to accept that his treatment helped him, instead believing that it was poisoning him, making him sick, and disrupting his sleep, appetite, and energy. (Erba Report at 4; Garakani Report at 4.)

With respect to his case, Musaid firmly asserted his innocence. (Erba Report at 5; Garakani Report at 4.) He was "quite certain that he would be released from jail soon" without needing to go to trial. (Erba Report at 5; Garakani Report at 4.) When confronted with the serious charges against him, and the fact that if he pleaded innocent, he would have to go to trial, Musaid maintained that he would not have to go to trial and would simply be released. (Garakani Report at 4.)

Dr. Erba concluded that, "due to [the] delusional and paranoid thinking," Musaid "lack[ed] the capacity to adequately understand his legal circumstances or participate appropriately in his defense." (Erba Report at 5.) Dr. Garakani concluded that Musaid's psychotic disorder, including his denial of his mental illness and his delusions of persecution and medical symptoms, significantly interfered "with his ability to think logically and realistically about many aspects of his court case. He [was] not adequately able to appreciate the possible outcomes of his decisions and ha[d] shown impaired reasoning in working with his attorney in his own defense." (Garakani Report at 4.)

### e.    First Order Of Commitment And Transfer To Kirby

On June 18, 2008, upon receiving Dr. Erba's and Dr. Garakani's reports, Justice Carro, the ADA, and the defense attorney concurred that Musaid "lack[ed] the capacity to understand the proceedings against him or to assist in his defense." Justice Carro thus

18

found Musaid to be an incapacitated person and ordered him committed for a period not to exceed one year unless he was found to be competent before then. (Pet. Ex. at 2.) On June 24, 2008, Musaid was admitted to the Kirby Forensic Psychiatric Center ("Kirby"). (Shoss Report at 1.)

### f.      Time At Kirby, Finding Of Fitness, And Transfer Back To DOC

When Musaid was admitted to Kirby, the staff initially described his thought process as "illogical with poverty of content" and noted that he expressed "paranoid and persecutory beliefs regarding his legal case." (Shoss Report at 2.) His medical team diagnosed him with "Schizophrenia, Paranoid Type" ("Paranoid Schizophrenia"), and proscribed him olanzapine (an antipsychotic) and Escitalopram (an antidepressant). (Schoss Report at 2-3.) He became compliant with his medication, taking it voluntarily, and participated in psychoeducational programming (programs to educate patients about the symptoms of their mental illnesses). (*See* Shoss Report at 3, 6.) Over the course of treatment, Musaid displayed substantial improvement. (Shoss Report at 3.) Specifically, he "became less paranoid, less preoccupied with somatic delusions, and better able to appreciate the seriousness of his legal situation. [He] developed a better understanding of his charges, the workings of the legal system, and the importance of cooperating with his attorney." (Shoss Report at 3.)

On March 4, 2009 – after a little more than eight months at Kirby and four months prior to the expiration of Justice Carro's commitment order – Musaid's medical team referred him as fit to proceed. (Shoss Report at 3.) On March 19, 2009, Dr. Naomi Shoss prepared a report for Justice Carro in support of competency restoration. (Shoss Report.)

In her report, Dr. Shoss addressed all of the major symptoms that had previously rendered Musaid incompetent. He was not preoccupied with somatic delusions. (Shoss

19

Report at 3.)  To the contrary, he "d[id] not appear to be internally preoccupied at any point during the interview."  (Shoss Report at 3.)  Musaid also did not display any conspiratorial thinking during the interview.  Dr. Shoss noted that "[n]o delusional material [wa]s elicited during the evaluation," and indeed, none is reflected in the report.  (Shoss Report at 3.)  Importantly, he no longer believed that his defense attorney was part of a conspiracy against him.  (Shoss Report at 5.)

Musaid exhibited a marked improvement in his understanding of the legal system in general.  (Shoss Report at 5.)  He still possessed general knowledge of the basic elements of a criminal prosecution.  (Shoss Report at 5.)  Now without coaching, he knew that the role of the defense attorney was to defend him, the prosecutor was against him, the judge was the "president of the court," and the jury was twelve ordinary people who decided guilt and innocence.  (Shoss Report at 5.)  He "demonstrate[d] an adequate understanding of the charges against him and [wa]s able to correctly recall the maximum sentence for th[o]se charges."  (Shoss Report at 5.)  He also understood the concepts of witnesses, evidence, and plea bargaining, which he described as "the DA and the other lawyer negotiating for the defendant to plead guilty to a lesser charge for lesser time in jail."  (Shoss Report at 5.)  He was aware of his own plea options, appeared to have the ability to consider the risks and benefits of alternative courses of action, and was willing to work with his attorney in order to assist in his own defense.  (Shoss at 5.)

Finally, Musaid acknowledged that he had a mental illness, that he needed to take medication in order to keep it under control, and that he planned to continue to take his medication when discharged to DOC custody.  (Shoss at 6.)  In a prophetic prediction, however, Dr. Shoss cautioned that "[i]f Mr. Musaid stops taking his medication, it is likely

that his thinking will become increasingly paranoid and illogical, impeding further progress toward resolving his legal situation." (Shoss at 6.)

## 2. Second Cycle

### a. Return To DOC Custody And Second Examination Order

On March 30, 2009, the Director of Kirby submitted a formal notification of fitness to Justice Carro and directed the DOC to take custody of Musaid. (Pet. Ex. at 3.) There is nothing in the record to suggest that either party or the court moved for a competency examination or that one was held. Subsequent medical records indicate that Justice Carro found Musaid fit and discharged him back to Rikers on April 28, 2009. (Hicks Report, Resp. Ex. L, at 2.)

After being returned to Rikers, Musaid stopped complying with his medication, and his psychosis worsened. (Hicks Report at 2.) He began suffering from somatic delusions again, complaining of kidney pain and broken bones, and once again engaged in conspiratorial thinking, believing that the staff was putting hair in his food. (Hicks Report at 2.) His symptoms even escalated to include banging his fist against the wall for up to five hours straight. (Hicks Report at 2.)

On September 9, 2009, Justice Carro held a hearing, at which defense counsel once against moved for § 730 examinations, arguing that Musaid was "exhibiting similar symptoms as he did a year ago when was in Kirby for nearly one year." (Dkt. 37, Ex. A at 2.) At that point, Musaid interjected: "I am sick in my kidney, I fell down and I need treatment."[11] (Dkt. 37, Ex. A at 2.) Without further discussion, Justice Carro ordered the § 730 examinations and "medical attention." (Dkt. 37, Ex. A at 2.) However, Musaid

---

[11] The record does not indicate whether Musaid spoke through an interpreter. There is no indication on the transcript that an interpreter was present.

continued to interject in ways that are salient to both his mental condition and also his unwavering desire to proceed to trial even in the midst of presenting his most serious symptoms.  For example:

> MUSAID: I bleed from behind, my kidneys, my kidneys, my kidneys, what happened to my kidneys, I'm sick, my head.
>
> CARRO: As soon as you are better we will have the trial.
>
> MUSAID: I want to be tried.
>
> CARRO: Tell that to the doctors.
>
> MUSAID: Also tell them about the money.[12]

(Dkt. 37, Ex. A at 2-3.)

After the hearing, Justice Carro issued another order stating that he was "of the opinion that [Musaid] may be an incapacitated person" and ordering § 730 examinations. (Pet. Ex. at 4.)  On September 20, 2009, Musaid was transferred back to Bellevue, where he continued refusing to take his medication, and on September 29, 2009, Bellevue obtained another court order to give him treatment over objection to inject him with a long-acting form of fluphenazine.  (Hicks Report at 2.)

### b.    Section 730 Evaluations

Drs. Murray A. Gordon and Jennifer Rosner jointly examined Musaid over two sessions – one on October 8, 2009, and one on November 4, 2009 – with the assistance of an Arabic interpreter on both occasions and Musaid's attorney, Robert Siracusa, present at the second.  (Gordon Report, Resp. Ex. J, at 3, 6; Rosner Report, Resp. Ex. K, at 3.)  At the conclusion of the November 4, 2009 session – roughly six months after

---

[12] For clarity and consistency, when block-quoting the transcripts in this case, the Court refers to the speakers by their last names, replacing without adding brackets the inconsistent descriptors given to those speakers across transcripts.

22

being discharged from Kirby and returned to Rikers – both doctors found Musaid unfit to proceed. (Gordon Report at 1; Rosner Report at 1.) Each doctor prepared a separate, single report describing both interview sessions. Dr. Gordon diagnosed Musaid with Psychotic Disorder NOS, Dr. Rosner diagnosed him with Paranoid Schizophrenia, and both recommended psychiatric hospitalization and treatment. (Gordon Report at 1; Rosner Report at 1, 5.)

Musaid still had a general understanding of the basic aspects of criminal prosecutions. He knew that Siracusa was his defense attorney, whose function was to defend him; he knew that the DA was against him; that the judge was the "boss of the court"; and that the jury was twelve people who decided guilt or innocence. (Gordon Report at 3.) At the same time, Musaid once again did not know how long he could be sentenced to prison if he were found guilty at trial. (Gordon Report at 3.)

Musaid's reporting of his medical and biographical background also remained largely unchanged. He now said, however, that after he was hit in the head in Yemen, "they do a CT scan on my head. … They said I had some vibrations, ups and down in my head. They gave me medicine and it slows me down." (Gordon Report at 8.)

During these interviews, all of the hallmark symptoms of Musaid's psychosis were on full display. He complained about his kidneys even though examinations found nothing wrong with them, and "repeatedly shift[ed] unrelated discussions to this irrelevant topic." (Rosner Report at 4; *see also* Gordon Report at 7 (Musaid "repeatedly makes tangential and illogical comments.")) He said that he had a broken bone in his shoulder, that his head and brain hurt, and that his head and mouth would turn uncontrollably, even though the doctors observed no such involuntary movements. (Gordon Report at 7; Rosner

23

Report at 4.)  Musaid's treating physicians reported that "defendant continues to display massive somatic delusions about which he is totally preoccupied and which preclude discussing any and all other matters."  (Gordon Report at 3.)

In addition, "he steadfastly and insistently display[ed] a paranoid and persecutory belief system including towards his treating doctors."  (Gordon Report at 7-8; Rosner Report at 4.)   He "expresse[d] paranoid beliefs about his prescribed medications," including that they were damaging his brain and kidneys, causing him to pass blood and throw up a lot, and making him crazy.  (Gordon Report at 8; Rosner Report at 4.)

When asked if it was possible that he was not in his right mind two years ago when Rafik was killed, he answered, "Yes … I had problems with my nerves."  (Gordon Report at 8.)  Overall, however, the reports reflect Musaid's rejection of the fact that he had a mental illness and absolute refusal to be treated for it, believing that his medications were poisoning him.  As Dr. Rosner put it, "He ha[d] no insight into his mental illness or the need for ongoing psychiatric treatment.  He repeatedly beseeche[d] examiners to return him to Rikers Island, rather than to Bellevue Hospital, so he [could] discontinue medication."  (Rosner Report at 4.)

Musaid's inability to appreciate the gravity of the charges and evidence against him came into stark contrast in the second interview, when Siracusa was present to provide additional information.  Musaid insisted that he was innocent and there was no evidence again him.  (Gordon Report at 2, 8; Rosner Report at 2.)  He acknowledged that the government had a written confession, but he stated that the officer who had taken it "showed me his gun and said if I don't sign the statement he will kill me! …  I signed but don't know exactly what paper it is."  (Gordon Report at 5.)  Siracusa, however, revealed

24

that Musaid had confirmed to him many of the salient details of his confession – that he claim[ed] Rafik had been sending money to his wife so that men could have sex with his children and that he kept confronting Rafik until he finally "went out and got a gun." (Gordon Report at 6.)

Siracusa contacted Musaid's brother, who had reported that Musaid's wife was a good woman and that Musaid's "belief system regarding the victim and his wife [was] not based on any objective reality." (Gordon Report at 6.) Siracusa also contacted Musaid's mother, who confirmed that Musaid had called her the day before Rafik was killed and told her that he was going to murder Rafik the next day. (Gordon Report at 8.) Confronted with that fact, Musaid said, "I never call my mother, buying chicken." (Gordon Report at 8.) When confronted with the fact that his confession corresponded with the number of bullets found in the victim and the alleged murder weapon, Musaid simply said, "No, no!" and, more generally, insisted that he "didn't have a gun."[13] (Gordon Report at 8.)

Musaid "repeatedly assert[ed] his innocence and merely ask[ed] to be released from jail without apparent appreciation for the steps necessary to resolve his legal case. When informed th[e] examination was completed, he ask[ed], 'You mean I can go home?'" (Rosner Report at 5.)

Dr. Gordon's conclusion and warrants quoting in full:

> In summary, while the defendant has an awareness of the
> nature of the charge against him and does present a sufficient
> grasp of courtroom proceedings and the roles of the various
> principals in the court, he demonstrate[d] on both occasions

---

[13] The report indicates that Musaid was told that the way his confession corresponded with the evidence was that his confession said that he shot Rafik three times. His confession only mentions shooting Rafik twice, but it says that the gun contained four live rounds when he purchased it, matching the three shots fired into Rafik and one left in the gun when it was recovered.

> … the presence of a fixed delusional system which includes psychotic denial with regard to the incriminating potential of his statements and admissions, paranoid persecutory thinking regarding the arresting police officer wherein he perceives and continues to perceive that he was coerced and threatened with bodily harm or worse and which resulted in an extracted confession, and finally and demonstrably the unwavering and fixed belief that the victim was in fact perpetrating the ongoing physical violation of his children in conspiracy with his wife.
>
> As a direct result the defendant lacks the requisite degree of flexibility to consider any reasonable or realistic legal options here.  He cannot allocate a plea were he to consider to plead (which is decidedly not the case) and he cannot effectively sustain himself to participate and to assist his attorney during a protracted adversarial proceedings such as during a trial.
>
> He is likely to decompensate and disorganize further and as a result is once again found not fit to proceed at this time.

(Gordon Report at 8; *see also* Rosner Report at 4 ("his irrelevant, perseverative focus on somatic delusions and illogical disregard of evidence against him and possible outcomes in his case indicates he lacks the capacity to proceed at this time.  He is alternately dismissive of or unable to recall defense counsel's clarification of the harmful evidence against him and the possibility the he could lose at trial").)

Dr. Gordon also cogently noted that, "Whenever the defendant is returned to Rikers Island he automatically refuses to take his medications and inevitably deteriorates."  (Gordon Report at 6.)  Dr. Rosner noted that, "Despite ongoing treatment over objection with antipsychotic medication, the defendant lack[ed] insight into his mental illness and [was] unlikely to voluntarily comply with recommended treatment."  (Rosner Report at 5.)

26

### c.    Second Commitment Order And Transfer To Kirby

On November 24, 2009, upon receiving Dr. Gordon's and Dr. Rosner's reports, Justice Carro, the ADA, and the defense attorney concurred that Musaid "lack[ed] the capacity to understand the proceedings against him or to assist in his defense."  Justice Carro thus adjudicated Musaid to be an incapacitated person and ordered him committed for a period not to exceed one year unless he was found to be competent before then. (Pet. Ex. at 5.)  On November 30, 2009, Musaid was re-admitted to Kirby.  (Hicks Report at 1.)

### d.    One Year At Kirby And Order Of Retention

When re-admitted to Kirby, the staff once again diagnosed Musaid with Paranoid Schizophrenia.  (Hicks Report at 2.)  Initially, Kirby continued to treat him with the long-acting injectable form of fluphenazine that he had been on at Bellevue.  (Hicks Report at 3.)  In February 2010, Kirby attempted to switch his medication to olanzapine, on which he had shown improvement during his last stay at Kirby, but he refused to take the medication, "stating that he did not have a mental illness and did not need medications." (Hicks Report at 3.)  As a result, on March 11, 2010, Kirby obtained another court order for treatment over objection and placed Musaid on a new medication – a long-acting injectable form of risperidone.  (Hicks Report at 3.)

Over the next six months, Musaid showed "partial improvement."  (Hicks Report at 3.)  He made "relevant contributions in group discussion" and, on September 15, 2010 – as Justice Carro's one-year commitment order neared expiration – his ward psychiatrist referred him as fit to proceed.  (Hicks Report at 3.)  The psychologist member of the hospital's forensic committee then examined his, as well, and found him "barely fit." (Hicks Report at 3.)  As a result, the other two members of the hospital's forensic

27

committee, including Dr. James Hicks, also examined Musaid.  (Hicks Report at 3.)  Dr. Hicks found that Musaid was "approaching fitness," but that he was not fit to proceed at that time, and thus prepared a report in support of an order of retention.  (Hicks Report at 3.)

In the report, Musaid's biographical and psychiatric history remained largely unchanged, except, however, it now included a note stating that, "[a]ccording to collateral information provided by his sister during a previous psychiatric hospitalization, Mr. Musaid had an extensive history of mental illness and psychiatric treatment in his home country of Yemen. He has previously self-reported seeing a doctor in Yemen in 2001 for 'a sickness in my head.'"  (Hicks Report at 2.)  But at the time Dr. Hick's prepared his report, Musaid disputed that history.

Dr. Hicks's report reflects his conclusion that Musaid's most problematic symptoms had been significantly mitigated, though some persisted.  In terms of somatic delusions, Dr. Hicks noted that Musaid "d[id] not appear internally distracted, as if by hallucination." (Hicks Report at 4.)  In discussing Musaid's refusal to take his medication, however, Dr. Hick's noted that part of Musaid's reasoning was that "he believe[d] that the medication [wa]s harming him in many ways, some of which appear[ed] to be related to previously expressed somatic delusional beliefs (about his kidneys, for example)."  (Hicks Report at 6.)

Dr. Hicks concluded that Musiad "d[id] not express persecutory delusion," but his report contains an extensive discussion of what went on to become a central issue in Musaid's competency struggle: a belief that his attorney, Siracusa, stole the $50,000 that he had allegedly stored in a safety deposit box, when in fact Siracusa had put it in an

escrow account.  (Hicks Report at 4-5.)  Dr. Hicks noted that Musaid believed that delusion so intensely that he had contacted the Yemeni Consulate for assistance.  (Hicks report at 4-5.)

Musaid also continued to exhibit an inability to appreciate the gravity of the charges and evidence against him.  He was still able to "accurately define[ ] court personnel and procedures, as well as the nature of the charges against him," even understanding the factual basis for those charges.  (Hicks Report at 5.)  He continuously stated, however, that the maximum sentence he faced was ten years, despite being repeatedly reminded that he faced life in prison.  (Hicks Report at 5.)  "It is possible that this minimization reflects, in part, wishful thinking," Dr. Hicks wrote, "but it may also reflect his general lack of appreciation of the seriousness of his situation."  (Hicks Report at 5.)

Musaid "stated categorically that he would pursue a particular defense" that was different from the one suggested by his lawyer, "seemingly without much consideration for the evidence that might be presented by either side."  (Hicks Report at 5.)  "But at the end of the examination, he surprisingly expressed willingness to consider a plea bargain should one be offered.  However, this seemed to be a concrete expression of his desire to serve the least amount of time incarcerated without any reasoned weighing of the likelihood of succeeding or failing."  (Hicks Report at 5.)

For Musaid's long-term fitness, his most concerning symptom at this juncture was his continued denial of his mental illness and refusal to take medication.  Dr. Hicks's notes on this point were a forbearer of what was to come, perhaps all the way up through trial:

> Mr. Musaid is stable and perhaps barely fit while in the hospital and compliant with medication.  Unfortunately, he is intent on stopping his medication at the earliest possibility.  He reiterated on exam today that he does not believe he is ill and

29

> does not believe he needs medication…. He stated that he would not take medication when he returns to jail. When advised of the concern that he would decompensate or be returned to Kirby by the judge, he seemed genuinely perplexed by the possibility, even though this has already happened once before. Though Mr. Musaid is now on a long-acting injection of antipsychotic medication, the level of the medication in his system will drop over a couple months once he starts to refuse, and this is likely to render him unfit before his case can be settled, given that the case is serious and the defendant wishes to go to trial.

(Hicks Report at 6.)

On November 19, 2010, Kirby submitted a formal application for an order of Musaid's retention to Justice Carro. (Pet. Ex. at 6.) No demand for a hearing was made and, on January 14, 2011, Justice Carro once again adjudicated Musaid to be incapacitated and granted the order of retention. (Pet. Ex. at 6-7.[14])

### e.     Three More Months At Kirby And Finding Of Fitness

Sometime in November 2010, before Justice Carro issued the retention order, the treatment over objection order expired, and Musaid refused to accept the injectable risperidone. (Kunz Report at 4.) During that time, Musaid "engaged in several incidents of inappropriate behavior." (Kunz Report at 4.) However, in February 2011, he was transferred to another ward and started on a new medication – an oral paliperidone, which he "consistently accepted." (Kunz Report at 4.)

After that, Musaid "generally displayed adequate emotional and behavioral stability." (Kunz Report at 4.) Although he "displayed [a] disagreeable interpersonal style,

---

[14] The date on the order reads "January 14, 2001," rather than 2011. (Pet. Ex. at 7.) That is clearly a typographical error given that the order itself references the court's previous November 24, 2009 commitment order. (Pet. Ex. at 6.)

30

and uncooperativeness," the staff at his new ward interpreted that "to be a reflection of his personality, rather than of a mental illness." (Kunz Report at 4.)

His treatment team on that ward also made a finding that would become central in disputes over his fitness: they diagnosed him with malingering, i.e. exaggerating or feigning illness. (Kunz Report at 4, 10.) The only support in the notes for that diagnosis was that Musaid, "at times, feigned ignorance of [legal] concepts he had demonstrably mastered on previous occasions." (Kunz Report at 4, 10.) Relatedly, although not strictly about a mental illness, the notes indicate that Musaid may have been exaggerating his inability to speak English: "Although Mr. Musaid [was] accompanied to all treatment activities by an Arabic interpreter, and in formal evaluations indicated his inability to speak English, ward staff noticed that, in unguarded moments, he spoke English fluently." (Kunz Report at 4.)

Of course, there could be several explanations for those observations, such as a fluctuation in Musaid's mastery of legal concepts, which his treatment notes already reflected, and a willingness to speak English in casual settings but a desire for an interpreter in "formal evaluations" and treatment activities. A doctor at Kirby, however, chalked those observations up to a "reluctan[ce] to return to the DOC," which Musaid expressed repeatedly. (Kunz Report at 4, 10.) His treatment team thus referred him as fit and, on May 25, 2011 – one year and three months after his current commitment to Kirby and three months after starting his new medication – he was examined by Dr. Michael Kunz, who prepared a report in support of competency restoration. (Kunz Report at 4.)

31

Dr. Kunz's report indicates a marked improvement in all of Musaid's most serious symptoms. On targeted questioning, Musaid still had an "ongoing somatic preoccupation with an imagined kidney disease." (Kunz Report at 5.) Unlike at other times, however, he was apparently not so preoccupied that he could not focus on his legal case. Dr. Kunz noted that "[h]e d[id] not interject any delusional thinking into his discussion of legal decision-making strategies." (Kunz Report at 5.)

Further, Musaid's conspiratorial thinking presented to a significantly lesser degree. He still believed that Siracusa had stolen money from him, now putting the amount at $48,000. (Kunz Report at 7.) However, when it was explained to him that the money had been placed in an escrow account, meaning that it still belonged to him, "[h]e accept[ed] the explanation." (Kunz Report at 7.)

He still generally understood basic legal concepts: his defense attorney would help him; the district attorney was against him; the judge "sentences" (though he also incorrectly added that the judge "decides if guilty or not guilty"); and the jury was twelve people who hear the case and decide if he is guilty or not guilty. (Kunz Report at 6.) In addition, he now also understood that losing at trial "may result in a lengthy prison sentence," that plea-bargaining means pleading guilty to a less serious crime and receiving a lesser sentence, and that his options were to plead guilty, not guilty, or not guilty by reason of mental illness. (Kunz Report at 6, 8.)

Still, however, Musaid maintained his innocence and stated that there was "no evidence against him" and no witnesses had been produced. (Kunz Report at 8.) On the other hand, he was "open to evaluating whatever evidence the police might produce and integrate it in planning his defense." (Kunz Report at 8.) He volunteered that he had

32

obtained a copy of his confession and showed it to Dr. Kunz.  (Kunz Report at 8.)  He acknowledged having made the confession but told Dr. Kunz that the police had coerced him into confessing, the confession was false, and he wanted to retract it.  (Kunz Report at 8.)  Dr. Kunz interpreted Musaid's effort to obtain the confession, his statements about its truthfulness, and his plan to retract it as an indication of "a capacity to understand specific issues relevant in the adjudication of his case, as well as a capacity to actively pursue a defense strategy."  (Kunz Report at 8.)  As Dr. Kunz put it, rather than delusion thinking, Musaid was merely engaged in "wishful thinking regarding the outcome of his case, i.e. he believe[d] he w[ould] be exonerated."  (Kunz Report at 10.)

Based on the report, Musaid's most severe symptom at this juncture was his persistent belief that he was not mentally ill and did not need any medication.  (Kunz Report at 9.)  That too, however, seemed slightly diminished given the fact that he was voluntarily taking his medication.  When asked why he would take the medication even if he did not need it, Musaid said, because "the doctor ordered them."  (Kunz Report at 9.)

Nevertheless, Musaid said that if he were transferred to the DOC, he would stop taking his medication.  (Kunz Report at 9-10.)  His "ostensible explanation" for refusing to take his medication if he were returned to the DOC was his belief that he did not need to take medication because he was not mentally ill, but he could not explain why he would take his medication in the custody of Kirby but not the DOC.  (Kunz Report at 9-10.)  Dr. Kunz noted, however, that [a]s the matter is discussed further, it became clear" that Musaid "recognize[d] that the refusal of medications in the DOC could help him return to Kirby, consistent with his wishes."  (Kunz Report at 9-10.)

33

When Dr. Kunz assessed Musaid's diagnosis of malingering, he acknowledged the staff's observations about his ability to speak English and understand legal concepts. (Kunz Report at 10.)   He noted, however, that "[d]uring the examination, Musaid display[ed] minimal psychiatric symptoms (somatic preoccupation), and none appear[ed] feigned." (Kunz Report at 10.)  He also extensively discussed Musaid's purported reason for refusing to take his medication if he were returned to DOC custody and his desire to remain at Kirby.  (Kunz Report at 10.)

Regardless of whether Musaid genuinely believed that he did not have a mental illness, Dr. Kunz opined that if Musaid did not take his medication, the effect on him would be quite negative.  Accordingly, Dr. Kunz's representation to the court that Musaid was fit to proceed came with a significant condition: "Continuing psychiatric treatment is a prerequisite for Musaid maintaining his Fit status." (Kunz Report at 9.)  To prevent Musaid from refusing to take his medication, Dr. Kunz recommended that when Musaid transferred back to DOC custody, he be hospitalized at Bellevue "where his acceptance of the medications can be better assured."  (Kunz Report at 9.)  Unfortunately, that did not occur.

### 3.    Third Cycle

#### a.    Return To DOC Custody And Third Examination Order

On June 8, 2011, the Director of Kirby submitted a formal notification of fitness to Justice Carro and directed the DOC to take custody of Musaid.  (Pet. Ex. at 11.)  There is nothing in the record to suggest that either party or the court moved for a competency examination or that one was held.  There is also nothing in the record about Musaid's specific whereabouts or medical condition from June to September 2011.  Subsequent medical records that document every time he was admitted to Bellevue do not indicate

34

an admission during that time; Musaid thus likely was at Rikers.  (Schneider Report II, Ex. Q, at 5.)

Because no medical records cover that period of time, the Court cannot be sure whether Musaid took his medication.  Upon his return to DOC custody, however, Musaid's condition deteriorated rapidly.  On September 28, 2011 – roughly three months after Musaid was discharged from Kirby – Justice Carro held another hearing and issued another § 730 examination order, indicating that the court was again of the opinion that Musaid may be an incapacitated person.  (Dkt. 37 at 2; Pet. Ex. at 12.[15])

### b.    Section 730 Evaluations

Pursuant to Justice Carro's order, Musaid was jointly examined by Drs. Nancy Nichols-Goldstein and Myles Schneider at Bellevue on October 18, 2011 – roughly four months after he had been found fit and discharged by Kirby.  (Nichols-Goldstein Report at 1, 5; Schneider Report at 1, 4- 5.)  Both doctors diagnosed Musaid with Psychotic Disorder NOS and deemed him unfit to proceed.  (Nichols-Goldstein Report at 2, 4; Schneider Report at 2, 4.)

At the time of the interview, Musaid reported that he had not taken any psychiatric medication for a month.  (Nichols-Goldstein Report at 4; Schneider Report at 4.)  Musaid still had a basic understanding of criminal proceedings: he understood that he had

---

[15] The State has been unable to obtain a transcript of this hearing, and it is unclear if Musaid attended the hearing.  (Dkt. 37 at 2.)  The § 730 examination order itself is also not in the record.  This is the only instance in this case where a § 730 examination was ordered and the order itself is not in the record.  Instead, the record contains what appears to be a slip from the court indicating that a § 730 examination was ordered, who the order was issued by (Justice Carro), and who the court clerk and court reporter were on that date.  In addition, both subsequent examination reports indicate that Justice Carro ordered the examinations on September 28, 2011.  (Nichols-Goldstein Report, Resp. Ex. N, at 1; Schneider Report, Resp. Ex. O, at 1.)

pleaded not guilty; his defense attorney, who was supposed to help him, was Siracusa; the district attorney was against him; and the judge would sentence him. (Nichols-Goldstein Report at 3; Schneider Report at 3.) At this juncture, however, he needed some coaching to explain that the role of the jury was to reach a verdict of guilty or not guilty. (Nichols-Goldstein Report at 3; Schneider Report at 3.) And more concerningly, he indicated that he did not understand what a plea bargain was. (Schneider Report at 4.)

In the interview, Musaid added to his biographical background that, for a year or two before his arrest, he had slept in the subway because he "didn't have any money" and "didn't have anybody." (Nichols-Goldstein Report at 4.)

The Nichols-Goldstein and Schneider reports demonstrate that Musaid was suffering from some of his most serious symptoms. His somatic delusions were back in full force. He complained of kidney pain during the interview, which, in what would become a hallmark of his behavior, caused him to lay down on the floor. (Schneider Report at 4.) He said that he was throwing up blood and suffering burning heartburn. (Schneider Report at 4.)

His conspiratorial thinking was also back. He blamed his current kidney pain on the doctors at Bellevue, and he said that people in jail had broken his nose and were urinating on him and throwing milk at him. (Schneider Report at 4.)

Most critically, he was completely unable to appreciate his legal situation. He stated that there was "no chance that he could lose at trial." (Schneider Report at 4.) He acknowledged that his lawyer had told him that there was evidence against him, but was "unable to rationally incorporate [that] significant information about his legal situation." (Nichols-Goldstein Report 5; Schneider Report at 4.) He denied having ever made a

36

statement, and "even when his legal circumstances and the gravity of potential sentences were explained to him, [he] would not want to consider any sort of plea," despite claiming not to understand what a plea bargain was. (Schneider Report at 4.) Instead, he insisted that there was no chance that he could lose at trial. (Schneider Report at 4.)

Dr. Schneider concluded that Musaid "appeared to lack the capacity to cooperate rationally in his defense" and Dr. Nichols-Goldstein concluded that "[h]is disorganized and illogical thinking precluded attempts to engage him in a meaningful discussion about his available choices and possible consequences" and, therefore, he was "NOT FIT to proceed." (Nichols-Goldstein Report at 5; Schneider Report at 4.) Both doctors recommended inpatient psychiatric hospitalization and treatment. (Nichols-Goldstein Report at 5; Schneider Report at 5.) At the conclusion of the interview, Musaid again fell to the floor. (Nichols-Goldstein at 5.)

### c. Order Of Commitment And Return To Kirby

On November 16, 2011, upon receiving Dr. Nichols-Goldstein's and Dr. Schneider's reports, Justice Carro, the ADA, and Siracusa concurred that Musaid "lack[ed] the capacity to understand the proceedings against him or to assist in his defense." Justice Carro thus found Musaid to be an incapacitated person and ordered him committed for a period not to exceed one year unless he was found to be competent before then. (Pet. Ex. at 13.) On November 18, 2011, Musaid was once again admitted to Kirby. (Mortiere Report at 1.)

### d. One Month At Kirby And Finding Of Fitness

According to notes from Kirby, Musaid made dramatic improvement over a period of just three weeks. (Mortiere Report at 4.) Upon admission, he had "frequent somatic complaints regarding his kidneys"; he was also "preoccupied and insistent in a paranoid

37

manner that his confession was coerced"; and he believed that there was no evidence against him. (Mortiere Report at 4.) Kirby staff, however, seemed to believe that Musaid was malingering. His treatment team "believed that his symptoms of 'kidney pain' or medication side effects [we]re fabricated"; and they thought that he began to complain "when certain clinicians [were] observing him and stop[ped] when they [were] not looking." (Mortiere Report at 4.)

Musaid's medical team prescribed him an oral form of paliperidone, the same medication he was on during his last stay at Kirby, and "[w]ithin a few weeks[,] the medication had a good effect." (Mortiere Report at 4.) Indeed, Musaid reportedly "verbalized a desire to return to court and accept a favorable plea deal," wished to further discuss his options with his attorney, and "sp[oke] in English to all clinicians and in all interactions. He appeared to utilize his interpreter [only] for social purposes." (Mortiere Report at 4.) Accordingly, his medical team referred him as fit to proceed on December 11, 2011 – just three weeks after he was found unfit and admitted to Kirby. On January 13, 2012, he was examined by Dr. Catherine Mortiere, who prepared a report in support of his return to competency. (Mortiere Report at 4.)

Dr. Mortiere's report indicated significant improvement in most of Musaid's most serious symptoms. The report was largely devoid of conspiratorial thinking, specifically noting that "he did not complain that his lawyer took money from him," as he had before. (Mortiere Report at 7.) It also noted that "he did not become emotional or preservative on somatic delusions, i.e., his kidneys, as he has done in previous interviews." (Mortiere Report at 7.)

38

To the contrary, the report indicates that Musaid mentioned his kidneys only once, as part of an anecdote that could be interpreted to both confirm his diagnosis of malingering and explain what he meant by saying that there were no witnesses against him. When discussing his case, Musaid said, "They said they have a witness against me and that I will see the witness in court … they had court two times and they not bring witness and I get angry because I want to see witness so I throw myself on the floor saying 'my kidney … my kidney' [laughing]." (Mortiere Report at 6 (internal ellipses and brackets in original).)

Musaid once again fully understood the basic procedures of a criminal trial, including the length of sentence he faced ("25-life") and plea bargaining, "[b]ut [he] explained he would rather go to trial." (Mortiere Report at 6.) He also "verbalized [an] understanding of the insanity plea and stated he would not consider taking such a plea if it were offered." (Mortiere Report at 6.) He also said that if he were "offered a plea bargain," he would work with his lawyer and consider it, but that "if it is not good[,] he [would] go to trial." (Mortiere Report at 6.) Musaid "acknowledge[d] that he made a confession and that that is considered evidence against him." (Mortiere Report at 7.) He not "perseverate that the statements in the confession [were] untrue" or that he was coerced into confessing. (Mortiere Report at 7.) However, Musaid still maintained his innocence. (Mortiere Report at 6.)

Perhaps the most significant improvement indicated in Dr. Mortiere's report was that Musaid "stated that he believes he has a mental illness, 'Schizophrenia,' and knows the name and function of his medication." (Mortiere Report at 8.) Unlike the last time he was found fit at Kirby, he also "agree[d] to take his medication once discharged to Rikers."

39

(Mortiere Report at 8.)  Still, "[i]n order to assure that he remains compliant," Dr. Mortiere recommended that Musaid be housed at Bellevue when released into DOC custody. (Mortiere Report at 8.)

### 4.    Fourth And Final Cycle

#### a.    Return To DOC Custody And Fourth Examination Order

On February 7, 2012, the Director of Kirby submitted a formal notification of fitness to Justice Carro and directed the DOC to take custody of Musaid.  (Pet. Ex. at 11.)  There is nothing in the record to suggest that either party or the court moved for a competency examination or that one was held.  Between February and April 2012, Musaid was again incarcerated at Rikers.  (*See* Schneider Report II at 5.)  There is no record of what, if any, medication he was on during that period of time.  However, his condition deteriorated quickly and severely.

On April 21, 2012 – roughly three months after he was discharged from Kirby – he was again admitted to Bellevue because he was suffering from "paranoid ideation about his treatment at Rikers," believed that his spine was broken, and demanded "that his kidneys be removed and the he be started on dialysis."  (Schneider Report II at 5.)  He was discharged, however, on April 26, 2012 – there is no explanation why – but was swiftly readmitted on May 9, 2012.  (Schneider Report II at 5.)  At that time, Musaid was viewed as "an imminent danger to himself or others."  (Schneider Report II at 5.)  He was "depressed, sleeping on the floor, [had] multiple psychosomatic complaints," and refused his medications.  (Schneider Report II at 5.)  At some point, Musaid was given an injection, but the record does not specify the date or type of medication.  (Schneider Report II at 5.) Notes reveal that he exhibited dystonic reactions (uncontrollable muscle contractions) as

40

a result of the medication, but that staff at Bellevue believed that he was only "pretending" to have those reactions.  (Saraiya Report, Resp. Ex. R, at 7.)

On May 23, 2012, Justice Carro held another hearing with Musaid in attendance. (Dkt. 37 at 2.)  There is no transcript, but after the hearing, Justice Carro issued an order noting that he was once again "of the opinion that [Musaid] may be an incapacitated person" and ordering § 730 examinations.  (Pet. Ex. at 15.)  Upon readmission to Bellevue, Musaid told staff that the examinations had been ordered but he claimed not to know what a § 730 exam was, or what the role of a judge or jury was.  (Saraiya Report at 7.)  The staff at Bellevue believed that Musaid was feigning ignorance.  (Saraiya Report at 7.)

### b.     Section 730 Examinations

Drs. Myles Schneider and Ankur Saraiya jointly examined Musaid over two sessions – one on June 27, 2012, and one on September 26, 2012 – with an Arabic interpreter and Musaid's defense attorney, Siracusa, present at both.  (Schneider Report II at 1; Saraiya Report at 1, 4.)  Dr. Schneider was one of the doctors who had examined Musaid on October 18, 2011, pursuant to Justice Carro's third examination order, and deemed him unfit.  (Schneider Report.)  At this juncture, both Drs. Schneider and Saraiya once again deemed him unfit.  (Schneider Report II at 6; Saraiya Report at 8.)  The record does not reveal what type of medication Musaid received during the three months between interviews, but it seems evident from the Schneider and Saraiya reports that he was receiving injectables rather than accepting medication orally.

Musaid continued to understand basic court proceedings, and his understanding was nearly identical in both interviews: he knew that his defense attorney was Siracusa, who was supposed to help him; the DA was against him and wanted to put him in jail; the

41

judge would sentence him (though he still incorrectly added that the judge would "say you guilty or not guilty"); and the jurors would hear his story and decide if he was guilty. (Saraiya report at 3-4.)

In the first interview, Musaid began complaining about his heart and kidneys as soon as he walked in the room and, throughout the interview, was so "preoccupied with physical complaints" that it "was difficult for him to focus on [other] issues." (Schneider Report II at 5; Saraiya Report at 3-4.) He alluded to his belief that Siracusa had stolen his money; "did not endorse having any mental illness"; and said that the medication he was receiving was causing his jaw and neck to twist. (Schneider Report II at 5; Saraiya Report at 5-6.)

Musaid continued to believe that there was "no proof" and no witnesses against him, and although he was "able to give the basic rationale behind a plea bargain," he wanted to go to trial. (Saraiya Report at 5-6.) Siracusa "attempted to explain what could happen if he lost at a trial and the gravity of his sentence," but Musaid "denied having made any statement and would emphasize that his lawyer was not helping him." (Schneider Report at 5.)

In the second interview, Musaid "presented as more linear" than in the first. (Saraiya Report at 7.) However, he also "continued to be preoccupied with his physical complaints with his heart and tremors and tumors and kidney pain." (Schneider Report II at 6.)

Musaid also continued to accuse Siracusa of stealing his money, and when Siracusa tried to explain that the money was in escrow, Musaid was "unable to incorporate" that information. (Schneider Report at 6.) He maintained that there were no

42

witnesses and no evidence against him, denied having made a confession, "would spontaneously say that his own brother and the brother of the deceased individual were accusing him of killing the deceased," insisted that there was no way he could lose at trial, and said he should simply be set free. (Schneider Report at 6; Saraiya Report at 7.) The doctors asked Siracusa to explain to Musaid his legal situation and the evidence against him. (Schneider Report at 6; Saraiya Report at 7.) Siracusa did so, but it "was clear that Mr. Musaid was unable to rationally integrate the information he was being given." (Schneider Report at 6; Saraiya Report at 7.)

That led Dr. Saraiya to conclude:

> Mr. Musaid's lack of insight into his illness makes it impossible for him to rationally consider his options. Though he is getting medications by court order and appears to be better than he has been at times in the past, he is still under the impression that the court ordered medications are causing him a litany of non-existent medical problems and that he has no mental illness. His belief that he has no mental illness makes it impossible for him to consider that his recollection of events is distorted. He refused to consider the NGRI [Not Guilty By Reason of Insanity] defense that his lawyer was recommending and in response to the evidence against him, could only say that they are all lies.

(Saraiya Report at 7.) Dr. Saraiya recommended inpatient treatment and a course of clozapine. (Saraiya at 8.) At the same time, he also expressed doubt that the court-ordered medications would ever be enough to "improve his insight into his need to continue the medication," and stated that "[i]t is not clear that Mr. Musaid can get any better." (Saraiya Report at 8.)

### c.    Third Commitment Order And Transfer To Mid-Hudson

On November 19, 2012, upon receiving Dr. Schneider and Dr. Saraiya's reports, Justice Carro, the ADA, and a substitute attorney appearing for Siracusa concurred that

43

Musaid "lack[ed] the capacity to understand the proceedings against him or to assist in his defense."  Justice Carro thus adjudicated Musaid to be an incapacitated person and ordered him committed for a period not to exceed one year unless he was found to be competent before then.  (Pet. Ex. at 16.)  On December 5, 2012, Musaid was committed – not to Kirby, but to the Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson").  (Rivas Report II, Resp. Ex. S, at 1.)

### d.    One Year At Mid-Hudson And First Retention Request

Excluding approximately four weeks before his first retention hearing, Musaid ultimately remained at Mid-Hudson for nearly two years.  From May 2013 until his ultimate release from Mid-Hudson in November 2014 – approximately a year and a half – Musaid's attending physician and psychiatrist was Dr. Osiris H. Rivas.  (RH 7, 21; Rivas Report II at 2.[16])  Upon admission to Mid-Hudson, Musaid's condition was particularly bad:

> [He] was somatically preoccupied, claiming to have several medical problems despite having medical testing showing nothing was physically wrong with him.  He was constantly demanding to be taken to nearby hospitals to get treatment for imaginary illnesses and constantly chanting, 'my kidneys don't work, my liver is damaged, my heart is not working,' and so on.  He was easily agitated, becoming violent with several incidents in which he attacked staff, requiring medication over objection and physical restraint to contain aggression….
>
> He was observed to be internally preoccupied, talking to himself ….  He was not cooperating with his lawyer, could not talk about his legal problems because all he talked about was his imaginary medical problems.

(Rivas Report, Dkt. 37, Ex. B, at 2-3.[17])

---

[16] "RH" refers to the transcript of the retention hearing held on December 16, 2013 (Dkt. 20).

[17] This report was not originally submitted with the State's other exhibits, so the Court ordered it produced, which the State did on May 20, 2021.  (Dkts. 36, 37.)

44

Musaid again refused to take any medication.  (Rivas Report at 2; RH 12.)  In July 2013, Mid-Hudson obtained a court order for treatment over objection and began administering him an injectable form of olanzapine.  (RH 12; Rivas Report II at 2.) Olanzapine is the drug that, during his first stay at Kirby, Musaid had accepted orally and improved while taking but, during his second stay at Kirby, had refused to take.  This time, however, even after several weeks of receiving the highest maximum dose permitted of the injectable form of olanzapine, Musaid did not show substantial improvement.  (Rivas Report II at 2.)  In October 2013, Mid-Hudson changed his medication to haloperidol.  (RH 28; Rivas Report II at 2.)  He was given haloperidol orally when he would accept it, and given a short-term injectable form of haloperidol when he would not.  (Rivas Report II at 2.)  Musaid also received individual therapy, group therapy, activity therapy, milieu therapy, Health and Wellness Education, and Forensic Education.  (Rivas Report at 3; RH 14.)

During his first year at Mid-Hudson, Musaid showed "significant improvement in his aggressive behavior but limited change in his psychosis."  (Rivas Report at 2.)  He was "no longer chanting that his internal organs [were] damaged," but still lacked sufficient insight into his legal problems or his mental illness to be fit to proceed.  (Rivas Report at 3; RH 15-16.)  Accordingly, on October 18, 2013, Mid-Hudson applied for an order of retention.  (Pet. Ex. at 17.)  In support of its application, Dr. Rivas conducted an interview and submitted an examination report.  (Pet. Ex. at 17; RH 16; Rivas Report.)

That report adds to Musaid's biographical and clinical background that, when Musaid's sister told Kirby that he had a history of mental illness, she also described him as a "violent individual."  (Rivas Report at 2.)

45

Musaid continued to have a basic understanding of the criminal process and the roles of various actors.  (RH 20-21.)  In fact, he was "able to concretely answer questions related to his understanding of the trial process and roles of courtroom personnel."  (Rivas Report at 6.)  However, he was "unable to apply that knowledge to his legal situation.  His interpretation of the legal situation he was facing varied from 'nobody died' to 'he was never there when the person was killed' to 'he had been falsely arrested because he is not from this country,' etc."  (Rivas Report at 6 (cleaned up).)  He also continued to accuse Siracusa of stealing $48,000 from him, despite "reassurance from his social worker that the money [was] in an account."  (Rivas Report at 6.)

He still insisted that he was innocent and there were no witnesses against him; still suffered somatic delusions; and did not believe that he had any psychiatric problems. (Rivas Report at 8; RH 13, 15-16, 20.)  In sum, Dr. Rivas believed that Musaid "lack[ed] an ability to deal with his legal situation due to his psychotic thinking which deprives him of his capacity to discuss the charges against him and cooperate with his attorney rationally and factually."  (Rivas Report at 8; RH 7, 15.)  He also believed that, in his present condition, Musaid would not be able to withstand the stresses of trial.  (RH 19.) Mid-Hudson thus submitted its application for an order of retention to the court.

### e.    First Competency Hearing

On October 18, 2013, upon receiving notice of the application for an order of retention, Musaid – through the Mental Hygiene Legal Service ("MHLS"), the state agency responsible for representing people committed to psychiatric hospitals – opposed the application and requested a competency hearing.  (Pet. Ex. at 18.)  As a result, in November 2013, Musaid was removed from Mid-Hudson and taken to Rikers where he was held for approximately four weeks before the competency hearing.  (RH 13.)

46

The competency hearing was held before Justice Carro on December 16, 2013. (RH 1.)  Mid-Hudson was represented by Jose Velez of the New York State Attorney General's Office ("AG's office"), and Musaid was represented by Mary Beth Feerick of MHLS.  (RH 1.)

The Attorney General's office called Dr. Rivas.  (RH 4.)  On direct, Dr. Rivas testified to the contents of his application for an order of retention discussed above – Musaid's somatic delusions, conspiratorial thinking, denial of his medical condition, and moderate improvement but ultimate incapacity to proceed to trial.  (RH 13, 15-16, 20.) Dr. Rivas also told the court that Musaid believed that the purpose of the hearing was not to determine his competency to stand trial, but to decide if he should simply be released to the street.  (RH 20.)

When Dr. Rivas stated, during his testimony, that Musaid "needs treatment and [ ] is not fit to proceed," Musaid interjected, stating on the record, "He's lying, he's lying." (RH 21.)

Asked about Musaid's previous findings of fitness, Dr. Rivas explained that, every time Musaid was found fit and released to Rikers, he stopped taking his medication, deteriorated, and became unfit again.  (RH 21.)  Dr. Rivas thus believed that Musaid required further treatment in order to understand his mental illness so that he would continue taking his medication when released to Rikers.  (RH 21.)

On cross, MHLS pressed Dr. Rivas on why he had not prescribed Musaid some of the medications on which he had shown improvement and been found fit in the past.  (RH 22-30.)  MHLS asked Dr. Rivas why Musaid was not on olanzapine.  (RH 22.)  Dr. Rivas explained that he tried olanzapine but switched medication when it did not work.  (RH 22.)

47

Dr. Rivas also explained that a patient can respond well to a medication at one point and then years later no longer respond well to that same medication. (RH 25.)

MHLS also asked why Musaid was being given haloperidol, which is an older drug with more side effects – such as shaking, from which Musaid was suffering – rather than a long-acting injectable form of risperidone or paliperidone, which are newer drugs with fewer side effects, and to which Musiad had responded well in the past. (RH 22-25.) Dr. Rivas explained that he was administering haloperidol because it was the only one with a short-acting oral form, a short-acting injectable form, and a long-acting injectable form, and Dr. Rivas wanted to bring Musaid to competency with an oral medication that could be supplemented with a short-acting injection when he refused to take it, and then switch him to a long-acting injectable form of the same medication so that when he was released to Rikers he would stay competent long enough to make it through trial. (RH 22-26, 30-31.) Dr. Rivas also said that notes in Musaid's file indicated that he may be exaggerating his side effects, but that he was also giving him benztropine for his shaking. (RH 28.)

Next, MHLS asked Dr. Rivas about Musaid's overall condition, pressing Dr. Rivas on whether, if he had fixed delusions and the medicine was not mitigating them, he would ever be competent to stand trial. (RH 26-29.) Dr. Rivas explained that while it was true that Musaid may have fixed delusions, he was treating Musaid to return him to fitness, not to eliminate all delusionary thinking, and that a person could be both delusional and competent to stand trial. (RH 27.) Delusions or not, Dr. Rivas explained, Musaid could be fit to proceed if he had proper insight into his own psychiatric condition and his legal situation, but would not be fit to proceed if he didn't have insight into his psychiatric condition and his legal situation. (RH 27.)

48

When asked squarely whether he believed that Musaid would be found fit to proceed in the foreseeable future, Dr. Rivas said that he could not be one-hundred percent sure; that Musaid was improving "very, very slowly"; but that he would "probably" be found fit if he continued taking his medication.  (RH 29.)

Finally, MHLS asked Dr. Rivas if he believed that Musaid could be malingering. (RH 31.)  Dr. Rivas acknowledge that people had suggested the idea, and that he had not conducted a formal test for malingering.  (RH 31.)  But, Dr. Rivas said, "I don't believe that he is malingering.  I believe that he's a truly sick person."  (RH 31.)

MHLS then called Musaid to the stand.  (RH 32.)  MHLS asked Musaid only if he knew what he was charged with and if he would work with his lawyer, to which he said yes.  (RH 32.)  On cross, the AG's office asked Musaid if he had heard Dr. Rivas's testimony about him not trusting his lawyer.  (RH 34.)  He responded:

> [y]es, he stole from me $48,000 from the safety deposit [box] in the bank and he take my Green Card and he take my passport and he take two videotape, the picture of my kids and he take the paper from my kids from the immigration and he took [$48,000] from me.  And I told him, "Give me my money back."  And he told me, he told me, "When you get out of here from the jail, I am going to give the money."  I told him, "No, this money is not your money.  I want my money.  I need my money back."  He didn't want to give me back my money.

(RH 34-35.)

The AG's office also asked Musaid why he kept telling the doctors that he had broken bones and liver, kidney, and heart problems when he tested negative for all of those conditions.  (RH 35.)  The following exchange ensued:

> MUSAID: No, this is all true, yes, Dr. Rivas is lying.
>
> VELEZ: No further questions, your Honor.

MUSAID: Dr. Rivas is lying. I have heart disease and kidney disease.

Justice Carro then followed up with his own questions for Musaid. He asked about the money that Siracusa had allegedly stolen from him, and Musaid explained for over a page, in a rambling fashion, how exactly Siracusa had stolen the money from him. (RH 36-37.) Justice Carro then asked how Musaid's heart felt that day. (RH 37.) Musaid started by answering the question, saying "[m]y heart hurts me and my kidney …" then went on for several pages about all of his alleged ailments, stating that they all began when "they made me sick with the medication in Bellevue Hospital, they sickened me with the treatments in 2008"; adding that Dr. Rivas had tried to kill him and broke his thumb; and concluding with:

> I told him, doctor, you broke my thumb, I almost made me three month, four month and my thumb and he's not helping me, he's not helping me. Also my right hand, I shake, I chant about my  heart, about my kidney, about my liver, about my nose, about my spine. My spine is broke, I throw up blood and I shit blood and I feel dizzy and I shake.

(RH 37-40.)

At that point, the court cut him off. (RH 40.) As Justice Carro tried to ask the attorneys if they had any further question, Musaid interjected – "The doctor – my nose is broke," "He told me I hear voices, I hear nothing, he's lying. This doctor he told me I hear voices, I don't hear nothing." (RH 40-41.)

The court then rendered its decision:

> Based upon today's hearing, the Court's satisfied that the defendant continues to be an incapacitated person and I will issue an order of retention. Defendant will be continued to be in the custody of remand to the custody of the Commissioner of Mental Health and Hygiene for a period not to exceed one year.

50

(RH 41.)

As Justice Carro tried to end the proceeding, Musaid continued to object: "Why you give me the hospital, why?," "The medication make me – it affect me the medication," "I don't want to go to the hospital.  I don't want to go to the hospital," "I don't want to go to the hospital please, doctor – I mean, Judge," "My heart is broken, my kidney, I don't want to go, tell them I don't want to go to the hospital.  Why do you want to send me to the hospital, why?"  (RH 42.)

### f.    Another Year At Mid-Hudson And Second Retention Request

On December 16, 2013, Justice Carro issued the formal order of retention, finding Musaid incapacitated and committing him to the Commissioner of the Office of Mental Health for a period not to exceed one year.  (Pet. Ex. at 19.)  Musaid was once again hospitalized at Mid-Hudson.

During Musaid's second stay at Mid-Hudson, his medication was switched from the short-acting oral and injectable forms of haloperidol to a long-acting injectable form administered once per month.  (Rivas Report II at 2.)  Mid-Hudson also continued to treat Musaid with "milieu therapy, Health and Wellness education, Forensic Education[,] and Medical Groups."  (Rivas Report II at 3.)  He continued to progress from the state he was in when he admitted to Mid-Hudson.  (Rivas Report II at 3.)  Even after another year, however,

> he remain[ed] psychotic with several somatic delusions and [ ] some of the psychotic symptoms that prompted his admission to [Mid-Hudson].  He [was] paranoid and believe[d] that his internal organs [were] damaged and his bones [were] broken. He still [got] easily frustrated[,] becoming aggressive and recently tried to attack a staff [member].

(Rivas Report II at 3.)

51

Accordingly, on October 17, 2014 – as the expiration of the one-year retention order neared – Mid-Hudson submitted another application for an order of retention. (Pet. Ex. at 20, 22.)  In support of the application, Dr. Rivas submitted a report on Musaid's condition.  The report noted that, "[w]ith some prompting, Mr. Musaid [was still] able to recite the roles of courtroom personnel." (Rivas Report II at 6.)  However, "when asked to discuss the case[,] he only says, 'I did not do it.  Nobody saw me do.  The DA is not telling the truth.'" (Rivas Report II at 8.)  Musaid was still "unable to work with his attorney due to his distorted thinking and having his own irrational perception of his legal situation." (Rivas Report II at 7.)

As a result, Dr. Rivas concluded that Musaid "lack[ed] the capacity to cognitively, rationally[,] and factually deal with his legal situation," and thus requested an order of retention "to restore him to a state of competency to stand trial." (Rivas Report II at 8.)

### g.    Second Hearing And Order For Further Examinations

On October 22, 2014, upon receiving notice of the application for an order of retention, Musaid once again opposed the application and requested a competency hearing through MHLS. (Pet. Ex. at 21.)  As a result, on December 5, 2014, Musaid was removed from Mid-Hudson and moved to Rikers where he remained for nearly four months before the competency hearing. (RH2 8, 13-14.[18])

The hearing was held before Justice Carro on February 24, 2015. (RH2 1.)  Mid-Hudson was represented by Adam Sansolo of the AG's office and Musaid was represented by Susan Park of MHLS. (RH2 1.)  The AG's office called Dr. Rivas to the

---

[18] "RH2" refers to the transcript of the second retention hearing, which was held on February 24, 2015 (Dkt. 20-1).

stand, who explained what symptoms Musaid had when he was discharged from Mid-Hudson on December 5, 2014:

> [H]e was paranoid. He had several somatic delusions: His kidneys [didn't] work; his heart [didn't] work[ ]; he believe[d] that he ha[d] broken bones; everything [was] a complaint. He also ha[d] the belief that his attorney, defense lawyer, stole forty-seven thousand that he ha[d] in an account. And Mr. Musaid also ha[d] – [wa]s very impulsive. He ha[d] attacked staff in several locations, and at times ha[d] been sexually inappropriate, trying to touch women in the facility and ha[d] been – Sometime[s] he bec[a]me very traumatic; he [threw] himself to the floor claiming to have … side effects [from his medication].

(RH2 2, 7.)

Dr. Rivas also testified that when Musaid was discharged from Mid-Hudson, he was unable to understand courtroom procedures; he refused to discuss his legal case, simply repeating, "I didn't do it. I didn't do it"; and his "ability to consider the risks and benefits of alternative courses of legal action" was "impaired." (RH2 8-9.) Dr. Rivas noted that Musaid "could not work with his attorney[,] especially because he had a delusion that the attorney ha[d] stole from him 47 thousand dollars," at which point Musaid interjected "Forty-eight thousand dollars." (RH2 9.)

On cross, MHLS once again pressed Dr. Rivas on why he had not been treating Musaid with olanzapine and risperidone but asked few other questions. (RH2 12-14.) Justice Carro then questioned Dr. Rivas directly, asking whether the doctor had "gone over with [Musaid] the procedures of the criminal case in general?" (RH2 15.) Dr. Rivas explained that a social worker / psychologist taught the patients forensic education daily, going over how many people were on a jury, how many plea options they have, etc. (RH2 15.) Justice Carro asked if there were any reports from those individuals. (RH2 15.) Dr. Rivas explained that that Musaid's problem wasn't understanding the procedures – "Mr.

Musaid is a smart man" – but that "he cannot work with his attorney, and basically he never discuss about his legal case because he insist[s] that he didn't do it."  (RH2 16.)

"Well, many defendants insist on that," Justice Carro quipped.  (RH2 16.)  "Are you saying he can't assist his attorney because of his [delusions?]"  (RH2 16.)  At that point, Dr. Rivas reminded the court of Musaid's conspiratorial delusion that Siracusa had stolen $48,000 from him, and remarked that "it's hard to work with an attorney when you don't trust the attorney."  (RH2 16.)  In a brief redirect, Dr. Rivas further clarified that Musaid's inability to work with his attorney was a result of his mental illness.  (RH 17.)

MHLS then called Musaid to the stand.  (RH2 17.)  Justice Carro immediately stated that court would break for lunch.  (RH2 16.)  Musaid then interjected, "I have a heart disease and kidney disease, man!"  (RH2 17.)

When the hearing resumed after lunch, MHLS had changed its position:

> At this time, Mr. Musaid is not going to take the stand and I'm not going to call him as a witness.  I did explain to him, and he understands, why he's here today.  His concern was that the medication he was on and the side effects he had and I explained to him that's something that the doctor and the hospital need to take care of and that is not before this Court. He also understands that he has medical issues.  And I also told him that's not before this Court; that's something that the doctor has to take care of; so at this time he's not taking the stand so we rest.

(RH2 18.)

MHLS then gave a closing statement, arguing that "just based on the doctor's testimony[,] … the hospital did not [show by] clear and convincing evidence that [Musaid needs to continue to be found unfit."  (RH2 18-19.)

Justice Carro then held an off-the-record discussion at the bench.  (RH2 19.)  An ADA arrived, and MHLS made a comment which seemed to explain why Musaid was held

54

at Rikers for so long before the hearing: "It was administratively adjourned back in December and I don't know why he wasn't transferred back." (RH2 19.)

After a recess, the court recalled the case and explained that Musaid's criminal defense attorney, Siracusa, had been replaced with Theodore Herlich, who was now in attendance. (RH2 21.) Justice Carro asked Musaid, "That's what you want; correct?," to which Musaid replied, "Okay, but how do I get my money back?" (RH2 21.)

Justice Carro told Musaid that that was a separate issue and concluded the proceeding by stating that he was going to send Musaid for another exam "to make sure that you understand what's going on here in court and then we're going to proceed from there and – " but Musaid interrupted, once again asking who was going to treat him for his heart and kidney issues. (RH2 21.) "First we want to deal with your court case," Justice Carro explained, and then ordered another § 730 examination. (RH2 21-22.) Justice Carro would later characterize his position at that time as "unable to determine if [Musaid] was an incapacitated person." (D&O at 1.[19])

### h.    Time In Rikers Prior To Examination

The reports of Musaid's subsequent examinations contain extensive notes of his time at Rikers from his discharge from Mid-Hudson to the time of his examinations. (Ciric Report, Resp. Ex. T, at 8-9.) The notes indicate that, for that entire time, he was treated by Correctional Health Services, the direct health care provider for NYC's jails. (*See* Ciric Report at 8.) In December 2014, upon admission to Rikers, a clinician noted – contrary to a malingering finding – that Musaid may have been "minimizing the presence of psychotic symptoms." (Ciric Report at 9.) He remained "100% non-compliant with meds,"

---

[19] "D&O" refers to Justice Carro's April 22, 2015 Decision and Order on the issue of Musaid's fitness (Resp. Ex. V).

"did not appear to understand the gravity of his charges," was observed talking to himself without stimulation, and complained that "being in jail [was] making [his] symptoms worse." (Ciric Report at 8-9.)

In January 2015, Musaid continued to refuse medication and "lack[ed] insight [in]to his diagnosis and the importance of medication." (Ciric Report at 8.) On February 4, 2015, he denied having any symptoms of mental illness, but had "paranoid feelings about the court just wanting to keep him incarcerated." (Ciric Report at 8.) On both February 10 and 16, 2015, Musaid reported that he "had not heard voices in three days." (Ciric Report at 8.) That is notable because all prior reports indicated that he had consistently denied hearing voices. On February 28, 2015, however, a clinician noted that Musaid sought medical attention "1-2 times per day." (Ciric Report at 8.)

A note from March 9, 2015 is the first one indicating any compliance with his medications, though it states that he was "poorly compliant with meds." (Ciric Report at 8.) Subsequent notes indicate that the medication was a short-acting oral form of risperidone, as well as a litany of medications for stomach issues, pain, and side effects. (Ciric Report at 8, 10.) Through March 12, 2015, the last note from the Correctional Health Services, Musaid "was not forthcoming of any psychotic symptoms" and was in "complete denial of [his] illness." (Ciric Report at 8.)

### i.    Final Examinations

Drs. Steven Ciric and Nancy Nichols-Goldstein examined Musaid over two interviews – one on March 11, 2015 and one on April 15, 2015 – with the assistance of an Arabic interpreter on both occasions and Musaid's attorney present at the second. (Ciric Report at 1; Nichols-Goldstein Report II, Resp. Ex. U, at 1, 3.) Dr. Nichols-Goldstein was one of the doctors who had examined Musaid on October 18, 2011, pursuant to

Justice Carro's third examination order, and deemed him unfit. (Nichols-Goldstein Report.) On April 15, 2015, both doctors ultimately found Musaid fit to proceed. (Ciric Report at 3; Nichols-Goldstein Report II at 3.)

Musaid had a basic understanding of criminal proceedings at both the March 11 and June 15 interviews. (Ciric Report at 2-3; Nichols-Goldstein Report II at 2-3.) He knew that his new defense attorney was Theodore Herlich, whose role was to defend him; that the DA was against him; that the judge was the "president" / "chairman" of the court; and that the jury decided guilt or innocence. (Ciric Report at 2-3; Nichols-Goldstein Report II at 2-3.)

Musaid's clinical and biographical history – though now including notes from his previous eight years of treatment – remained largely unchanged, except, however, Musaid now reported for the first time a history of substance abuse. (Ciric Report at 5; Nichols-Goldstein Report II at 4.) He stated that, for approximately two years prior to 2007, when Rafik was killed, he drank "two bottles of Hennessey daily." (Ciric Report at 5; Nichols-Goldstein Report II at 4.) He also stated that one of his prior arrests occurred when he "drank liquor and jumped a turnstile" (Ciric Report at 5), and that he had once become "dizzy and unable to find his way home after smoking hashish with a friend." (Nichols-Goldstein Report II at 4).

In notes that are not pegged to either of the two interviews, Dr. Ciric noted that Musaid denied knowing why he had been admitted to mental hospitals over the last eight years, "return[ed] to his preoccupation with physical ailments"; denied having a mental illness; refused to take his medication (at least in injectable form); and "sometimes" had

57

to be locked in his cell for one or two days because he would scream about the fact that "they refused to admit me to a clinic." (Ciric Report at 4.)

At the March 11, 2015 interview, Musaid "was very somatically preoccupied and oddly related throughout the interview," needing "redirection and limit-setting to affectively conduct the interview." (Ciric Report at 9; Nichols-Goldstein Report at 5.) He gave incorrect answers to basic calculations: "3x5 = 20, 8+5 = 14, and 2+2 = 5." (Ciric Report at 9.) When asked about plea bargaining, Musaid said that a defendant who is guilty can admit and get less years, but that a defendant who was not guilty could not admit to guilt. (Ciric Report at 9.) When pressed on whether an innocent person could admit to guilt to get a lesser sentence, Musaid "remained steadfast" that that could "never happen" for him. (Ciric Report at 9.) He was resolute that "if he believed himself innocent, then it would not be possible to lose at trial." (Ciric Report at 9.) He was convinced that there was "no proof against [him]," he had been so informed by one of his lawyers, there could be no witnesses against him, and he had made no inculpatory statements. (Ciric Report at 9.) He did acknowledge, however, that his lawyer had told him that if he admitted to the crime he would get much less time, and that if he went to trial, he might get 25 years, but if he were to win, he would go home. (Ciric Report at 9.)

At the April 15, 2015 interview, Musaid reported that he had "remained compliant with daily mediation at Rikers, and denied major psychological symptoms." (Ciric Report at 10.) Musaid still gave incorrect answers to basic arithmetic, "responding that 1+1 is '3' and 2+2 is '5'," but Dr. Ciric now noted that his calculation difficulties "impressed as possibly exaggerated." (Ciric Report at 10.) Contrary to his prior acknowledgement of

58

hearing voices, Musaid now denied having ever heard voices. (Ciric Report at 10; Nichols-Goldstein Report II at 5.)

Even though Musaid denied having any psychological symptoms, he "continued to evince multiple somatic preoccupations," and "was eager to relate concerns about his physical worries," "necessitating intermittent redirection." (Ciric Report at 10.) Dr. Nichols-Goldstein also noted that he "complained about being hit, about having a broken spine as well as nose[,] and when the interviewer tried to continue, Musaid said in English, "Let me finish." (Nichols-Goldstein Report II at 4.) Dr. Ciric concluded, however, that he "otherwise sat without agitation for a lengthy interview and mostly responded to efforts to redirect him to pertinent questions." (Circ Report at 10.)

Despite reporting compliance with his medication, Musaid also "expressed worry around his medical treatment." (Circ Report at 10.) He believed that the doctors were not properly treating his ailments and were "going to kill [him]" with his medication. (Ciric Report at 10.) He denied having any conspiratorial thinking, but "expressed suspiciousness that the doctors and the judge and the government 'may be plotting to kill me.'" (Ciric Report at 10; Nichols-Goldstein Report II at 5.) Dr. Ciric, however, characterized his conspiratorial thinking as "without clear-cut or elaborated delusions thinking," and noted that he "was able to discuss his legal situation without undue digression to paranoid themes." (Ciric Report at 11.)

With respect to his legal situation, Musaid "demonstrated an understanding of the options of proceeding to a trial versus entering in a 'negotiation' or 'plea bargain,'" explaining that if a defendant took a plea bargain, he would get less years, that if he went

to trial and was found guilty, he could get more years, but that if he went to trial and was found innocent, he would get out of jail.  (Ciric Report at 10-11.)

> He initially expressed an unwavering preference for the trial option, asserting that there [was] no evidence against him…. However, when presented with information from counsel about the possibility, though presently unconfirmed, of alleged evidence (biological material on gun trigger, question of a witness placing defendant near crime scene), the defendant's stance became more flexible.

(Ciric Report at 11.)

When Drs. Ciric and Nichols-Goldstein presented Musaid with hypotheticals including such evidence, Musaid replied that he would "of course" consider a plea bargain, and that if the State could prove its case, he wanted to receive the shortest prison sentence.  (Ciric Report at 11.)  Musaid also stated that he trusted his assigned counsel, thought Herlich was fighting for him, and would listen to his advice.  (Ciric Report at 1.) At sentencing, when recounting this examination, Herlich would state:

> It had been my impression that one of the central issues at the assessment was that [Musaid] agreed that if the DNA results pending at the time regarding whether or not his DNA was present on the gun would come back positive to defendant, he would consider some type of negotiations for a plea instead of proceeding to trial.  At that time he said yes.  I think that was a very important moment in the interview which led the psychiatrist to find him fit to proceed.  So we came to trial.

(Sentencing Tr. 4-5.[20])

Based on the April 15, 2015 examination, both Drs. Ciric and Nichols-Goldstein found that Musaid adequately understood the proceedings against him and could assist

---

[20] "Sentencing Tr." refers to the transcript of Musaid sentencing, which occurred on April 12, 2016 (Dkt. 20-9).

in his own defense and was thus fit to proceed.  (Ciric Report at 12; Nichols-Goldstein Report II at 5.)

## C.    Fitness Decision

On April 15, 2015, the court received the examination reports from Drs. Ciric and Nichols-Goldstein.  (D&O at 2.)  Nothing in the record suggests that a motion for a competency hearing was made at that juncture.  The Court specifically asked the parties to review the case file and inform the Court of whether there was any evidence that a request for a competency hearing was made after those examinations were completed, and the State represented that there was not.  (Dkt. 37 at 3.)

On April 22, 2015, Justice Carro issued a Decision and Order deeming Musiad fit to proceed.  (D&O.)  The Decision and Order briefly recounts the history of the proceedings, concluding with the fact that the court had received the April 15, 2015 examination reports.  (D&O at 2.)  The entire substantive discussion of the issue of Musaid's capacity to stand trial reads as follows:

> The reports reflect the conclusions of examiners Steven Ciric, M.D. and N. Nichols-Goldstein, Psy. D., that the defendant does not as a result of mental disease or defect lack capacity to understand the proceedings against him or to assist in his own defense.  After carefully considering these conclusions and the examinations on which they were based, the court is satisfied that the defendant is no longer an incapacitated person.

(D&O at 2.)

## D.    DNA Comparison

On May 13, 2015 – roughly three weeks after Justice Carro's final fitness determination – a sample of Musaid's DNA was compared to a partial profile that the State was able to develop from a sample taken from the trigger of the gun that was found near

61

the crime scene.  (2T 319.)  To understand the results, a brief review of DNA comparisons is appropriate.

When technicians develop and compare DNA samples, they look at sixteen different locations on strains of DNA.  (*See* 2T 323-24.)  Those locations are called loci, and each locus that is examined contains two genes called "alleles."  (*See* 3T 328.)  "The alleles at comparable loci vary from person to person and are the basis of individual DNA profiles."  *United States v. Jones*, 965 F.3d 149, 155 (2d Cir. 2020).  The chance that two people will have the same "eight or ten of these alleles at four or five different loci is extremely low."  *United States v. Jakobetz*, 955 F.2d 786, 792 (2d Cir. 1992).

In this case, the "partial profile" that the technician was able to develop from the trigger of the gun consisted of eleven alleles at eight loci – both alleles at three loci and one allele at five other loci.  (2T 335.)  No more than two alleles were found at any locus, indicating that the DNA came from a "single source," that is, one person.  (2T 325-26, 331.)

The sample from the trigger of the gun was compared with a sample taken from Musaid, which had the same eleven alleles at the same eight loci.  (2T 320-27, 335.)  The chance of two people having the same eleven alleles at those eight loci was one in 107 million.  (2T 327.)  The lab technician would later testify that the DNA on the trigger of the gun "matche[d]" Musaid.  (2T 326-27.)

Despite this new evidence against Musaid, he proceeded to trial.  Musaid was 37 years old at the time and faced life in prison.  According to his application for pro bono counsel and a guardian ad litem in this case, Musaid "was offered 21 years flat."  (Dkt. 6

62

at 7.)  Nothing in the record indicates that a motion was made for a competency hearing after Musaid learned of the DNA evidence and refused to accept a plea.

### E.      Psychiatric Defense

As will be discussed next, Musaid waived an affirmative psychiatric defense. Before examining that waiver in more detail, the Court first explains the nature of a psychiatric defense as distinct from a psychiatric plea and as distinct from competency to stand trial.

#### 1.      Psychiatric Defense Generally

On October 5, 2015, Musaid's attorney, Herlich, filed a notice of intent to present psychiatric evidence in support of the affirmative defense of "lack of responsibility by reason of mental disease or defect." (Resp. Ex. W.)  Under New York law, a person is not criminally responsible for a crime when, at the time the crime was committed, the person, as a result of mental disease or defect, lacked substantial capacity to know or appreciate either (1) the nature and consequences of such conduct; or (2) that such conduct was wrong.   N.Y. Penal Law § 40.15.   Such a defense is referred to as a "psychiatric defense" or, colloquially, as an "insanity defense."  *See Cortijo v. Bennett*, 293 F. App'x 794, 795 (2d Cir. 2008).

Importantly for this case, a defense of not responsible by reason of mental disease or defect (a psychiatric defense or insanity defense) is distinct from a plea of not guilty by reason of mental disease or defect, otherwise known as an "insanity plea."  When a defendant pursues a psychiatric defense, the defendant does so at trial, before a jury, as part of the adversarial proceedings, and the defendant bears the burden of proving the psychiatric defense by a preponderance of the evidence.  *See* N.Y. Penal Law § 40.15.

63

By contrast, when a defendant pleads not responsible by reason of mental disease or defect, the defendant forgoes trial. *See* N.Y. Crim. Proc. L. § 220.15. To enter such a plea, the defendant must have the consent of the prosecution and the court, and the prosecution must state that, if the case had gone to trial, the defendant would have proven the psychiatric defense by a preponderance of the evidence. N.Y. Crim. Proc. L. § 220.15(1). Since defendants waive their constitutional trial rights by accepting such a plea, the court must question the defendant in open court to determine that the defendant understands the ramifications of waiving their trial rights. N.Y. Crim. Proc. L. § 220.15(4). The court must also state on the record "in detail and not in conclusory terms," that each element of the charged offense would have been proven beyond a reasonable doubt at trial, that a psychiatric defense would have been proven by a preponderance of the evidence at trial, that the defendant had the competency to stand trial, that the defendant's plea was knowing and voluntary, and that the accepting of the plea was in the public interest. N.Y. Crim. Proc. L. § 220.15(5).

Furthermore, a defense or plea of not responsible by reason of mental disease or defect are distinct from incompetency to stand trial. *Medina v. California*, 505 U.S. 437, 448 (1992). The question of competency to stand trial focuses on the defendant's mental state at the time of trial – if he is incompetent, he may not enter a plea or be prosecuted. *Drope*, 420 U.S. at 171. By contrast, a defense or plea of not responsible by reason of mental disease or defect focuses on the defendant's mental state at the time the crime was committed – if he suffered a mental disease or defect when the crime was committed, he may not be criminally liable, but he can still be prosecuted. The concepts are interrelated, however, as entering a plea or presenting a defense of not guilty by reason

64

of mental disease or defect requires that a defendant is competent to stand trial. *Medina*, 505 U.S. at 449 (1992).

When either a jury renders a verdict that a defendant is not responsible by reason of mental disease or defect, or the court accepts a plea of not responsible by reason of mental disease or defect, the defendant enters a system, similar to that outlined in § 730, where the defendant is examined by doctors to determine if he has a dangerous mental disorder, a mental illness, or neither. *See* N.Y. Crim. Proc. L. § 330.20(2), (6), (8)-(13). Defendants with dangerous mental disorders must be committed to secure facilities; defendants with mental illnesses but not dangerous mental disorders can be committed to secure or non-secure facilities with conditions; and defendants with neither dangerous mental disorders or mental illnesses must be released. *Id.*

In this case, the Manhattan District Attorney's office opposed Musaid's motion to present psychiatric evidence in support of a psychiatric defense. (Resp. Ex. X.) The opposition brief stated that Musaid had "made it clear – both on the record and to counsel directly – that he refuse[d] to allow counsel to interpose [a psychiatric defense]," and wished to argue that this was a case of mistaken identity and he was innocent. (Resp. Ex. X at 1.) The brief then established, through ample citation to case law, that the decision of what defense to pursue rests with the defendant, not defense counsel. (Resp. Ex. at 1-4.) Finally, the brief noted that the court could hold a hearing to determine whether the defendant did, in fact, wish to pursue a psychiatric defense. (Resp. Ex. X at 1-5.)

65

**2.    Hearing And Decision**

On January 11, 2016, Justice Carro held a hearing to set a trial date and decide whether a psychiatric defense would be presented to the jury.  (Pretrial Tr. 1.[21])  Musaid was represented by Herlich; the State was represented by Matthew Bogdanos; and an Arabic interpreter was present.  (Pretrial Tr. 1, 8.)  The waiver hearing is important not only with respect to whether Musaid effectively waived a psychiatric defense, but also because it is one of the junctures at which Petitioner now argues that Justice Carro should have been concerned that Musaid was not fit to stand trial and ordered a competency hearing.

The questioning of Musaid, and his answers about what exactly he was waiving, were not a pinnacle of clarity, largely because of Musaid's digressions.   Justice Carro started the hearing by explaining its purpose to Musaid: "[W]e are here to set your trial date, but I'm going to ask you a few questions, okay?  So listen to my questions, and then after that if there is some concerns you have I'll hear you.  But first let me ask you a few questions." (Pretrial Tr. 2.)

Musaid replied by asking a question: "What is trial?"  (Pretrial Tr. 2.)

Justice Carro then turned to Herlich and asked, "Is he ready to go?"  (Pretrial Tr. 2.)  Herlich said "Yes, he is," and Musaid said, "Fine."  (Pretrial Tr. 2.)

Justice Carro then attempted to proceed with his explanation: "So we are about to set your case down for a trial so that a jury can decide the issues in this case."  (Pretrial Tr. 2.)

Musaid interjected: "The jurors?"  (Pretrial Tr. 2.)

---

[21] "Pretrial Tr." refers to the transcript of the pretrial hearing held on January 11, 2016 (Dkt. 20-2).

The following colloquy ensued:

> CARRO: Yes. The jurors will decide the issues.
>
> MUSAID: They will decide?
>
> CARRO: Correct.
>
> MUSAID: The jury?  The jury you mean will decide, right?
>
> CARRO: Yes.  So let me ask you a couple questions.  So one of the defenses that your attorney brought up is you taking the position of interposing a psychiatric defense.
>
> MUSAID: No, I don't want it.
>
> CARRO: Right.   Only you can decide how you want to proceed at this trial, what defenses you want to put forward, right?
>
> MUSAID: If they don't uncuff me to let me go in the street I will go for trial.

(Pretrial Tr. 2-3.)

Justice Carro then asked Musaid if he had conferred with Herlich about whether to put forth a psychiatric defense, at which point Musaid and Herlich conferred.  (Pretrial Tr. 3.)  Back on the record, the colloquy continued with Herlich correcting Musaid about what Justice Carro had asked:

> HERLICH: No, that is not the question.  The question is, did you discuss with me the insanity plea?
>
> MUSAID: The only discussion that my lawyer asked me if I would plead with the insanity and I said no.
>
> CARRO: [Alright].  So not only – right, okay.  Not only plead, but you don't want the defense of insanity before a jury; is that correct?
>
> MUSAID: No.
>
> CARRO: No.  Well, okay.  So you do not want to take that position at trial, correct?

67

> MUSAID: I don't want to be in that position.  I don't' want to be insanity.  I don't want an insanity plea.
>
> CARRO: The record should note that Mr. Musaid has spoken in English.
>
> BOGDANOS: And he said "I don't want the insanity plea," were his exact words.

(Pretrial Tr. 3-4.)

Herlich once again conferred with Musaid, and the colloquy continued:

> BOGDANOS: I'm not sure how much of that go on the record. I could certainly overhear him saying I refuse that.
>
> MUSAID: I didn't speak to nobody.  I didn't kill nobody.
>
> HERLICH: Okay.  Judge, when I spoke to my client just now, as distinct from an insanity plea –
>
> CARRO: Speak slowly.  He has to interpret this.
>
> HERLICH: – as distinct from an insanity plea, I asked my client are you rejecting putting forth an insanity defense at trial, which means that you admit to the commission of the crime, but you are claiming that you were insane at the time of the crime, and he indicated that he rejects the defense.
>
> BOGDANOS: And to be precise, in English his exact words were "I refuse."
>
> CARRO: Correct.
>
> MUSAID: That I killed and I was insane at the moment, right? That is what you are saying?
>
> CARRO: Yes.  That's the position you are rejecting.
>
> MUSAID: No.  I didn't do it.  I didn't do it.  I don't understand. I don't know what happened.

(Pretrial Tr. 4-5.)

Herlich conferred with Musaid again, and then Justice Carro issued his ruling: "He just said in English he wants to plead innocent, so I'm satisfied that it is his wish to go forward with the trial and not interpose a psychiatric defense." (Pretrial Tr. 5.)

The parties then discussed other evidentiary issues that are not relevant here and set a trial date. Justice Carro then addressed Musaid, and the following exchange about the trial and jury ensued:

> CARRO: So let me just tell you, sir, you know, when Corrections wants to bring you here in the morning, you have to get on the bus and come here so we can start your trial, and then you will find out –
>
> MUSAID: No, I come. I always come. They don't told me where I'm going, exactly what happened. Sometimes they tell me I go to Bellevue Hospital for psych. Sometimes they tell me I go to clinic. Sometimes I go to court. I don't know where I'm going.
>
> CARRO: Well I'm telling you now, on the 25th, that Monday, you are going to be coming here.
>
> MUSAID: 25th what? Monday?
>
> CARRO: Monday the 25th.
>
> MUSAID: No, I won't give them a hard time.
>
> CARRO: Once the jury decides we'll find out whether you are going home or –
>
> MUSAID: What will decide? What is the decision?
>
> CARRO: Whether you are guilty or not guilty. The jury will decide that, and then we will know where you will be. So we will see you on the 25th.
>
> MUSAID: Tell them I didn't kill anyone.
>
> CARRO: Okay. Okay.
>
> MUSAID: I didn't do nothing. My case, there is no evidence, no witness, no nothing. No evidence. I didn't do the crime. I'm innocent.

69

CARRO: Okay.  That is for the jury to decide.

(Pretrial Tr. 5-8.)

## F.    Trial

Although trial was scheduled to begin January 25, 2016, jury selection did not start until February 1, 2016.  There is no explanation for the delay in the record.

Jury selection proceeded smoothly, with the exception of the following interjection by Musaid as Bogdanos questioned a potential juror:

> BOGDANOS: Let me come here to you.  Ma'am, can you accept that I may prove to you everything in this case?  I may prove to you that this man right here, Mohamed Musaid, walked up behind the victim, shot him three times, twice in the back.
>
> MUSAID: I'm innocent.

(1T 120.)  No one replied to Musaid's interjection.  Bogdanos simply continued with his question.  And Musaid made no further comments during jury selection.

During trial, however, Musaid interjected at various points.  Petitioner points to several of those interjections as additional junctures that Justice Carro should have doubted Musaid's competency to be tried and inquired into his fitness.  Respondent points to some of those interjections as evidence that Musaid understood the proceedings against him and could assist in his own defense.  The Court will thus review those interjections and the contexts in which they occurred.

### 1.    Day One

Trial started with opening statements on February 2, 2016.  Before the jury entered the courtroom, as the attorneys were putting in their appearances, the following exchange between the court and Musaid occurred:

MUSAID: I have health problem, your Honor.  My heart, my lung, my heart, my kidney, my arm.  And the police hit me around this area.

CARRO: Okay.

MUSAID: The ribs, the ribs broken.  He need some help.

CARRO: We're going to deal with that later on.

MUSAID: The police were hitting me.  GRVC and when I was at precinct.

CARRO: I'm going to try to get you to move somewhere else.

MUSAID: I need help.  I need my help.  My heart, my kidneys hurts and there is blood and I was extracting blood, too, and I faint and I'm –

CARRO: Okay.  We're going to deal with that later and I'm going to try to get you moved.

MUSAID: And my vertebrae is broken.

CARRO: Okay. I'm going to talk to you later about that.

MUSAID: My ribs, my fingers are broken.  I have problem with my spine.  The thumb.  Somebody broke his thumb Manhattan.

CARRO: Okay.

MUSAID: My right feet.  I need assistance.  I need somebody to help me.  I guess I'm injection on my right feet. The injection and I'm still under treatment and I broke my big toe, the next to the one.  I always faint and I'm not concentrating.  And somebody hit me at this level.  He hit me with a knife.  He stabbed me in.  I put everything in writing in the document.

CARRO: I'm going to look at that, but I can't talk to you about this now.  We're going to talk about this later.  We have the jury coming in.  You have to sit quietly.

MUSAID: I didn't speak to anybody.  I didn't do anything.  I didn't kill anybody.  I don't have the guns.  I do not have nothing.

CARRO: You're going to be able to talk to the jury.

71

MUSAID: (In English) I'm innocent.  I want to go home.

CARRO: We'll figure out whether you're going to go home in a couple of days.  We have to get through the trial.

MUSAID: The witness Noman, I don't know him.

CARRO: Okay.

MUSAID: Alsamet.

CARRO: Mr. Musaid, please don't [interrupt] me, okay. You got to remain quiet.  Mr. Musaid, listen to me.  No.  Listen to me.  You have to remain quiet when the jury comes in here.  We're going to go through your case and they'll decide whether you go home or not.  That's No. 1.  No. 2, if you disrupt this proceeding, I'm going to remove you from here, okay.  You're going to be at a disadvantage because Mr. Herlich won't have the availability to speak to you about the case and assist you in your defense.  You have a right to be here, but you also have to follow the rules.  Now I've listened to you for a number of minutes.  Now it's time to remain quiet.  And when it's your turn to tell the jury what you need to tell the jury, if that's what you wish to do after discussing it with your attorney, you'll have the ability to do that.  Okay.

MUSAID: There's so many lies against me.

CARRO: Well, you can tell that to the jury at the proper time.

MUSAID: Is it possible to give a copy to the jury?

CARRO: It's not your turn yet.  When it's your turn, I'll talk about that.  They're coming in now in just about a minute.

MUSAID: Your Honor, they didn't give me my medication. I didn't take anything this morning.

CARRO: We'll get you that.

MUSAID: Somebody get in touch with them.  They supposed to give me medication with the food and make me stiff and maybe me trembling.

CARRO: We'll work on that.

(1T 162-65.) At that point, the jury entered the courtroom, and Musaid did not say another word.

The prosecutor, Bogdanos, got through his entire opening statement – laying out all of the State's evidence – without Musaid interjecting. (1T 165-98.) Musaid's defense attorney, Herlich, did not make an opening statement. (1T 198.)

The State then called its first witness, Noman Alsamet, the brother of the victim, Rafik Alsamet. (2T 2.) Noman testified about his family history, his relationship to Musaid, and Musaid's threats against Rafik. (2T 2-17.) Musaid did not interrupt Noman on the record at any point.[22]

Next, the State called Omar Hadwan, the fifteen-year-old who had known Musaid since they both lived in Yemen and placed Musaid at the scene of the crime shortly before Rafik was killed. (2T 18.) Hadwan testified to his relationship with Musaid and seeing Musaid that morning. (2T 18-35.) Once again, Musaid did not interrupt the witness's testimony. After Justice Carro told Hadwan that he could step down, however, Musaid interjected: "Judge, Judge, he's lying. He's lying." (2T 35.)

Justic Carro ignored the outburst, dismissed Hadwan, and then dismissed the jury for a lunch break. (2T 35.) After the jury exited the courtroom, the following discussion was held at sidebar, offering some insight into Musaid's condition beyond what was captured during questioning, and Justice Carro's opinion about that conduct:

> CARRO: This morning the defendant complained about a number of injuries, his thumb, his ribs, and various other parts of his body. He has done this repeatedly through the pendency of this case which was a number of years and also

---

[22] Musaid may have made interruptions not captured in the transcript, but the Court relies on what is captured by the record, which includes both interjections by Musaid and discussions about his conduct.

claims some of the injuries are inflicted by the Department of Correction. This has been investigated, and defendant has been brought to the hospital many times by the Department of Correction. Each time no injury. In court today, he indicated that both thumbs were broken. He was able to move both thumbs. I was watching him during the course of the trial. He also complained of broken ribs. He had no problem breathing or speaking. He complained of pain. He has no standing. This has been a strateg[y] of his since day one. It may be a strategy to garner some kind of bail conditions, but it's truly been untrue allegations by the defendant.

BOGDANOS: Let me add a couple of things. One, he has no visible injuries whatsoever on his hands or on his face all of which are clear. Secondly, he said that the injuries that were inflicted today were inflicted by the police while he was in Rikers Island which is, of course, absurd on its face. Third, he had said at one point that he couldn't concentrate. However, throughout the entire morning he participated; he was engaged. He was very loudly advising Mr. Herlich what to do and what not to do. He was engaged in running commentary on every single witness out loud in English I don't know for me to hear. Presumably he was doing this intentionally for the jury. At all occasions, he knew what was going on in the courtroom. He's indicating a clear awareness of his surroundings, and frankly I join your Honor in this. This is orchestrated at manipulation of the System.

HERLICH: Judge, just to say a few word on behalf of my client. The obsessive complaining about his kidney and his heart.

CARRO: That he didn't do today.

HERLICH: Oh, he did say that to me in the pens before he came out. That's sort of just somatic to the delusion that, at least, in light of the psychiatric reports during the pendency of this case. They consider that a symptom of his chronic schizophrenia. And just one other thing, Judge. One of his thumbs was injured while he was in Mid-Hudson. He has a lawsuit in Federal Court against a Mid-Hudson employee named Colum Mulca (phonetic). He's always complaining how that's the individual who broke his thumb subduing him because he refused to take his psych medication. So he mentions his thumb quite a bit. But I think today is the first time you hear anything about both thumbs.

74

> CARRO: Oh, I thought he was complaining that it was broken now.
>
> HERLICH: No, in Mid-Hudson.  One other thing.  The last thing when my clients use the word, police, they mean correction officer.  I think the defendant did his usually routine of lying down on the floor when he doesn't get his way.  The correction officer may have had to use same force to get him onto the bus and off the bus which was appropriate to the situation because his MO is to lie on the floor when he doesn't get his way.

(2T 36-38.)

After lunch, the case resumed and the State called Juanita Brown, the woman who witnessed the shooting while waiting for her boss to arrive at work.  (2T 39.)  Brown testified to what she had seen that morning, and Musaid was silent throughout.  (2T 39-53.)

For the remainder of the day, the State called four police officers who testified to responding to the scene and finding Rafik deceased (2T 54-68), hearing a report of a gun being thrown over a nearby fence (2T 68-78), retrieving the gun (2T 78-94), and swabbing the gun for DNA and retrieving the bullets (2T 96-134).  Musaid did not make any interjections during that testimony.

After the jury exited the courtroom, Herlich asked the court's permission to make an evidentiary objection.  Before addressing the objection, Justice Carro stated the following about Musaid's behavior for the record: "[Musaid] just took a soft landing to the floor which is not unusual for him."  (2T 134.)  Counsel then discussed the evidentiary objection without further recorded interruption from Musaid, and the case was adjourned for the day.  (2T 135-36.)

75

## 2. Day Two

On the second day of trial, before the jury entered the courtroom, Musaid once again started the day by complaining to the judge about various issues. He stated that he was innocent and wanted to go home. (2T 137-38.) Justice Carro told him that he would have the opportunity to testify the following day and that trial should be over by Monday. (2T 137-38.) Musaid replied that he wanted to go home by Monday, and then digressed into expressing more somatic delusions: "My kidney hurt. My heart hurt. I need to go to hospital." (2T 138.) The discussion ended with Justice Carro telling Musaid that he needed to be quiet and not to interrupt the proceedings. (2T 138.) At that point, the jury entered the courtroom and Musaid once again ceased interjecting on the record.

The state called four police officers who testified to various aspects of the investigation – the undercover officer who witnessed the aftermath of Rafik being shot and chased the perpetrator (2T 142-53), an officer who responded to the scene and found Rafik's identification (2T 153-67), an officer who transported the DNA swabs taken from the gun (2T 167-76), and one of the officers who arrested Musaid in the Kennedy Fried Chicken (2T 176-94).

In recounting his story, the arresting officer testified about a person – who he identified by name as Oumar Diallo – approaching him to tell him that he had seen the man on the wanted poster (Musaid) in a nearby restaurant. (2T 191.) Diallo would not testify at trial, so after the testimony of the arresting officer, Bogdanos read into the record a stipulation stating that Diallo was not an eyewitness to the shooting, but had seen the wanted poster, seen Musaid inside the Kennedy Fried Chicken, and flagged down the police. (2T 191-92.)

76

After that, the jury was dismissed, the attorneys discussed evidentiary and scheduling matters, and a brief recess was taken. (2T 192-94.) After the recess, before the jury returned to the courtroom, Musaid asked, "Your Honor, what Omar said about me?" (2T 194.)

Justice Carro responded: "Oumar Diallo? You'll have an opportunity to tell the jury whatever you want if that's what you want to do, but we're going to continue with the trial. Remain quiet. We'll talk to you at the end of the case. We're going to bring out the jury now." (2T 194.) Musaid remained quiet, the jury reentered the courtroom, and the proceedings continued.

The next witness for the State was Detective Killen, who had taken Musaid's confession. During Detective Killen's testimony, Musaid appeared to correct a date to which Detective Killen testified in the following interaction:

> BOGDANOS: Did Mr. Musaid indicate the last time he had been back to Yemen?
>
> KILLEN: I believe it was 1999.
>
> MUSAID: It's not true. He's lying. He's lying.
>
> BOGDANOS: Do you want to take a look at your notes?
>
> MUSAID: He's lying to me.
>
> KILLEN: It was in 2003.

(2T 215-16.) That concluded Musaid's interruption at that juncture. However, as Detective Killen continued testifying, when he discussed writing down what Musaid was saying during the interview, Musaid spoke up again:

> BOGDANOS: And did you explain to Mr. Musaid that you were, in fact, writing out his statement?
>
> KILLEN: Yes.

77

> BOGDANOS: And did you do that?
>
> KILLEN. Yes.
>
> MUSAID: You lying.
>
> BOGDANOS: If I could ask that People's 12 for identification be shown.  Could we have –
>
> CARRO: I told you you'll have an opportunity.  If you wish to say something, you'll have an opportunity later on, but now you have to be quiet.
>
> MUSAID: He's lying. You have –
>
> CARRO: Listen to me.
>
> MUSAID: You have tape recorder?
>
> CARRO: Continue. Go ahead.

(2T 220-21.)  After being admonished by the court, Musaid ceased interrupting on the record for the rest of Detective Killen's testimony.  However, after the detective was dismissed from the stand and the State called its next witness, but before that witnesses took the stand, Musaid added one more time: "He's lying."  (2T 236(a).)

The final three witnesses for the day were the medical examiner, who testified that Rafik suffered three gunshot wounds (2T 237-64); the interpreter who was present during Musaid's interrogation and testified to the circumstances around his confession (2T 265-77); and a police officer who testified to the operability of the recovered firearm (2T 277-90).  Musaid made no recorded interruptions.

After the testimony for the day concluded, and the jury exited the courtroom, the following information about Musaid's courtroom behavior, and both the court and the prosecutor's perception of it, was put on the record:

> CARRO: On the record.  The defendant has to be taken out of the courtroom again.  He is flopping to the floor as the jury was leaving at the end of the day as he did yesterday.

78

BOGDANOS: Tuesday.

CARRO: Tuesday. So, hopefully, he'll come tomorrow. We'll see what he's going to do, but we'll see.

BOGDANOS: Judge, there can be no doubt by – held by anyone in this courtroom, and it should be clear on the record this is completely 100 percent intentional. Again as the jury is walking out, he falls out of his chair softly falling on his face and screaming how he's innocent and has to be taken to the hospital. As he's being led out, he's screaming, Stop hitting me. And I'm watching, and not a single court officer is laying hands on him other than escorting him out and he's screaming, Stop hitting me, I'm innocent, etc. I mean, this is completely manipulated, completely intentional. Obviously, your Honor is going to be given an instruction. I understand. You already told us at the end of the trial. If he's not here tomorrow, he's made it abundantly clear that to him this is a circus.

CARRO: I'm certain this is intentional. It is all an act. It's pretty clear. It's been pretty clear for years now because this is a routine he's done before. Actually, this is I think it's the first time in court, but he does this in Corrections repeatedly and I'm certain of that. I warned him countless time he has to behave himself here. Let's see if he shows up tomorrow. It should be noted that he delays coming to court, refusing to come to the courtroom and has to be persuaded to come here. And our outstanding force orders that are actually getting him to the courthouse. All right.

(2T 290-91(a).)

### 3.    Day Three

The third day started with more complaints from Musaid. He stated that his heart hurt, then said that he was innocent and wanted to go home. (2T 292-93.) To that, Justice Carro replied, "I don't know why you're telling me this. The jury is going to decide this." Justice Carro then threatened to remove Musaid from the courtroom and proceed with trial without him. (2T 293.) Nevertheless, Musaid burst into a litany of somatic complaints: "I'm sick, I'm dying. I'm dying. I need to go to the hospital. I'm really sick.

79

I'm really sick.... I'm afraid to die." (2T 293.) Justice Carro simply told Musaid to be quiet and instructed his clerk to bring in the jury. (2T 293.) At that point, the jury entered, and Musaid ceased his protestations.

The State's final three witnesses were a detective who took a DNA sample from Musaid in May 2015 (2T 294-302); the DNA analyst who developed the samples from the gun and Musaid and compared the two (303-42); and the ballistics expert who stated that the gun recovered near the crime scene, with Musaid's DNA on the trigger, was the gun that fired the three bullets that killed Rafik (2T 343-67). During all of that testimony, Musaid interrupted on the record only once, and it was directed at his interpreter. As the ballistics expert testified about how guns allegedly leave markings on bullets, the following occurred:

> INTERPRETER: The interpreter would like to –
>
> CARRO: No, don't interrupt.
>
> MUSAID: He's playing games, the interpreter.
>
> CARRO: Just keep quiet.
>
> MUSAID: He's playing games, the interpreter.
>
> CARRO: Quiet down.

(2T 347.) The rest of the expert's testimony proceeded without recorded interruption, and the State rested its case.

Justice Carro then dismissed the jury for a lunch break and asked Musaid to speak with Herlich about whether he wished to testify, resulting in the longest colloquy with Musaid on the record. Musaid started by stating that he would like to give the jury a piece of paper. (2T 368.) Herlich explained that the paper was about Musaid's prior attorney taking his money and incidents with corrections officers and Mid-Hudson staff and that

80

"[n]one of it [was] about this case." (2T 368-69.) Justice Carro explained to Musaid that he could not give the letter to the jury because it was not relevant to his case, told him again to discuss with his lawyer if he wanted to testify, then said they would return at 2:15. (2T 369-70.) At that point, Musaid and Justice Carro had the following exchange:

> MUSAID: What happened about my case right now?
>
> CARRO: That is what I am asking. You can testify this afternoon, or it would be over this afternoon.
>
> MUSAID: You're not going to let me go home?
>
> CARRO: Depends on what the jury decides. That we will find out on Monday. See you Monday.
>
> MUSAID: I not commit no crime. I am innocent. I want to go home.

(2T 370-71.) With that, the lunch break was taken.

When the parties returned, but before the jury entered, the discussion continued. At first, Herlich said that Musaid had decided that he would testify: "To the extent I'm able to determine his wishes, the answer is yes. [He wants to testify.]" (2T 372.) Justice Carro then explained to Musaid that he would be allowed to testify but would then be cross-examined by Bogdanos. (2T 372.) At first, Musaid complained that his written confession was false and there was no video but then asked what he would be asked on cross examination. (2T 372-33.)

Herlich conferred with Musaid again and reported to the court that Musaid had changed his mind and would not testify. (2T 373.) Herlich explained that if Musaid took the stand, he would explain that he remembered nothing of the date the crime occurred and "refute the written statement and his signature that's affixed." (2T 373-75.) After a final round of debating if he would testify, the following ensued:

81

> MUSAID: What kind of questions I will be asked?
>
> CARRO: I don't know.  I'm not the prosecutor in this case. You're going to be asked about everything you heard during the course of this trial and more.
>
> MUSAID: No.  I don't want to.
>
> HERLICH: The answer is no.
>
> BOGDANOS: He said it in English.  Defendant said it in English.

(2T 375.)  With that, the jury reentered the courtroom, the defense rested, and Justice Carro dismissed the jury until the following day of trial, when summations would be delivered.  (2T 376.)

After the jury exited, Musaid told Justice Carro, "Judge, I'm innocent," to which Justice Carro replied, "I know.  I know.  Hold on a second.  Let me hear from you[r] attorney."  (2T 376.)  The court and attorneys discussed some procedural matters, and then Justice Carro turned back to Musaid, resulting in further comments by Musaid and discussion of his behavior:

> CARRO: Great.  Mr. Musaid, we've decided to break for the day so you have to come back on Monday and then we'll find out from the jury whether I send you home or not.  If they don't decide it on Monday, you'll have to come back on Tuesday.
>
> MUSAID: I'm innocent.  I don't have guns.  I don't have knife. I'm innocent.
>
> CARRO: If the jury thinks that, then they will be sending you home.  All right.  We're done.
>
> (Whereupon, there was an off-the-record discussion at the bench between Court and counsels.)
>
> CARRO: We're back on the record again.  The defendant took a dive to the floor.  This time not in front of the jury, but, again, he did a soft landing to the floor, made the officers have to carry him out.

82

> BOGDANOS: The record should reflect he didn't do it in front of the jury because all of us led him to believe we were coming back again.    It wasn't the end of the day.    Obviously, intentionally.    So part of his manipulations.

(2T 379-80.)

### 4.    Day Four And Verdict

Day four of the trial consisted largely of summations, during which Musaid interjected only three times.    When Bogdanos mentioned that the ballistics test on the recovered gun and DNA comparisons were not done until after Musaid gave his confession, Musaid said simply, "Not true."    (2T 433.)    Later, Bogdanos referred to the fact that Musaid said something about wanting to go home to the assistant district attorney who spoke with him after his confession, then argued that that may be how things work in Yemen, but not the United States.    (2T 438.)    To that, Musaid said only, "He's lying." (2T 438.)    And as Bogdanos tried to conclude his summation, saying, "[J]ustice in this case says unerringly Mohamed Musaid for the murder of Rafik Alsamet on the morning of November 21st of 2007 – ," Musaid interjected to say, "You are lying."    (2T 440.)    All of those interruptions passed without comment by the court or prosecutor.

After summations, the jury was dismissed for lunch, Justice Carro and the attorneys had a brief conversation, then Justice Carro dismissed them for lunch, as well. (2T 442.)    At that time, Musaid stated without context, "This is not true.    I don't have guns. I have nothing."    (2T 442.)    Justice Carro replied: "It's not over yet.    We'll see you after lunch."    To which Musaid responded, "I want to go home.    I don't have guns."    (2T 442-43.)    Then the lunch recess was taken.

After lunch, Justice Carro charged the jury and dismissed them to their deliberations. After they were dismissed, Musaid continued to profess his innocence to Justice Carro. (2T 464.)

Before the end of the day, the jury reached a verdict, finding Musaid guilty on both charges. (2T 465-66.) Justice Carro then polled the jury, and each juror individually confirmed that their verdict was guilty on both charges. (2T 466-67.) The jury then exited the courtroom, and the following exchange ensued, concluding the trial transcript:

> MUSAID: I'm not guilty, Judge.
>
> CARRO: March 14th. I'm ordering 390 as part of the I and S.
>
> HERLICH: Thank you, your Honor.
>
> MUSAID: Let me finish talk.
>
> CARRO: We'll talk to you in March.
>
> MUSAID: What happened now? What happened now, Judge?
>
> CARRO: Relax.
>
> MUSAID: I'm not guilty. What happened, Judge? I want to do trial again. I want to do trial again.

(2T 468.)

## G.    Sentencing

Sentencing occurred on April 12, 2016. (Sentencing Tr. 1.) Bogdanos spoke on behalf of the State, recounting the testimony at trial and requesting the maximum of 25-to-life on the murder charge and a consecutive sentence for the gun charge. (Sentencing Tr. 2-4.) The record contains no interruptions by Musaid. Herlich then spoke on Musaid's behalf and recounted how Musaid had spent "seven years between Mid-Hudson and Kirby – ," when Musaid corrected him, stating, "Eight years." (Sentencing Tr. 4.)

84

Herlich then recounted how it was his belief that one of the central issues of the final competency assessment was that Musaid had agreed that if the DNA results pending at the time had come back matching Musaid, then Musaid would consider a plea bargain; Herlich also underscored Musaid's rejection of any psychiatric defense at trial. (Sentencing Tr. 4-5.)  Herlich concluded by stating that Musaid's ability to assist in his own defense was "an open question," because "he's pretty much refused or opposed any kind of legal advice or assistance I could have accorded him prior to trial, during and after trial."  (Sentencing Tr. 5.)

Justice Carro then asked Musaid if he had anything he wanted to say before he was sentenced., Musaid's statement and sentencing, during which the court opined about Musaid's competency, concluded the proceeding as follows:

> MUSAID: Listen, I am not the crime.  The witness not saying anything about my case, (unintelligible).  I want to go home.  I'm innocent.  (Unintelligible).  I do not have guns.  I do not have nothing.  The jury say find me guilty and the lawyer represent me right and this guy is against me for no reason, Man.  The jury find me guilty.  I'm innocent.  When it come pick the phone in front of the jury and find me guilty.  I am not guilty.  I am innocent.  I do not have guns.  I do not have nothing.  I want to go home as soon as possible.  I want to go home now, please.  My kidney and find blood and my spine is broken.
>
> CARRO: We'll talk about your medical condition in a minute.
>
> MUSAID: Let me go home, please.
>
> CARRO: This was a conviction after trial.  Clearly, the defendant does suffer some psychiatric issues; however, he certainly was fit for trial and those psychiatric issues did not play a part in what was clearly a calculated, premeditated murder of the deceased in the case.  There was even evidence, if my recollection serves me, that the defendant hid out after he perpetrated this murder.  So on the conviction for Murder in the Second Degree, the defendant is sentenced to the maximum allowable under the law, a minimum of 25 years,

maximum of the rest of his life.  The conviction for the Class C violent felony, Criminal Possession a Weapon in the Second Degree, the defendant is sentenced to five years with five years post-release supervision, a determinate sentence. That sentence to run consecutively to the 25 years, for a total of 30 years to the rest of his life.  That's the sentence of the Court.  Take charge.

MUSAID: What happened.

CARRO: They'll bring you back.

MUSAID: What happened now?

CARRO: They'll tell you in the back.

(Sentencing Tr. 6-7.)

## H.    Direct Appeal

In June 2018, Musaid appealed his conviction and sentence to the New York Appellate Division of the New York Supreme Court, making four arguments: (1) the trial court deprived him of due process in ruling that he was competent to stand trial based on the 2015 evaluations of Drs. Ciric and Nichols-Goldstein because their findings were rebutted by the symptoms he exhibited during those evaluations and prior evaluations that had found him incompetent when exhibiting those symptoms; (2) the trial court denied Musaid due process by failing to fulfill its continuing duty to inquire into his fitness where his behavior leading up to, during, and after trial signified that he was not fit; (3) the trial court deprived him of due process and his right to a fair trial by insufficiently inquiring

86

into the waiver of his right to pursue a psychiatric defense; and (4) his aggregate sentence of 30 years to life was excessive.[23]  (Appellate Br. at 2.[24])

On January 17, 2019, the Appellate Division, First Department, rejected Musaid's claims.  *People v. Musaid*, 168 A.D.3d 526, 526, 91 N.Y.S.3d 93, 94, *leave to appeal denied*, 33 N.Y.3d 979, 124 N.E.3d 720 (2019).  The substance of the brief decision reads, in its entirety:

> The court properly found defendant fit to proceed to trial following [§ 730] examinations.  The ultimate expert findings, and defendant's statements, showed that he evinced an understanding of the purpose of a trial, the actors in a trial, their roles, the nature of the charges against him, and the severity of a potential conviction and sentence.  Despite defendant's claims of innocence in the face of overwhelming evidence of his guilt, the most recent set of expert reports provided no indication that he was unable to understand the proceedings and assist in his defense.  Although defendant engaged in some conspiratorial thinking, this did not render him unfit in light of his general understanding of the proceedings.  The court reasonably credited experts who found that defendant's psychiatric symptoms had been alleviated by compliance with his medication regimen, thus rendering his past history an unreliable indicator of his present competency.  We also find that there was nothing in defendant's behavior during trial that obligated the court to order yet another examination, sua sponte.
>
> Having found defendant competent to stand trial, the court properly permitted him to decline to assert an insanity defense.  The court was not required to conduct an inquiry analogous to the procedure for accepting a defendant's waiver of the right to counsel.  In any event, the court fully informed defendant of his right to raise the affirmative defense

---

[23] In Musaid's appellate brief and habeas petition, the first two claims are stylized as sub-arguments to a single claim, but Musaid's counseled reply brief in support of his habeas petition breaks them into separate claims.  For clarity, the court discusses them as separate claims throughout.

[24] "Appellate Br." refers to Musaid's brief to the Appellate Division of the New York Supreme Court (Resp. Ex. A).

> of mental disease or defect and defendant knowingly chose
> not to assert such a defense.

*Id.* at 526-27, 91 N.Y.S.3d at 94-95 (internal quotation marks, citations, and brackets omitted.)

Musaid sought leave to appeal to the New York Court of Appeals through two separate letters.  On February 14, 2019, he filed a letter with his appellate brief attached, asking the Court to "consider and review all state and federal issues in the attached briefs," and noting that he may send a follow-up letter in support of the application after the case was assigned to one of the Court's Judges.  (Dkt. 30 at 5-6.)  Then, on March 14, 2019, after the case was assigned to Judge Michael J. Garcia, Musaid submitted another letter seeking leave to appeal.  (Resp. Ex. D.)  That letter did not reference the first letter and focused almost exclusively on Musaid's waiver of his right to pursue a psychiatric defense.  (Resp. Ex. D at 1-7.)  The second letter never specifically addressed the trial court's finding of competency based on the final § 730 examinations or failure to inquire into Musaid's competency at any point thereafter.  The last sentence did, however, "request that [the] Court review all state and federal issues presented."  (Resp. Ex. D. at 7.)

On April 25, 2019, the Court of Appeals denied leave to appeal.  *People v. Musaid*, 33 N.Y.3d 979, 101 N.Y.S.3d 231 (2019).

I.   **Habeas Petition**

On August 23, 2019, Musaid petitioned this Court for a writ of habeas corpus. (Petition at 1.[25])  In it, Musaid raised the first three issues outlined above: (1) that he was denied due process when deemed competent based on the 2015 § 730 evaluations; (2)

---

[25] "Petition" refers to Musaid petition for a writ of habeas corpus (Dkt. 1).

that he was denied due process when no further inquiries were made into his competency before or during trial; and (3) that he was denied due process and a right to a fair trial when the trial court did not sufficiently inquire into the waiver of his right to present a psychiatric defense.  (Petition at 4.)  Musaid's petition attached his brief to the New York Appellate Division.  (Petition, Ex. A.)  Arguments made in Musaid's Appellate Division brief, to the extent relevant to his habeas claims, are thus included in the court's analysis below.

On October 25, 2019, Musaid also filed a motion for appointment of pro bono counsel and a guardian ad litem.  (Dkt. 6.)  The motion noted that because of Musaid's psychiatric disorders, the Legal Assistance Program of the Clinton Correction Facility was assisting him with his application.  (Dkt. 6 at 2.)  It further explained that, at the time of filing, Musaid was being housed in the Intensive Care Program unit ("ICP"), which is for incarcerated people with "severe mental and social issues."  (Dkt. 6 at 3.)  Musaid was being "force[-]medicated once a month with a dosage of strong antipsychotic medication" that gave him "severe, zombie-like side effects," which were treated with "other mental health medications which have their own side effects (i.e. oral ticks, spastic movements, etc."  (Dkt. 6 at 3.)

The motion was accompanied by a sworn affidavit from the incarcerated law library clerk who was assisting Musaid.  (Dkt. 6, Ex. C.)  The affidavit reveals that Musaid's pre-trial conditions persisted: "Mr. Musaid was constantly in need of explanation of the most basic legal terms and procedures he needed to understand in order to file his federal habeas application(s).  He was under a constant belief that he was going to go home soon.  He kept on insisting on his innocence, even though I tried to explain to him that his

89

DNA on the weapon and his confession suggested otherwise." (Dkt. 6, Ex. C at 1.) The law library clerk observed that Musaid's mental condition fluctuated from being "almost competent enough to understand the appellate process" shortly after receiving his monthly injections to "an absolute fantasy world of going home" as the end of the monthly cycle approached. (Dkt 6, Ex. C at 2.)

On October 31, 2019, the Honorable Analisa Torres examined Musaid's petition, ordered respondent to answer, and referred the case to the undersigned. (Dkts. 10, 11.) This Court granted Musaid's motion for pro bono representation and denied his motion for appointment of a guardian ad litem without prejudice to renew. (Dkt. 13.) Musaid is now represented by Jeffrey G. Pittell of Maher & Pittell LLP. The request for a guardian ad litem has not been renewed.

On March 9, 2020, Respondent filed its opposition to Musaid's petition, (Dkts. 18-20); Petitioner filed a reply on August 30, 2020 (Dkt. 25). After some additional letter briefing on discreet questions from the Court and filings of supplemental portions of the record on appeal, the petition is now ripe for review.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides a remedy for a state prisoner when his continued custody is in violation of federal law. 28 U.S.C § 2254(a). Under AEDPA, an application for a writ of habeas corpus on behalf of a state prisoner "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

90

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims,' and to give appropriate deference to that decision." *Wilson v. Sellers*, __ U.S. __, __, 138 S. Ct. 1188, 1191-92 (2018) (first quoting *Hittson v. Chatman*, 576 U.S. 1028, 1028 (2015) (Ginsburg, J., concurring in denial of certiorari); then citing *Harrington v. Richter*, 562 U.S. 86, 101-02 (2011)).

A state court decision is "contrary to" clearly established precedent when the state court applies a rule that is "diametrically different, opposite in character or nature, or mutually opposed" to the governing law set forth in Supreme Court cases. *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotation marks omitted) (quoting *Contrary*, Webster's Third New International Dictionary (1976)).

By contrast, "[a] court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle … but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). This inquiry focuses not on whether the state court's application of clearly established federal law is merely incorrect or erroneous, but on whether it is objectively unreasonable. *See id.* "Under § 2254(d), a habeas court must determine what arguments or theories supported or, … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories

91

are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102.

AEDPA forecloses "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (quoting *Renico v. Lett*, 559 U.S. 766, 779 (2010)). "A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion." *Pine v. Superintendent, Green Haven Correctional Facility*, 103 F. Supp. 3d 263, 275 (N.D.N.Y. 2015). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Even if a trial court error meets the standards required by AEDPA, habeas relief is not warranted unless the violation "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (confirming continued applicability of Brecht under AEDPA); *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) ("Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict.") (quoting *Brecht*, 507 U.S. at 637); *Butler v. Graham*, No. 07-CV-6586, 2008 WL 2388740, *6 (S.D.N.Y. June 12, 2008) (recognizing and applying "substantial and injurious effect" standard and citing *Brecht* and *Fry*).

The habeas petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Jones v. Vacco*, 126 F.3d 408,

92

415 (2d Cir. 1997). The petitioner also bears "the burden of rebutting the presumption of correctness" of state court fact determinations "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

AEDPA also imposes a number of threshold requirements on habeas petitioners, including that petitioners first exhaust their claims in state court. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005). The exhaustion requirement is designed to provide state courts with the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *see Galdamez*, 394 F.3d at 72-73 ("Comity concerns lie at the core of the exhaustion requirement."). The Second Circuit has adopted the Supreme Court's warning against "interpreting this [exhaustion] provision too narrowly"; exhaustion requires "'only that state prisoners give state courts a *fair* opportunity to act on their claims.'" *Galdamez*, 394 F.3d at 72 (emphasis in original) (quoting *O'Sullivan*, 526 U.S. at 844).

As a result, a petitioner need not invoke every possible avenue of state court review but instead must "'give the state courts *one full opportunity* to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.'" *Id.* at 73 (emphasis in original) (quoting *O'Sullivan*, 526 U.S. at 845). A "complete round" requires presenting the federal claim to the highest court of the state, which in this case is the New York Court of Appeals. *See id.* (citing *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000)). Furthermore, a petitioner must have "'*fairly presented* his claims to the state courts,' such that the state court had a fair opportunity to act." *Id.*

(alteration omitted) (emphasis in original) (quoting O'Sullivan, 526 U.S. at 848). Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)).

Where a state appellate court summarily affirms a decision by the lower court, the federal habeas court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume[s] that the unexplained decision adopted the same reasoning." *Wilson*, ___ U.S. at ___, 138 S. Ct. at 1192. "[T]he State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id.*

## DISCUSSION

### A.    Exhaustion

As noted, all claims raised in a petition for habeas corpus must first be exhausted in state court, which requires presenting those claims to the New York Court of Appeals. *See Galdamez*, 394 F.3d at 73. When a defendant raises several issues in briefing to the Appellate Division, but then raises only a subset of those issues in a leave to appeal to the Court of Appeals, only the subset of issues is exhausted, even if the defendant attaches the Appellate Division briefing to the leave to appeal. *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991). In addition, if the leave to appeal argues a single claim at length and makes only passing reference to other claims to be found in attached Appellate

94

Division briefing, those other claims are not exhausted. *Jordan v. Lefevre*, 206 F.3d 196, 198 (2d Cir. 2000). On the other hand, if the leave to appeal states that it is pressing "all of the claims in the attached brief," or makes no argument at length and simply requests that the Court of Appeals "consider and review all issues outlined" in the attached Appellate Division briefing, all claims raised in the Appellate Division briefing are exhausted. *Id.* at 199.

Where a defendant files two letters seeking leave to appeal to the Court of Appeals, if the first letter attaches the Appellate Division brief and requests review of "all issues outlined" in the brief, all issues in the Appellate Division brief are exhausted, even if the second letter addresses only a subset of those issues. *Morgan v. Bennett*, 204 F.3d 360, 371 (2d Cir. 2000). The second letter focusing on only one issue does not withdraw the others. *Id.*

Here, Musaid filed two letters with the Court of Appeals regarding his request for leave to appeal. In his first letter, Musaid asked the Court to "consider and review all state and federal issues in [his attached Appellate Division Brief." (Dkt. 30 at 5-6.) But when Respondent initially filed the state-court record in the instant proceeding, it included only Musaid's second letter. That letter argued at length Musaid's claim about wavier of his psychiatric defense, did not reference the first letter, did not list as an attachment Musaid's Appellate Division brief, and did not ask the Court of Appeals to address all of the issues raised in the Appellate Division. It asked only that the Court review "all state and federal issues presented." (Resp. Ex. D. at 7.)

Based on that letter alone, it thus appeared that Musaid's competency claims had not been exhausted. Respondent's opposition, however, did not make that argument. Of

95

course, a state may waive the exhaustion requirement, but only if it does so expressly. 28 U.S.C. § 2254(b)(3); *Jelinek v. Costello*, 247 F. Supp. 2d 212, 263 (E.D.N.Y. 2003).

Accordingly, the Court requested letter briefing from the parties on why Petitioner's competency claims should not be barred for failure to exhaust.  (Dkt. 27.)  The parties submitted letter briefs, acknowledging that the State had failed to file Musaid's first letter seeking leave to appeal and agreeing that all claims were properly exhausted.  (Dkts. 30, 31.)  Where a state expressly concedes that a petitioner has satisfied the exhaustion requirement – and that concession is not based on a mistake of fact – the state has expressly waived the exhaustion requirement.  *Vazquez v. Secretary, Florida Department of Corrections*, 827 F.3d 964, 966-67 (11th Cir. 2016).  Based on this Court's review of the record, the State's concession was not based on a mistake of fact, and thus the exhaustion requirement is expressly waived.

Even without the State's concession, the Court finds that Musaid's claims have been properly exhausted.  Musaid's first letter seeking leave to appeal, attaching his Appellate Division brief, and asking the Court to "consider and review all state and federal issues in the attached briefs" satisfied the exhaustion requirement, and his second letter arguing at length his claim about waiver of his psychiatric defense without mentioning his other claims did not withdraw those claims.  *Morgan*, 204 F.3d at 371.  In *Morgan*, unlike here, the second letter referenced the first letter.  That is a potentially distinguishing feature.  However, the bottom line in *Morgan* was that "[b]ecause counsel's initial letter expressly sought review of all issues outlined in [petitioner's Appellate Division brief]," the exhaustion requirement had been satisfied as to all claims.  *Id.*  All of Musaid's claims

96

were thus properly exhausted.  Accordingly, all of Musaid's habeas claims are properly before this Court for habeas review.

## B.    Legal Standards For Competency

The test for determining if a criminal defendant is competent is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960).  A person "whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense" is not competent to enter a plea, stand trial, or be sentenced.  *Drope*, 420 U.S. at 171; *Godinez v. Moran*, 509 U.S. 389, 398 (1993) *United States v. Mata*, 614 F. App'x 35, 35 (2d Cir. 2015).  Accordingly, the state may not prosecute such a person. *Drope*, 420 U.S. at 171 (1975).  Doing so violates due process and the fundamental principles underpinning our criminal legal system.  *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996).  The Supreme Court has emphasized that "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the right to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so."  *Cooper*, 517 U.S. at 354 (internal quotation marks omitted).

The duty to ensure that a defendant is competent during all stages of a criminal prosecution ultimately rests with the trial court.  *See Harris v. Kuhlmann*, 346 F.3d 330, 350 (2d Cir. 2003).  Even after a court has found a defendant competent at one stage,

the court "must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181. To fulfill its duty, a trial court must hold a competency hearing whenever there is "reasonable ground … to conclude that the defendant may not be competent to stand trial." *Harris*, 346 F.3d at 350 (internal quotation marks omitted). That duty exists even absent a motion by defense counsel. *Cooper*, 517 U.S. at 354 n.4.

In determining whether reasonable ground to believe that a defendant may not be competent exists, there are no "fixed or immutable signs which invariably indicate the need for further inquiry." *Drope*, 420 U.S. at 180. "[T]he question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts." *Id.*

The Supreme Court has stated that some relevant considerations are "a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion[s]," but that "even one of th[o]se factors standing alone may, in some circumstances, be sufficient." *Id.* Although the court's duty to hold a hearing where appropriate exists even absent a motion by defense counsel, defense counsel's opinion is another relevant consideration. *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir.1986). The Second Circuit has stated that, "since competency involves an inability to assist in the preparation of a defense or rationally to comprehend the nature of the proceedings, failure by trial counsel to indicate the presence of such difficulties provides substantial evidence of the defendant's competence." *Id.* In addition, medical opinions are usually "persuasive evidence on the question of whether sufficient doubt exists as to the defendant's

98

competence." *United States v. General*, 278 F.3d 389, 398 (4th Cir. 2002) (internal quotation marks omitted). More recent and comprehensive evaluations are entitled to "significant weight," *id.*, but that is not sufficient to resolve the issue of competence when conflicting reports are submitted "just a few days" apart. *Silverstein v. Henderson*, 706 F.2d 361, 369 (2d Cir. 1983). Any suggestion of malingering is also a relevant consideration. *Harris*, 346 F.3d at 355.

"Where there are two permissible views of the evidence as to competency, the court's choice between them cannot be deemed clearly erroneous." *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995) (internal quotation marks omitted). And where some evidence supports the notion that a defendant is incompetent, but there is also evidence to the contrary, it is generally not objectively unreasonable not to hold a competency hearing, especially where there is a suggestion that some of the evidence in support of incompetency is the result of malingering. *Harris*, 346 F.3d at 355.

In reviewing whether a trial court has properly discharged its duty to ensure that a defendant was competent at all stages of prosecution, "only the evidence before the court at the time its decision was made is pertinent. Obviously, before being required to hold a competency hearing on its own initiative, the trial judge must be made aware of the factual basis for questioning the competence of the defendant." *Nicks v. United States*, 955 F.2d 161, 168 (2d Cir. 1992). Where the evidence before the court does not create reasonable ground to question the defendant's competency, the court need not hold a competency hearing. *Roth v. Zelker*, 455 F.2d 1105, 1108 (2d Cir. 1972).

Both a state court's competency determination and decision on whether reasonable ground exists to hold a hearing are issues of fact. *Demosthenes v. Baal*, 495

U.S. 731, 735 (1990); *Nichols*, 56 F.3d at 414.  As with all habeas claims, a state court's factual findings about competency are presumed correct unless the petitioner rebuts them with clear and convincing evidence.  *Harris*, 346 F.3d at 350.  That is "particularly important" when reviewing the trial court's "assessment of witness credibility."  *Id.* Additionally, in the case of assessing competency, "deference is owed to the [trial] court's determinations based on observation of the defendant during the proceedings.  *Vamos*, 797 F.2d at 1150.  Similarly, the trial court is in a better position than a reviewing court to assess evidence of malingering.  *Harris*, 346 F.3d at 355.

As discussed above, a habeas court's role is not to determine whether a state court's application of the law to the facts was incorrect or erroneous, but whether its application of clearly established Supreme Court precedent was "objectively unreasonable."  *Id.*  In the case of a competency determination, this Court's role is thus to determine whether it was objectively unreasonable for the state court to conclude that the defendant had the capacity to understand the nature and object of the proceedings against him, consult with counsel, and assist in preparing his defense.  And in the case of a decision not to hold a competency hearing, this Court's role is to determine whether – at any stage of the prosecution – it was objectively unreasonable for the state court to conclude that there was not reasonable ground to believe that the defendant was incompetent.  *Id.*

## C.   Analysis

The Court will first address Musaid's claim that Justice Carro's April 22, 2015 decision finding him fit to proceed was an objectively unreasonable determination of the facts or application of clearly established Supreme Court precedent.  The Court will then

address Musaid's claim that his due process rights were violated when Justice Carro failed to further inquire into his competency leading up to, during, and after trial. Finally, the Court will address Musaid's claim that his rights to due process and a fair trial were violated because Justice Carro failed to adequately inquire into his waiver of a psychiatric defense.

### 1.    The Trial Court's Initial Fitness Decision Was Not Unreasonable

Petitioner argues that Justice Carro's April 22, 2015 fitness decision, issued approximately nine months before trial, and the Appellate Division's affirmance of that decision, were objectively unreasonable determinations of the facts and application of clearly established Supreme Court precedent. (Reply Br. at 43.) Petitioner is incorrect.

Both decisions correctly identified the proper standard for competency – that Musaid had to have sufficient ability to understand the proceedings against him and assist in his own defense. (D&O at 2; *Musaid*, 168 A.D.3d at 527, 91 N.Y.S.3d at 93 (citing *People v. Phillips*, 16 N.Y.3d 510, 516, 924 N.Y.S.2d 4, 11 (2011), which cites *Dusky*, 362 US at 402).) Justice Carro "carefully consider[ed]" the reports of Drs. Ciric and Nichols-Goldstein, and their conclusions that Musaid was competent, and concluded that Musaid was "no longer an incapacitated person." (D&O at 2). The Appellate Division found that crediting those reports to conclude that Musaid was "presently competent," despite his "past history," was reasonable. *Musaid*, 168 A.D.3d at 526, 91 N.Y.S.3d at 94. The reports of Drs. Ciric and Nichols-Goldstein addressed all of the major symptoms that had previously rendered Musaid incompetent and concluded that those symptoms had lessened to such a degree that he was competent to stand trial. Relying on those reports to find that Musaid was no longer incompetent was thus not objectively unreasonable.

Petitioner, however, argues that it was unreasonable to rely solely on the reports of Drs. Ciric and Nichols-Goldstein, especially when they were contradicted by Dr. Rivas's testimony "merely four months [earlier]" and the other previous reports that had found Musaid unfit. (Pet. Reply at 33-34.) That argument ignores the import of Justice Carro ordering the final § 730 evaluations and obscures the relevant temporal element of the competency inquiry.

At the October 22, 2014 retention hearing, Dr. Rivas testified the he believed Musaid was not fit to proceed. (RH2 8-9.) Dr. Rivas's testimony was the only evidence offered at that hearing. Nevertheless, at the conclusion of that hearing, Justice Carro was "unable to determine if [Musaid] was an incapacitated person." (D&O at 1.) Implicit in that conclusion is that Justice Carro did not fully credit Dr. Rivas's testimony. *See Harris*, 346 F.3d at 356 (court's refusal to hold a hearing when defense counsel raised issued of defendant's competency indicated that the court did not credit defense counsel, even though court never so stated).

This Court must afford a presumption of correctness to Justice Carro's fact finding, which petitioner can only overcome with clear and convincing evidence, and that is "particularly important" with respect to Justice Carro's "assessment of witness credibility." *Id.* at 350. Petitioner has not presented clear and convincing evidence that Justice Carro's assessment of Dr. Rivas's credibility was incorrect. This Court thus presumes that his assessment was correct. As such, the Court cannot say that it was objectively unreasonable to rely on the reports of Drs. Ciric and Nichols-Goldstein over the testimony of Dr. Rivas. That is particularly true because Drs. Ciric and Nichols-Goldstein had examined Musaid much more recently than had Dr. Rivas. *See General*, 278 F.3d at 398

(medical opinion was entitled to "significant weight because it [was] the most recent and comprehensive evaluation of [petitioner's] competency"). This is not a case where the reports were conducted "just a few days" apart, like in *Silverstein*, 706 F.2d at 369.

Petitioner argues that the reports of Drs. Ciric and Nichols-Goldstein were "contradicted by" many of the earlier reports that found Musaid incompetent. (Pet. Reply at 34.) However, there is nothing contradictory about a person being incompetent at one point and competent at another, and the proper inquiry for whether a person is competent to stand trial is whether that person has a "present ability" to understand the proceedings against him and rationally consult with his lawyer. *Dusky*, 362 U.S. at 402.

Petitioner also levels specific, substantive criticisms at the reports of Drs. Ciric and Nichols-Goldstein based on findings about Musaid's mental illness and competency in prior reports. In particular, Petitioner notes the reports of Drs. Ciric and Nichols-Goldstein "found Mr. Musaid competent, in part, because he seemed to understand the court processes and nature of his charges," and argues that that "did not definitively demonstrate he was fit to proceed as he was able to recite this information during periods he was deemed unfit." (Pet. Reply at 34-35.)

It is true that Musaid understood basic criminal procedures at times when he was found incompetent, but no one suggested that his ability to understand those procedures alone "definitively demonstrate[d]" that Musaid was fit to proceed. Neither Drs. Ciric and Nichols-Goldstein, nor Justice Carro, asserted that Musaid's understanding of basic criminal procedures improved in his final examinations, but Drs. Ciric and Nichols-Goldstein did note that Musaid had improved in various other respects, which the Court discusses below. Drs. Ciric and Nichols-Goldstein cannot be faulted for noting that

103

Musaid had a basic understanding of criminal procedures, nor can the fact that Musaid continued to have that understanding be considered evidence of incompetency.

Petitioner also points out that the reports of Drs. Ciric and Nichols-Goldstein indicate that Musaid was still suffering somatic delusions at the time of his final examination, and that other reports had previously found that those delusions prevented him from focusing on his case, thus rendering him incompetent. (Pet. Reply at 37-38.) The Court notes that the same is true of conspiratorial delusions. (Ciric Report at 10; Nichols-Goldstein Report II at 5.) However, a close review of the record indicates that the question of Musaid's competency was not always a matter of whether he did or did not suffer delusions, but a matter of the extent and effect of those delusions – particularly how much they interfered with his ability to focus on his legal case.

The first and third times that Musaid had been found fit, he was not exhibiting delusions. (Shoss Report at 3; Mortiere Report at 6-7.) The second time that he was found fit, however, he exhibited both somatic and conspiratorial delusions. (*See* Kunz Report at 5, 7.) At that juncture, the delusions were present, but the examiner reported that they did not preoccupy Musaid so much that he could not be redirected back to pertinent legal questions, which he could discuss without undue digression. (Kunz Report at 5, 7.) The same conclusion was reached in Musaid's final interview. (Ciric Report at 11.) Even Dr. Rivas noted that it would be possible for Musaid to have delusions and still be competent to stand trial. (RH 27.) With at least four doctors agreeing that Musaid could exhibit somatic and conspiratorial delusions and still be competent, the Court cannot say that it was objectively unreasonable to conclude that Musaid was competent to proceed despite the reports of Drs. Ciric and Nichols-Goldstein containing examples of

104

persistent delusions.  As Dr. Rivas noted, delusions or no, the key was whether Musaid had proper insight into his own psychiatric condition and his legal situation.  (RH 27.)

On that note, Petitioner argues that the reports of Drs. Ciric and Nichols-Goldstein do not "sufficiently demonstrate" that he recognized that he was mentally ill.  (Pet. Reply at 38.)  The final reports do not squarely state that Musaid acknowledged that he was mentally ill.  Nor do they clearly state that Musaid said he was not mentally ill during his final interview.  But a closer look at the contents of the reports provide some support that he did acknowledge his mental illness.

To be sure, Dr. Ciric's report indicated that Musaid flatly denied having a mental illness.  (Ciric Report at 4.)  That comment, however, was not pegged to the first or second interview.  It thus could have been made during the first interview, while the finding of fitness was based on Musaid's presentation during the second interview, not the first.  In his second interview with Drs. Ciric and Nichols-Goldstein, Musaid did express "worry about his medical treatment" and fear that his medication was going to kill him.  (Ciric Report at 10.)  However, he nevertheless reported being compliant with that medication. (Ciric Report at 10.)  As a previous report finding him fit noted, even when Musaid said that he did not believe he was mentally ill, compliance with his medication indicated an unspoken acknowledgment that he had a mental illness and needed medication.  (Kunz Report at 9.)  Of course, there could be other reasons for him to take his medication.  For example, he may have taken it only because he wanted to proceed to trial, and he knew that he had to comply with his medication in order to do so.  There is ample support in the record for the fact that Musaid desperately wanted to proceed to trial, such as his opposition to the two final applications for orders of retention.  (Pet. Ex. at 18, 21.)  But

105

because one reasonable interpretation of the reports was that Musaid's compliance with his medication was evidence of acknowledgment of his mental illness, it would not have been objectively unreasonable for Justice Carro to believe that Musaid acknowledged that he had a mental illness at that juncture.  *Nichols*, 56 F.3d at 411 (where there are two permissible views of evidence of competency, a court's choice between them cannot be deemed clearly erroneous.)

Petitioner also argues that the final examination reports of Drs. Ciric and Nichols-Goldstein did not provide a sufficient basis to believe that Musaid understood the gravity of the evidence against him adequately enough to be deemed competent.  (Pet. Reply at 35.)   Again, however, the question of Musaid's competency did not always turn on whether he initially denied the gravity of the evidence against him, but on whether he was too fixed on that delusion to consider his legal options or could be guided to consider the evidence against him through direction from the court or counsel.

It is true that Musaid's beliefs that he was innocent, that there was no evidence against him, and that there was no way that he could lose at trial were cited as reasons he was found incompetent in the past.  (Rivas Report II at 6; Hicks Report at 5-6; Rosner Report at 4; Erba Report at 4; Garakani Report at 4.)  It is also true that he continued to claim that there was no evidence against him and "express an unwavering preference for [ ] trial" in his final interview with Drs. Ciric and Nichols-Goldstein.  (Ciric Report at 11.) However, Musaid also expressed similar beliefs at two of the other three junctures where he was found fit to proceed.  (Kunz Report at 8 (maintained his innocence and claimed there was no evidence against him); Mortiere Report at 6 (strong preference to go to trial).)  In those instances, and in his final interview, he was initially adamant about his

106

beliefs but, after further discussion, was open to considering what evidence there was against him and changing his position based on that information.  (Kunz Report at 8; Mortiere Report at 6; Ciric Report at 11.)  Again, that was similar to how he presented in his final interview.  (Ciric Report at 11.)  It would thus not be objectively unreasonable to conclude that Musaid was competent to stand trial despite the fact that, at the start of his final interviews, he stated that there was no evidence against him and he wanted to go to trial.  To the contrary, that conclusion would be supported by some of Musaid's psychiatric evaluations, including the most recent ones.  (Kunz Report at 8; Mortiere Report at 6; Ciric Report at 11.)

In sum, the final examination reports of Drs. Ciric and Nichols-Goldstein addressed all of the serious symptoms that had previously been found to render Musaid incompetent and concluded that those symptoms had subsided enough that Musaid was no longer incompetent.  Those reports were more current than any other reports and indicated that Musaid had been compliant with his medication, which had improved his competency in the past.  In addition, at that juncture, Justice Carro had observed Musaid during at least three hearings and thus had points of reference for evaluating the contents of the reports. *See Vamos*, 797 F.2d at 1150 ("deference is owed to the [trial] court's determinations [about a defendant's competency] based on observations of the defendant during the proceedings").  This Court may have reached a different conclusion if presented with the same facts.  But based on the more current reports, which Justice Carro credited, stating that Musaid was competent, that he was compliant with his medication, and that the symptoms that previously rendered him incompetent had sufficiently subsided, this Court cannot say that it was objectively unreasonable to conclude that Musaid had the ability to

107

sufficiently understand the proceedings against him and consult with his lawyer. Accordingly, neither Justice Carro's decision, nor the Appellate Division's affirmance of that decision, was an objectively unreasonable determination of the facts or application of clearly established Supreme Court precedent.

### 2. Proceeding Through Trial Without A Competency Hearing Was Not Unreasonable

Petitioner argues that some of Musaid's conduct leading up to, during, and after trial created a reasonable ground to believe that Musaid was incompetent, and thus Justice Carro's failure to hold a competency hearing was an objectively unreasonable determination of the facts and application of clearly established Supreme Court precedent. (Reply at 27, 42-49; Appellate Br. at 45.) The Appellate Division did not address the failure to hold a competency hearing before or after trial and regarding trial itself, said only "there was nothing in defendant's behavior during trial that obligated the court to order yet another examination, sua sponte." *Musaid*, 168 A.D.3d at 527, 91 N.Y.S.3d at 95. The Court thus looks directly to the trial court's decision-making. *See Wilson*, ___ U.S. at ___, 138 S. Ct. at 1192. Since no party moved to hold a competency hearing, Justice Carro did not explicitly consider and reject holding a competency hearing at any point. Accordingly, the Court examines whether the facts before Justice Carro warranted holding a hearing sua sponte, and whether it was objectively unreasonable not to do so.

Aside from the hearing on waiver of Musaid's psychiatric defense, Petitioner does not specify what points "leading up to trial" created reasonable ground to hold a competency hearing, but three junctures merit discussing: (1) the point at which Justice Carro received the final evaluations and decided to issue a competency decision rather

108

than hold a hearing; (2) the point after which it became clear that the DNA results implicated Musaid and he did not accept a plea; and (3) during the hearing to set Musaid's trial date and discuss the waiver of his right to present a psychiatric defense. The Court will also discuss the points at trial and sentencing that Petitioner argues raised reasonable ground to believe that he was incompetent, most of which correspond to where he made interjections.

### a.    Upon Obtaining Final Evaluations

Petitioner has consistently characterized his challenge to Justice Carro's competency determination based on the reports of Drs. Ciric and Nichols-Goldstein as a substantive challenge – that is, whether it was incorrect, erroneous, or objectively unreasonable to conclude that Musaid had the ability to sufficiently understand the proceedings against him and consult with his lawyer. Petitioner has not, however, squarely argued in the alternative that, upon receiving the reports of Drs. Ciric and Nichols-Goldstein, there was reasonable ground to believe that Musaid may still have been an incompetent person and thus Justice Carro should have held a competency hearing rather than issuing a competency decision. In both his direct appeal and habeas petition, however, Musaid broadly challenged Justice Carro's failure to further inquire into Musaid's fitness at any point leading up to trial when the evidence provided reasonable ground to believe that Musaid may have been incompetent. (Appellate Br. at 45-52; Pet. Reply at 27.) For completeness, the Court addresses the issue.

A determination that a defendant is competent to stand trial may suggest that there was not reasonable ground to believe that the defendant may be incompetent. However, there can be reasonable ground to believe that a defendant is not competent even where the court does not believe that the defendant is actually incompetent. *Smith v. Rock*, 554

F. Supp. 2d 505, 512 (S.D.N.Y. 2008), *aff'd*, 344 F. App'x 656 (2d Cir. 2009). Furthermore, a court's belief that it needs to hold a competency hearing only when it believes that a defendant is actually incompetent, rather than when there is reasonable ground to believe that a defendant may be incompetent, is an objectively unreasonable application of clearly established Supreme Court precedent that requires granting a habeas petition. *Id.*

This case is arguably a prime example of where the court may not have believed that the defendant was incompetent but should have conducted further inquiry. As discussed above, there are ways to read the final reports of Drs. Ciric and Nichols-Goldstein as containing information that contradicted their conclusions that Musaid was fit to proceed, especially given the previous reports and testimony about what symptoms rendered Musaid incompetent. Given the importance of the prohibition on prosecuting incompetent defendants, and Musaid's right to be competent enough to consider a plea bargain or assist in his defense at trial, this Court is of the opinion that the potential contradictions in the final evaluation reports, and Musaid's extensive, fluctuating history of incompetency, warranted holding a competency hearing rather than simply relying on those reports and issuing a decision.

On habeas review, however, the question is not whether it was incorrect or erroneous not to hold a competency hearing, but whether it was objectively unreasonable to conclude that there was not reasonable ground to believe that Musaid may have been incompetent. *Harris*, 346 F.3d at 355. And based on the record, the Court cannot say that Justice Carro's decision not to hold a competency hearing was objectively unreasonable.

110

First, Musaid's defense counsel did not move for a competency hearing upon receiving the final examination reports of Drs. Ciric and Nichols-Goldstein, as he was entitled to do under § 730.  N.Y. Crim. Proc. L. § 730.30(2).  To verify that procedural fact, the Court ordered the parties to re-review the case file and inform the Court whether there was any record that Musaid's attorney, Herlich, requested a hearing at any point after the final § 730 evaluations.  (Dkt. 35.)  The State has represented that there is none, and Petitioner has not indicated otherwise.  (*See* Dkt. 37 at 3.)  If Herlich had requested a hearing, and one was not held, depriving Musaid of the ability to challenge the evaluations upon which the fitness decision was based, that would have been an objectively unreasonable application of clearly established Supreme Court precedent, requiring a grant of the habeas petition.  *Lewis v. Zon*, 573 F. Supp. 2d 804, 815 (S.D.N.Y. 2008).  Granted, Herlich was in a difficult position where his client adamantly opposed further commitment and was eager to go to trial.  Nevertheless, defense counsel's failure to raise the issue of competency provides "substantial evidence of defendant's competence." *Vamos*, 797 F.2d at 1150.

In addition, as discussed above, there are ways to read the final evaluation reports as fully consistent with the conclusion that Musaid was competent, even in the context of the prior findings of incompetency, and the Court must afford deference to Justice Carro's factual findings and assessments of credibility.  *Harris*, 346 F.3d at 350.  For those reasons, the Court cannot say that it was an objectively unreasonable determination of the facts or application of clearly established Supreme Court precedent for Justice Carro to conclude that there was not reasonable ground to believe that Musaid may have been incompetent at that juncture.

111

**b.      Upon Receipt Of DNA Results**

Review of the final evaluations by Drs. Ciric and Nichols-Goldstein reveal that their findings of competency depended in significant part on Musaid's willingness to consider a plea if the results of the forthcoming DNA comparison inculpated him.  (Ciric Report at 11.)  Musaid's ability to understand the weight of the potential evidence against him, and respond to it flexibly enough to consider a plea, differed markedly from how he presented at times when he was found incompetent.

When the DNA results came back inculpating Musaid, the fact that he did not accept a plea deal arguably undercut a significant basis for his final finding of fitness, warranting further inquiry.  Petitioner has not pointed to that specific juncture as one where Justice Carro should have found reasonable ground to believe that Musaid was unfit to proceed and thus held a competency hearing.  But because Petitioner broadly challenges Justice Carro's failure to hold a hearing at any point leading up to trial when the evidence required one (Appellate Br. at 45-52; Pet. Reply at 27), the Court will address this juncture for completeness.

Dr. Ciric and Nichols-Goldstein's final findings of competency depended on the fact that Musaid would "consider" a plea bargain if the DNA results inculpated him, not "accept" a plea bargain.  (Ciric Report at 11.)  That nuance is consistent with prior examinations where Musaid had been found fit to proceed, in which he said that he would consider a plea, but reject it if it were not good, even in the face of powerful evidence against him – his own confession.  (Mortiere Report at 6-7.)

At some point before trial, Justice Carro obviously became aware that Musaid did not accept a plea bargain even after learning of the results of the DNA comparison.  If Justice Carro had been informed that Musaid refused to even consider a plea, that may

112

have been an objectively unreasonable application of the Supreme Court's clearly established duty for a trial court to ensure that a criminal defendant is competent at all stages of prosecution.  *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the [legal] principle was announced" and "even a general standard may be applied in an unreasonable manner" (internal quotation marks omitted)).

Here, however, there is nothing in the record to suggest that Justice Carro was informed that Musaid refused to consider a plea bargain at that time.  In fact, there is nothing in the record that clearly states that a plea bargain was offered or still on the table at that juncture – after the DNA results came back.  And when assessing whether a trial court properly discharged its ongoing duty to ensure that a defendant was fit to proceed, a reviewing court can only consider facts of which the trial court was actually made aware. *Nicks*, 955 F.2d at 168.[26]

Here, it is particularly relevant that Herlich did not request a competency hearing. He would have been in the best position to inform the court if Musaid had refused to consider a plea bargain and request a competency hearing, and there is nothing in the record to suggest that he did.  That, again, provides "substantial evidence" to believe that

---

[26] There is a seeming oddity about the fact that Musaid's petition can be granted only if Justice Carro was aware of the evidence of his incompetency.  If Musaid was prosecuted while incompetent, his due process rights were violated regardless of whether Justice Carro was aware of it.  But that is the standard established by the Second Circuit.  That does not, however, leave an incompetent defendant without recourse.  Such a defendant could argue that his counsel was ineffective for not bringing evidence of his competency to the Court's attention, or that the prosecutor violated its duty by not disclosing it.  Musaid has made neither of those claims.

Musaid was competent at that juncture. *Vamos*, 797 F.2d at 1150. The Court cannot say that it was an objectively unreasonable determination of the facts or application of Supreme Court precedent for Justice Carro not to inquire into Musaid's continued competency upon learning that the DNA results had come back inculpating Musaid and no plea agreement had been reached.

### c.      At The Psychiatric Defense Hearing

One juncture leading up to trial that Musaid's counsel zeroed in on as a point where the evidence before Justice Carro required inquiring into Musaid's competency is the hearing on Musaid's wavier of his psychiatric defense. (Reply Br. at 16-17, 43.) At the hearing, Musaid made several comments that corresponded with the major symptoms of his mental illness or otherwise suggested incompetency, such as expressing ignorance of basic trial procedures, asserting his innocence, and denying that there was weighty evidence against him. The Court will examine those comments and the context surrounding them, but ultimately the Court cannot say that it was objectively unreasonable for Justice Carro not to believe that there was reasonable ground that Musaid may have been incompetent during that hearing.

### i.      Ignorance Of Trial Proceedings And Malingering

There are two points in the transcript of the waiver hearing where Musaid appeared oblivious to the most basic aspects of criminal procedure or completely disoriented to time and place. When Justice Carro said that the purpose of the hearing was to set Musaid's trial date, Musaid replied, "What is trial?" (Pretrial Tr. 2.) Justice Carro seemed to observe that something was off with Musaid, asking Herlich, "Is he ready to go?" (Pretrial Tr. 2.) Herlich said that he was and then Justice Carro mentioned that, at trial, the jury

would decide Musaid's case, to which Musaid appeared confused by the concept: "The jurors? … They will decide?" (Pretrial Tr. 2.)

On their face, those comments seem concerning. In its opposition to Musaid's petition, the State notes that the record contained evidence that Musaid feigned ignorance of concepts he had previously mastered, including the role of the judge and jury. (Opp. at 52.) That is true. (Kunz Report at 4; Saraiya Report at 5.) But the State suggests that Musaid was feigning ignorance to avoid being returned to jail or delay going to trial. (Opp. at 52.) That does not follow. Musaid consistently expressed an adamant desire to proceed to trial, including in opposing the retention orders by Mid-Hudson, which would have kept him out of jail and in the hospital. (Pet. Ex. at 18, 21.)

Nevertheless, the Second Circuit's decision in *Harris v. Kuhlman* requires that the Court afford great deference to the trial court's decision not to hold a competency hearing where there is a suggestion of malingering in the record. 346 F.3d at 355. Given the evidence of Musaid's malingering that will be addressed throughout the remainder of this opinion, a brief review of *Harris v. Kuhlman* and its import is warranted.

In *Harris v. Kuhlman*, like in this case, the defendant had confessed. *Id.* at 334. Prior to trial, the defendant was examined by a psychiatrist on two occasions to assess whether he was competent to stand trial, but also whether, as a result of low intelligence, he did not voluntarily waive his *Miranda* rights, requiring suppression of his confession. *Id.* The psychiatrist found him competent to stand trial but believed that he had not voluntarily waived his *Miranda* rights. *Id.* The psychiatrist testified that he did not believe that the defendant was malingering, though he did not conduct a formal malingering test.

115

*Id.* at 335.  The prosecutor, however, "raised the possibility" that the defendant was malingering.  *Id.*

While detained before trial, the defendant tried to escape and was shot in the head. *Id*.  As a result, defense counsel said that he was having trouble communicating with his client and sought a § 730 examination.  *Id.*  The court heard oral argument on the motion. *Id.*  As evidence of defendant's competency, the State noted that the defendant had been released from the hospital after the gunshot wound, and jail personnel had no problem communicating with him that morning.  *Id.* at 354-55.  In lieu of a medical evaluation, the court decided to question the defendant directly.  *Id.* at 335.  Some of defendant's answers indicated confusion, such as not knowing the day of the week.  *Id.*  Regardless, the court rejected the motion.  *Id.*  The court mentioned nothing about malingering, saying only that based on his observations in the questions he asked, he was "constrained to deny" the motion.  *Id.* at 336.  Subsequently, the court also denied the motion to suppress the confession, finding that the defendant was familiar with *Miranda* rights because of prior arrests and noting that "it is interesting to note[ ] that the defendant did not raise to [the psychiatrist] his confusion concerning his right to counsel until the second interview, at which point he had been studying this area of the law."  *Id.* at 337.

At a subsequent hearing on a separate issue, defense counsel informed the court that he had sought the defendant's assistance in investigating his prior arrests and choosing jurors, and the defendant would merely "utter forth a grunt" and "offered absolutely no assistance."  *Id.* at 338.  The court noted its belief that it had observed no evidence to believe that the defendant could not aid in the trial of the action and did not hold a competency hearing at that point or any point going forward.  *See id.* at 339.  In

116

his habeas petition, the defendant argued that the court's failure to hold a competency hearing at the time of trial was objectively unreasonable. *Id.* at 349.

In reviewing the trial court's decision, the Second Circuit noted that there was some evidence "to support the notion" of incompetency, but also "evidence to the contrary," and, moreover, "there was evidence suggesting [the defendant] had malingered in the past in order to bolster his legal arguments, and may have been doing so again." *Id.* at 355. Furthermore, the Second Circuit stated that the trial court "appeared to accept" the prosecution's suggestion that the defendant had been malingering. *Id*. at 353. Ultimately, the Second Circuit found that it was not unreasonable for the trial court to conclude that there was not reasonable ground to believe that the defendant may have been incompetent – even where defense counsel had requested a hearing, arguing that he could not effectively communicate with his client after his client was shot in the head; the suggestion of malingering came from the prosecutor, not a medical professional; the only medical professional to offer an opinion on the issue did not believe that the defendant had been malingering; and the trial court did not state on the record that it was relying on the suggestion of malingering. *Id.* at 335, 353-55.

In this case, the suggestion that Musaid feigned his ignorance of basic legal concepts came from medical staff rather than the prosecutor, making it even more persuasive evidence. (*See* Kunz Report at 4, 10; Saraiya Report at 7.) In addition, Musaid, like the defendant in *Harris*, wished to have his confession suppressed (or at least disbelieved by the jury), so feigning incompetency could be seen to support his position.

117

On the other hand, feigning incompetency could be seen as diametrically opposed to Musaid's litigation goals. Musaid consistently opposed being found incompetent and wished to proceed to trial; so much so that he twice opposed Mid-Hudson's applications for orders of retention, which would have kept him out of jail and in the hospital. (Pet. Ex. at 18, 21.) Feigning incompetency could thus be seen as evidence that he did not understand the proceedings against him. If he understood that being found incompetent would work against his goal of being found competent and proceeding to trial, it would make no sense to feign incompetency.

Given the varied reasonable inferences that could be drawn from Musaid's behavior and comments, his seeming confusion about basic trial procedures ("What is trial?"; "The jurors?") do not make it objectively unreasonable for Justice Carro to have concluded that there was not reasonable ground to believe that Musaid may have been incompetent. The transcripts simply do not reveal whether, with those two comments, Musaid was truly expressing confusion or simply did not hear the court and was thus seeking clarification, or whether there was an issue with interpretation. The transcripts rarely indicate when the interpreter had translated for Musaid versus when Musaid interjected without a translation, or when he replied through the interpreter or spoke English for himself. Under the circumstances, the two queries by Musaid exemplify why deference to the trial court, who observed the nuances of the proceedings first hand, is appropriate. *See Nicks*, 955 F.2d at 168; *see also Harris*, 346 F.3d at 354 ("Based on the trial transcript alone, we cannot determine whether [the defendant] was legitimately confused, or was simply uncooperative").

118

### ii.    Rejection Of Plea

Another notable comment by Musaid at the waiver hearing was his rejection of a hypothetical plea to not bear responsibility by reason of mental disease or defect.  While Musaid argues that he did not adequately waive his right to present a psychiatric defense at trial, it is undisputed that he clearly rejected the idea of accepting a plea of not responsible by reason of mental disease or defect.  (Appellate Br. at 58.)  He stated so repeatedly at the hearing.  (Pretrial Tr. 3-4.)  That position alone raises red flags about his ability to understand the proceedings against him and assist in his own defense in a way that would achieve his desired outcome – to be released.  Upon accepting a plea of not responsible by reason of mental disease or defect, he could have been released soon after demonstrating that he was no longer suffering a mental illness.  N.Y. Crim. Proc. L. § 330.20(2), (6), (8)-(13).  If he was in fact competent and not suffering a mental illness, not accepting a not responsible by reason of insanity plea would have worked directly against his own stated interests.

On the other hand, he had previously been found fit while acknowledging that his confession was evidence against him and still saying that he would not consider an insanity plea.  (Mortiere Report at 6-7.)  Furthermore, there could have been many reasons besides not understanding the proceedings against him for not wanting to accept a not responsible by reason of mental disease or defect plea.  For example, he could have been concerned that he would not be able to demonstrate that he was not suffering a mental illness and thus be committed for a considerable amount of time; he may have been unwilling to take any plea that conceded that he committed the homicide, even if not criminally culpable; or he may have thought the State could not meet its burden at trial and preferred being found not guilty and released immediately.

119

With so many possible interpretations, the Court cannot say that Musaid's rejection of a hypothetical insanity plea made it objectively unreasonable not to believe there was reasonable ground to believe that he may have been incompetent. *Harris*, 346 F.3d at 355. Again, the Court must defer to the trial court, who was in a better position to observe the nuances of the proceedings, that there was no reasonable ground to doubt Musaid's competency, unless Petitioner were to present clear and convincing evidence to the contrary, which he has not. *See Vamos*, 797 F.2d at 1150; *Harris*, 346 F.3d at 350, 355.

### iii.    Assertion Of Innocence

Rejecting a plea alone does not create reasonable ground to believe that a defendant may be incompetent. *See United States v. Wolfson*, 616 F. Supp. 2d 398, 417 (S.D.N.Y. 2008) ("vacillation on whether to accept a guilty plea, particularly for a defendant who protests his innocence as a matter of law, does not establish incompetence"). In Musaid's case, however, numerous medical reports indicate that his fixed beliefs in his innocence and that he might simply be released at any moment prevented him from understanding the proceedings against him and assisting in his own defense. (Gordon Report at 8; Rosner Report at 4-5; Nichols-Goldstein Report at 5; Schneider Report at 4; Saraiya Report at 7; RH 20-21.) The Court must thus examine whether Musaid's expressions of innocence at the waiver hearing rose to a level that would have made it objectively unreasonable to conclude that there was not reasonable ground to believe that Musaid may have been incompetent.

At the hearing, Musaid expressed his innocence directly ("I'm innocent") and in terms that seemed to express bewilderment about why he was being detained at all and a belief that he might simply be released ("I didn't do it. I don't understand. I don't know what happened"; "If they don't uncuff me to let me go in the street I will go for trial").

120

(Pretrial Tr. 4-5, 8.)  While those expressions are consistent with interviews where Musaid had been found unfit, he had also been found fit while continuing to assert that there was no evidence against him.  (Kunz Report at 8; Mortiere Report at 7; Ciric Report at 11.)

Moreover, there are multiple reasonable interpretations of Musaid's assertion of innocence at the hearing, and where there are two possible views of evidence of competency, a court's choice between them cannot be considered objectively unreasonable.  *Nichols*, 56 F.3d at 411.  Musaid could have been professing his innocence because he believed he was in fact innocent; he also could have been professing his innocence not because he believed it to be true but rather as a tactic to sway the judge.  That is consistent with comments he had made in several of his psychiatric interviews, where he expressed a belief that the judge decided guilt or innocence, possibly in conjunction with the jury.  (Kunz Report at 6; Nichols-Goldstein Report at 3; Schneider Report at 3; Saraiya report at 3-4.)  That explanation is not entirely satisfying as it could indicate that Musaid misunderstood basic trial procedures.  On the other hand, Musaid had been found fit while expressing that same confusion (Kunz Report at 6), and it was never cited as a significant factor when Musaid had been found unfit.  (Nichols-Goldstein Report; Schneider Report; Saraiya Report.)  Once again, the Court must defer to the trial judge, who was in a position to observe Musaid and draw conclusions based on the totality of circumstances.  *See Nicks*, 955 F.2d at 168.

### iv.    Further Ignorance Of Trial Procedures

At the very end of the hearing, Musaid made a comment suggesting that he did not understand the purpose of the hearing.  Once the waiver issue had been decided and a trial date was set, Justice Carro told Musaid that, "Once the jury decides[,] we'll find out whether you are going home or – ," but Musaid interjected, asking, "What will decide?

121

What is the decision?" (Pretrial Tr. 8.) Musaid's apparent bewilderment about the basic nature of the proceeding is concerning. It is consistent with Dr. Rivas's testimony that Musaid believed that the first retention hearing was not to determine his competency but to decide if he would simply be released. (RH 20.)

However, like his comments from early in the hearing that could be read to indicate confusion ("What is trial?"; "The jurors?"), the Court cannot glean the meaning of these comments from the transcript. Musaid could have been seeking clarification, jumping in before waiting for his interpreter to translate, or something else. The Court cannot say. Justice Carro was in a better position to interpret the meaning of Musaid's questions and apparently did not interpret them to indicate incompetency. *Nicks*, 955 F.2d at 168. Defense counsel did not seek further inquiry into Musaid's fitness, providing further evidence that his questions did not cast doubt on his competency. *See Vamos*, 797 F.2d at 1150. And, it appears that Justice Carro cleared up any possible confusion. He told Musaid that the jury would decide "[w]hether you are guilty or not guilty," and Musaid's response suggested that he understood that the jury would decide the case, even if still indicating some confusion about the role of the judge. "Tell them I didn't kill anyone," he said. (Pretrial Tr. 8.)

### v. Denial Of Weighty Evidence Against Him

While imploring Justice Carro to convey his innocence to the jury, Musaid made perhaps his most concerning statement during the hearing, continuing to express a belief that there was no evidence against him: "My case, there is no evidence, no witness, no nothing. No evidence." (Pretrial Tr. 8.) Of course, Musaid had been found fit in the past when insisting that there was no evidence against him, including in his final fitness examinations. (Kunz Report at 8; Mortiere Report at 7; Ciric Report at 11.) However,

122

something important had changed since then – the DNA comparison had been conducted (*See* 2T 319), and the final psychological examinations finding him fit depended in part on him considering that evidence against him. (Ciric Report at 11.) If Musaid and Justice Carro were aware of the results of the DNA comparison, it may have been objectively unreasonable for Justice Carro not to pause the proceedings and inquire about whether Musaid understood that the result of the DNA comparison was evidence against him and that he would have to grapple with that evidence at trial. *See Panetti*, 551 U.S. 930, 953 (2007) (habeas court may find unreasonable application of "even a general [legal] standard," even under unique facts).

However, the Court cannot say for sure that Musaid knew about the DNA evidence at that juncture, let alone whether, if he had, that Justice Carro had been made aware of that fact. As noted, the Court can only consider evidence of which Justice Carro had been made aware. *Nicks*, 955 F.2d at 168. Again, defense counsel Herlich would have been in the best position to convey that information to Justice Carro, but he made no motion for a competency hearing – at this juncture, or at any point during the waiver hearing – again providing evidence to believe that Musaid was competent at that juncture. *Vamos*, 797 F.2d at 1150.

For all of the foregoing reasons, the Court cannot say that it was an objectively unreasonable determination of the facts or application of Supreme Court precedent for Justice Carro to believe that there was not reasonable ground to believe that Musaid may have been incompetent based on his behavior at the waiver hearing, even in conjunction with his past medical reports and other relevant evidence. *See Harris*, 346 F.3d at 355.

### d.    At Trial

Musaid argues that his behavior at trial provided reasonable grounds to believe that he may not have been fit to proceed, thus requiring Justice Carro to hold a competency hearing.  (Appellate Br. at 45-52; Reply Br. at 42-49.)  Musaid points to his expressions of somatic delusions and falling to the floor; conspiratorial thinking about abuse by the guards; insistence on his innocence and minimization of the evidence against him; and his apparent bewilderment about the trial process.  (Appellate Br. at 45-52; Reply Br. at 42-49.)

Musaid did indeed exhibit all of those behaviors during trial, which had all been previously found to contribute to his incompetency.  (Erba Report at 5; Garakani Report at 4; Gordon Report at 8; Rosner Report at 4; Nichols-Goldstein Report at 5; Schneider Report at 5; Schneider Report at 6; Saraiya Report at 7; RH 13, 15-16, 20.)  However, when Musaid expressed those symptoms at trial, Justice Carro consistently was able to redirect him back to the proceedings, which had previously been found to be evidence of his fitness.  (*E.g.*, Ciric Report at 10.)  In addition, some of his behavior during trial itself exhibited an ability to understand the proceedings against him and consult with his lawyer.  For those reasons, the Court cannot say that it was objectively unreasonable to conclude that there was no reasonable ground to believe that Musaid may have been incompetent.  *Harris*, 346 F.3d at 355 (finding that where there was some evidence of competency, but some evidence of incompetency, Court could not conclude that it was objectively unreasonable not to hold competency hearing).  A review of the record of Musaid's conduct during trial demonstrates why that is so.

### i.    Time In DOC Custody And Medication

A premise to Petitioner's argument that a competency hearing was required at the time of trial was that Musaid had previously lapsed into incompetency after six months of being returned to DOC custody from psychiatric hospitals; by the time of trial, Musaid had been in DOC custody for nearly fourteen months; and thus the "full-blown" symptoms he exhibited at trial was strong evidence of his incompetency.  (Reply Br. at 45.)

It is true that after the first, second, and third times that Musaid was found fit at Kirby and then returned to DOC custody, he soon deteriorated and was found unfit again. (Hicks Report at 2; Pet. Ex. at 12; Schneider Report II at 5; RH 21.)  On each of those occasions, however, Musaid had discontinued taking his psychiatric medication.  (RH 21; *see also* Hicks Report at 2; Schneider Report II at 5.)  Conversely, it is undisputed that Musaid improved when compliant with his medication.  (Shoss Report at 3, 6; Kunz Report at 4; Mortiere Report at 4, 7.)  Doctors thus repeatedly indicated that Musaid's continuing his medication when returned to DOC custody would be critical to him remaining fit to proceed to trial (Shoss at 6; Kunz Report at 9; Mortiere Report at 8).

Nothing in the record indicates that Musaid had not been taking his medication while awaiting trial.  To the contrary, if anything, the record suggests that by the time of his final evaluations Musaid had become compliant with his daily medication, even while at Rikers awaiting trial.  (Ciric Report at 10.)  On the first day of trial, Musaid said to Justice Carro, "Your Honor, they didn't give me my medication.  I didn't take anything this morning.…  They supposed to give me medication with the food and make me stiff and maybe me trembling."  (1T 165.)  Although Musaid's comment suggests that he missed a dose that morning, Justice Carro said that Musaid would be given his medication.  (1T 165.)  Justice Carro could have reasonably inferred from Musaid's comment that he was

eager to take his medication and had remained compliant.  The record does not reflect whether Justice Carro made such an inference, but the point is that he would have had a reasonable basis for doing so.

Regardless, what matters is not the length of time that Musaid was at Rikers but rather the manifestation of his symptoms at trial and the Court's conclusions in that regard.  The Court therefore does not attribute any particular significance to the length of time Musaid spent in DOC custody prior to trial.   Instead, the Court analyzes the expressions of Musaid's symptoms at trial based on their severity and context as captured in the record.

### ii.    Day One

On the first day of trial, before the jury entered the courtroom, Musaid engaged in a long colloquy with the court, exhibiting many of the symptoms that had previously contributed to findings that he was unfit.  He expressed somatic delusions, saying that his heart, lungs, kidney, arm, vertebrae, ribs, fingers, spine, thumb, and feet were all damaged.  (1T 162-63.)  He repeated conspiratorial thinking, stating that the police were beating him.  (1T 162-63.)  He expressed his innocence, stating that he didn't kill anyone, and expressed disbelief in the evidence against him, stating that he didn't have a gun and didn't know Noman Alsamet, the victim's brother.  (1T 164.)  Finally, he brought up the issue of his medication, noting that he had not received it that morning.  (1T 165.)  Justice Carro told Musaid he would receive his medication, and instructed him to be quiet because the jury was coming in.  (1T 164-65.)

After the jury entered, Musaid followed Justice Carro's instructions to remain quiet and did not make any recorded comments for the entirety of the State's opening statement or the testimony of the first two witnesses.  (1T 165 to 2T 35.)  After the testimony of the

second witness – Omar Hadwan, who placed Musaid at the scene of the crime – Musaid said, in the presence of the jury, "Judge, Judge, he's lying.  He's lying."  (2T 35.)  That comment – even if inappropriate to make at that juncture – can be taken as evidence of Musaid's ability to understand the proceedings, i.e., he understood that the testimony was evidence against him and that he needed to rebut it.

After the jury was dismissed, the court, prosecution, and defense counsel discussed Musaid's competency and the comments he had made that morning before trial started.   Justice Carro again expressed his belief that Musaid was malingering, stating that Musaid's expression of his somatic delusions and conspiratorial thinking were some sort of "strategy" that Musaid had been deploying since "day one" to achieve a goal, perhaps "some kind of bail conditions."  (2T 36.)

Justice Carro's comments that Musaid had been malingering since "day one," are somewhat troubling as they are not consistent with Justice Carro's and the experts' previous determinations finding Musaid unfit based on display of the same or similar somatic delusions.   (*See* Mortiere Report at 7 (evidence of malingering somatic delusions); Schneider Report II at 6 (subsequently deeming Musaid unfit while he expressed somatic delusions); Pet. Ex. at 16 (Justice Carro subsequently adjudicating Musaid incompetent.).)  And even if Musaid was feigning his symptoms, the feigning itself does not necessarily mean that Musaid was competent.  *See Pena v. Graham*, No. 08-CV-3828, 2009 WL 5173819, at \*12 (S.D.N.Y. Dec. 30, 2009) ("A determination that Petitioner was malingering does not equate with a finding that Petitioner was competent to stand trial").

127

That said, the relevant issue is not the consistency of Justice Carro's subjective conclusions about Musaid's malingering (which, as noted, deserve great deference), but rather whether it was objectively unreasonable to conclude, at that juncture, that there was no reasonable ground to believe that Musaid may have been incompetent based on his somatic delusions and other symptoms, malingered or not. Again, based on the record here, the Court cannot say that it was objectively unreasonable to conclude that there was no such ground.

Even when Musaid exhibited somatic delusions during his clinical evaluations, he had been found fit where he was able to be redirected to his criminal case, and that is apparently exactly what happened on the first day of trial. In the colloquy about Musaid's competency and his early-morning comments, prosecutor Bogdanos stated that Musaid had been engaged throughout the morning's proceedings, understood what was going on the entire time, advised his attorney Herlich on what to do and not do, and provided a running commentary, in English, on every witness. (2T 36-37.) While the State's comments could be seen as self-serving, the Court assumes that if Bogandos made any inaccurate representations, the court or defense attorney would have corrected the record. They did not. The comments are thus evidence of Musaid's ability to understand the proceedings against him and assist in his own defense during trial.

For his part, Herlich mentioned that the somatic delusions were a symptom of Musaid's schizophrenia but did not go so far as to suggest that his expression of them at trial indicated incompetency; and, mental illness alone does not indicate incompetency. *Nichols*, 56 F.3d at 412. (2T 37.) Herlich's failure to raise the issue of possible

128

incompetency again provides substantial evidence to believe that Musaid was competent at that juncture. *Vamos*, 797 F.2d at 1150.

Following the jury's return, Musaid sat through the testimony of five straight witnesses with no recorded interjections for the remainder of the day. (2T 54-134.) After the jury was dismissed, Musaid "took a soft landing" on the floor, which he had previously done when found unfit (2T 134, 379-80; Nichols-Goldstein Report at 5), but no further comments were recorded. (The court will discuss the import of Musaid's falling to the floor below, where it occurs again below.)

### iii.    Day Two

On the start of the trial's second day, Musaid again expressed somatic delusions and insisted on his innocence outside of the presence of the jury, adding that he wanted to go home by Monday. (2T 137-39.) That display could be viewed as a delusion about the proceedings and firm belief in his innocence, but once again, Justice Carro succeeded in refocusing Musaid on the proceedings. Justice Carro told Musaid to be quiet and not disrupt the proceeding, then brought in the jury, and Musaid sat without making another recorded interjection for the entire first half of the day, throughout the testimony of four straight witnesses. (2T 137-192.)

Musaid then made statements about the testimony of two witnesses indicating that he was closely attuned to and understood what was happening at the proceedings. After the lunch recess, Musaid asked a question about the testimony of the last witness to testify before lunch – the officer who had arrested Musaid at the Kennedy Fried Chicken. Musaid asked Justice Carro what "Omar" had said about him. (2T 194.) Justice Carro interpreted that to be a question about what *Oumar* Diallo had said about him. (2T 194.) If that is what Musaid was asking about, his comment is evidence of fairly sharp insight

129

into the proceedings.  Oumar Diallo was the person who had flagged down the police to tell them that Musaid was in the Kennedy Fried Chicken.  By focusing on what Oumar had said, Musaid was thus zeroing in on how the hearsay statement of a non-testifying witness would be used against him.

The next witness was Detective Killen, who had questioned Musaid and transcribed his confession.  During Detective Killen's testimony, Musaid made two more comments indicating his ability to follow the proceedings.  First, when Detective Killen stated that Musaid had last returned to Yemen in 1999, Musaid interjected to say that Detective Killen was lying.  (2T 215.)  Detective Killen then checked his notes and corrected the date to 2003.  (2T 215.)

Second, and more incisively, when Detective Killen testified that he had written down Musaid's answers to his questions, Musaid interrupted him to say that Detective Killen was lying and asked the detective if he had a tape recorder.  (2T 220-21.)  Although Musaid's interjection was not appropriate court procedure, it evinces his competency. Musaid's comment on Detective Killen's veracity demonstrates that Musaid remembered the interview and the substance of the written statement, thus indicating knowledge of the factual basis of the charges against him.  His comment also shows that he understood that the statement was powerful evidence against him that he needed to rebut, and even that he had a strategy to rebut it – i.e., to ask why there was no recording.

After that interaction, Musaid sat quietly for the rest of the day through three more witnesses.  (2T 237-90.)  Before the jury left for the day, however, Musaid flopped to the floor and, as he was being carried out of the courtroom, screamed that he was innocent. (2T 290-91.)  That conduct is notable for being the most extreme recorded expression of

his symptoms in front the jury. After the jury was dismissed, Justice Carro, Bogdanos, and Herlich discussed the incident.

Justice Carro stated his belief that it had been "pretty clear for years now" that Musaid's behavior was "intentional." (2T 291.) As with Musaid's expressions of his somatic delusions, that conclusion is supported by earlier medical evaluations in which Musaid, while competent, commented about a time when he had been found incompetent and acknowledged that he had intentinally fallen to the floor not because he was in pain but because he was upset about how his legal case was proceeding. (Mortiere Report at 6.)

Here too, reasonable inferences about Musaid'scompetency or incompetency can be drawn from his flopping to the floor, whether malingering or not. Musaid fell to the floor in front of the jury. He might have done so with the strategic goal of influencing them, perhaps into believing that his confession was not true but the result of a weak mind succumbing to pressure. He might have done so strategically to make the jury think he was not in his right mind, although that would not necessarily cohere with his having declined to defend on the basis of not responsible by reason of insanity. Or, he in fact may not have been in his right mind. Herlich, however, did not make that argument, at least not on the record. And without Herlich suggesting that Musaid's conduct should have been reasonable ground to believe that Musaid may not have been competent, there was substantial evidence to believe that Musaid was competent at that juncture. *Vamos*, 797 F.2d at 1150. Once again, even if this Court might reach a different conclusion, it must defer to the trial court given the multitude of reasonable inferences that could be drawn.

131

### iv. Day Three

At the start of the third day of trial, Musaid again expressed somatic delusions, his belief in his innocence, and a desire to go home. (2T 392-93.) Justice Carro said that he did not know why Musaid was telling him about his innocence. (2T 293.) That could have had to do with Musaid's mistaken belief that the Judge, possibly in conjunction with the jury, decided guilt or innocence. (Kunz Report at 6; Nichols-Goldstein Report at 3; Schneider Report at 3; Saraiya report at 3-4.) But, as discussed, Musaid previously had been held competent while expressing that confusion. (Kunz Report at 6.) Regardless, Justice Carro again was able to redirect Musaid back to the case, reminding him that the jury would decide his fate. (2T 293.) After the jury was brought back in, Musaid remained largely silent for the state's final witnesses, interjecting only once to object to something the interpreter had done. (2T 294-367, 347.)

The State then rested its case, the jury took a break for recess, and the parties discussed whether Musaid would testify. (2T 368-75.) Musaid's comments during that discussion showed some confusion about the proceedings and fixation on irrelevant issues. He wanted to read the jury a statement he had written about his prior attorney taking his money and incidents he had had with corrections officers and medical staff, distractions that had contributed to his being found incompetent in the past. (2T 368-69; Erba Report at 4-5; Garakani Report at 4; RH 34-35.)

In the midst of that discussion, he also made the following comments: "What happened about my case anyway?," "What happened about my case right now?," and "You're not going to let me go home?" Those comments could be interpreted as Musaid not understanding the proceedings against him on a very basic level, i.e., not understanding that his criminal case had not concluded. However, they could also be

132

understood as questions about why the jury had left the courtroom and a break had been taken.  If Musaid thought the jury had been dismissed for good, he may have thought a decision had been reached and he should be let go.  Once again, Justice Carro was in a better position to interpret the meaning of those comments, *Vamos*, 797 F.2d at 1150; where there are two reasonable interpretations, the trial court's interpretation of them cannot be said to be unreasonable, *Nichols*, 56 F.3d at 411; and the fact that Herlich did not argue that Musaid was incompetent at that juncture is substantial evidence that he was not, *Vamos*, 797 F.2d at 1150.

Throughout the discussion about whether Musaid would testify, he also repeatedly stated that he was innocent and attacked the evidence against him, arguing that he did not sign the written statement and there was no recorded confession.  (2T 372.)  While those comments may not have been appropriately addressed to Justice Carro, they again indicate an understanding of the factual basis of the charges against him and need to rebut devastating evidence.

At the end of the discussion, Musaid said that he wanted to testify, but after a discussion of the fact that he would be cross-examined by the prosecution, he decided not to, again indicating a degree of understanding the proceedings, i.e., the dangers of being cross-examined.  (2T 373.)  Ultimately, Herlich explained that if Musaid took the stand, he would have refuted the written statement and stated that he remembered nothing about the date the statement was given.  It is concerning that Musaid may not have remembered the interview, but again, his ability to think of ways to rebut the statement indicated an understanding of the proceedings.  After the jury left for the day, he once again proclaimed his innocence and fell to the floor.  (2T 379-80.)

### v.    Day Four

During summations, Musaid remained largely silent, interjecting only three times to assert that Bogdanos was lying or that his statements were not true.  (2T 433, 438, 440.)  After the jury retired to deliberations, Musaid once again told Justice Carro that he was innocent.  (2T 442.)

After the jury returned, Musaid was silent while the jury read its verdict of guilty on both counts, and each juror confirmed that that was their verdict.  (466-67.)  After the jury was dismissed, however, Musaid once again expressed his innocence: "I'm not guilty, Judge."  (2T 468.)  Musaid also made several comments that could be seen to indicate bewilderment about court procedures: "What happened now?  What happened now, Judge? …  I'm not guilty.  What happened, Judge?  I want to do trial again.  I want to do trial again."  (2T 468.)  Of course, the same comments could simply indicate Musaid's displeasure with the jury's verdict.

### vi.    Conclusion About Musaid's Behavior At Trial

When viewing the record of Musaid's behavior at trial as a whole, there is certainly evidence to suggest that Musaid may have been incompetent.  He expressed many of the same symptoms that had contributed to him being found incompetent in the past, including somatic delusions, conspiratorial thinking, a fixation on his innocence, and minimization of the evidence against him.  The trial court, however, was consistently able to redirect him back to the legal proceedings, which had supported his findings of fitness in the past.  In addition, some of Musaid's behavior at trial can be taken as evidence that he understood the proceedings against him and could assist in his own defense, including his running commentary on witnesses, his correction of a date, his zeroing in on a possible hearsay statement, and his attacks on his confession.

134

When, as here, there is some evidence of incompetency, but also some evidence of incompetency, it is not objectively unreasonable to conclude that there was not reasonable ground to believe that a defendant may have been incompetent. *Harris*, 346 F.3d at 355. Additionally, at no point during trial did defense counsel raise the issue of competency, providing additional substantial evidence that Musaid was not incompetent during trial. *Vamos*, 797 F.2d at 1150. Affording the proper deference to the trial court under Second Circuit precedent, the Court thus cannot say that it was an objectively unreasonable determination of the facts or application of clearly established Supreme Court precedent for Justice Carro not to conclude that there was reasonable ground to believe that Musaid may have been incompetent during trial. *See Harris*, 346 F.3d at 355.

### e.   At Sentencing

Just as the State may not put an incompetent person to trial, the state may not sentence an incompetent person, and the trial court's ongoing duty to ensure that an incompetent person is not prosecuted extends to sentencing. *Mata*, 614 F. App'x at 35; *United States v. Arenburg*, 605 F.3d 164, 171 (2d Cir. 2010). At sentencing, Musaid largely expressed the same symptoms he had at trial – somatic delusions, belief in his innocence, and conspiratorial thinking. (Sentencing Tr. 6.) The Court thus need not rehash its analysis of the meaning of each. Suffice it to say that at sentencing, defense counsel did not raise those symptoms as evidence of incompetency, and deference is owed to the trial court on whether they rose to the level of rendering Musaid incompetent. *See Vamos*, 797 F.2d at 1150; *Harris*, 346 F.3d at 355.

Herlich did mention his belief that the final competency determination was contingent on Musaid considering a negotiated plea, but he did not squarely say that a

135

plea was offered or that Musaid had refused to consider it, instead shifting to discussing Musaid's rejection of a psychiatric defense. (Sentencing Tr. 4-5.) The issue of whether Musaid refused to consider a plea after learning of the results of the DNA comparison, undermining the conclusions of the final examination reports, was thus once again not placed before Justice Carro.

As at trial, Herlich did not request a competency hearing. Unlike at trial, however, Herlich directly questioned Musaid's present competency. He noted that one component of fitness is the ability to assist in your own defense, and said that, "that's an open question that I have because he's not, I'll put it this way, not unique in the situation but he's pretty much refused or opposed any kind of legal advice or assistance I could have accorded him prior to trial, during and after the trial." (Sentencing Tr. 5.)

Defense counsel's representation, however, is not dispositive on whether there is reasonable ground to believe that a competency hearing is required. *Harris*, 346 F.3d at 355 ("[I]t is indisputable that courts are not required to accept the representations of defense counsel without question. On the contrary, such representations are merely one factor to be considered by the court, including, in this case, the court's own observation of the defendant's conduct…."). Here, as in *Harris*, the court was able to observe the defendant and directly addressed the issue of competency.

In a comment somewhat at odds with Justice Carro's statements during trial that Musaid's symptoms were calculated and intentional tactics to achieve a desired outcome, at sentencing, Justice Carro said that, "Clearly, the defendant does suffer some psychiatric issue." (Sentencing Tr. 7.) If Justice Carro believed that those psychiatric issues raised reasonable ground to believe that Mr. Musaid may have been incompetent

136

– either at trial or at the sentencing hearing – but did not hold a competency hearing because he had found Musaid competent before trial, that would be an unreasonable application of clearly established Supreme Court precedent.  *See Smith*, 554 F. Supp. 2d at 512; *see also Arenburg*, 605 F.3d at 169.

But Justice Carro's next comment shows that he had no doubt about Mr. Musaid's fitness for trial: "however, he certainly was fit for trial."  (Sentencing Tr. 7.)  Although that statement does not speak directly to Musaid's competency at sentencing, there is nothing in the transcript to distinguish Musaid's behavior at sentencing from his behavior at trial. Defense counsel did not argue otherwise.

In sum, Justice Carro had no reason to believe that Musaid was any less competent during sentencing than he had been for trial.  Affording proper deference to the trial court's observations and assessment of Mr. Musaid's competency, the Court cannot say that it was an objectively unreasonable determination of the facts or application of clearly established Supreme Court precedent to believe that there was not reasonable ground to believe that Musaid may have been incompetent at sentencing. *See Harris*, 346 F.3d at 350, 355-56.

## D.    Waiver Of Psychiatric Defense

On direct appeal, Musaid argued that a trial court "must sufficiently establish that [a] defendant knowingly, voluntarily[,] and intelligently waive[s] his right to pursue an insanity defense," and that Justice Carro insufficiently inquired into Musaid's waiver of his insanity defense.  (Appellate Br. at 56-59.)  For the proposition that trial courts have such a duty, Musaid relied on two New York State cases.  (Appellate Br. at 56-57.)  Neither case affirmatively states that such a duty exists but found that the defendants' waivers

137

were adequate where "[t]he court fully informed defendant of his right to raise the affirmative defense" and "[d]efendant was fully informed of the consequences of his decision to abandon an insanity defense." *People v. Ciborowski*, 302 A.D.2d 620, 622, 755 N.Y.S.2d 113, 115 (3d Dep't 2003); *People v. Morton*, 173 A.D.2d 1081, 1085, 570 N.Y.S.2d 846, 849 (3d Dep't 1991). Musaid's supplemental letter seeking leave to appeal to the Court of Appeals focused exclusively on waiver rather than competency. (Resp. Ex. D.) But Musaid's brief in support of the instant petition conflates the two into an argument that Musaid was not competent at the time of the waiver hearing, an argument the Court discussed at length above. (Reply Br. at 51-54.)

That conflation makes sense because, under the federal Constitution, there is no clearly established duty for a trial court to sufficiently establish that a defendant knowingly, voluntarily, and intelligently waives his right to pursue an insanity defense. *Melcher v. Holland*, No. 12-CV-544, 2014 WL 31359, at *20 (N.D. Cal. Jan. 3, 2014) ("no Supreme Court authority addresses the type of inquiry that a trial court must make in accepting a defendant's waiver of an insanity defense"). Indeed, "while the Due Process Clause affords an incompetent defendant the right not to be tried, [the Supreme Court has] not said that the Constitution requires the States to recognize the insanity defense." *Medina*, 505 U.S. at 449.

Of course, Musaid was free to ask the New York Court of Appeals to recognize a right under the New York State constitution that had not yet been recognized under the federal constitution. William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harvard L. Rev. 489 (1977). After all, there is a rich tradition of state high courts finding that state constitutions protect a greater swath of rights than does the

138

federal constitution.  *See, e.g.*, *People v. Gordon*, 36 N.Y.3d 420, 436, 142 N.Y.S.3d 440, 451 (2021) (finding that the state constitution protects a greater right to privacy than does the federal constitution); *People v. Scott*, 79 N.Y.2d 474, 491, 583 N.Y.S.2d 920, 930 (1992) (same).

On habeas review, however, the Court can grant a petition only where a state court decision was an objectively unreasonable determination of the facts or application of clearly established federal law, and the Supreme Court has repeatedly stated that it is not an unreasonable application of clearly established federal law for a state court to decline to enforce a rule that has not been clearly established by the Supreme Court.  28 U.S.C. § 2254; *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

Musaid tries to argue that the right he seeks to enforce here – that a defendant must knowingly and intelligently waive his right to present a psychiatric defense – is derivative of the right recognized in *Faretta v. California*, i.e., that a court must satisfy itself that a defendant's waiver of his right to counsel is knowing and intelligent.  *See Faretta v. California*, 422 U.S. 806, 835 (1975).  (Reply Br. at 49-50.)

There is some logic to that argument since, in waiving an affirmative defense, a defendant takes a degree of control of his own defense.  The Second Circuit, however, has squarely rejected the idea that declining an affirmative defense is akin to rejecting the right to counsel and thus requires a knowingly and voluntary waiver.  *Petrovich v. Leonardo*, 229 F.3d 384, 3856 (2d Cir. 2000) ("We reject the analogy to the decision to appear pro se; instead, we consider whether the waiver of the defense was a trial strategy decision that counsel should have been permitted to make, or whether it was a fundamental decision for the defendant alone.  We conclude that the decision was for [the

defendant] to make, and that the trial court's inquiry, which was less searching than would be needed if [the defendant] had elected to proceed without counsel, was nevertheless sufficient.").

Petrovich is slightly distinguishable from the facts here because, in Petrovich, the defendant waived the affirmative defense after trial, in the context of declining a jury charge. Id. at 385. By contrast, Musaid also declined to put evidence of his mental disease or defect before the jury. (Pretrial Tr.). In addition, a footnote in a district court case from the District of Columbia suggests that a procedure similar to a Faretta hearing is required to waive a psychiatric defense. United States v. Robertson, 430 F. Supp. 444, 447 n.4 (D.D.C. 1977). On the other hand, the Seventh Circuit has held that a defendant's silence was sufficient to waive an insanity plea. Weber v. Israel, 730 F.2d 499, 507 (7th Cir. 1984). Those varied outcomes only further demonstrate the absence of clearly established Supreme Court precedent that a trial court must obtain a knowing and voluntary waiver of a psychiatric defense, similar to a Faretta waiver. In that respect, the Appellate Division's decision in this case was correct when it noted that Justice Carro "was not required to conduct an inquiry analogous to the procedure for accepting a defendant's waiver of the right to counsel." Musaid, 168 A.D.3d at 527, 91 N.Y.S.3d at 95.

In his appellate brief, Petitioner also argues that it was not clear that he had waived his psychiatric defense at all due to confusion between waiver of an insanity defense versus rejection of an insanity plea. (Appellate Br. at 58.) The record demonstrates otherwise. (Pretrial Tr. 4-5 (Herlich consulted with Musaid and stated that Musaid

140

rejected a psychiatric defense as well as plea, and the prosecutor and court confirmed on the record that they had overhead Musaid say he "refuse[d]").)

No specific inquiry about Musaid's waiver of an insanity defense was required under clearly established Supreme Court precedent.  The state court decisions upholding Musaid's waiver of his psychiatric defense thus were not objectively unreasonable determinations of the fact or applications of clearly established Supreme Court precedent.

## CONCLUSION AND OBJECTIONS

For all of the reasons explained above, the Court recommends that the petition be DENIED.  Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Analisa Torres, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007.  **Failure to file timely objections will result in a waiver of objections and will preclude appellate review.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: July 20, 2021
       New York, New York

Copies transmitted this date to all counsel of record.

141